No. 4:10-mc-00202

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

KERRY DIMART ALLEN,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
351st District Court of Harris County, Texas

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

**SETH KRETZER**                          **JONATHAN LANDERS**
SBN: 24043764                             SBN: 24070101

Two Post Oak Central                      2813 W. T.C. Jester
1980 Post Oak Blvd; Suite 1900           Houston, Texas 77018

Houston, TX 77056
(713) 775-3050 (office)                   (713) 301-3153 (Office)
(713) 623-0329 (fax)                      (713) 685-5020 (fax)

1

*email: seth@kretzerfirm.com*                    *e-mail: jlanders.law@gmail.com*

Court-Appointed Attorneys for the Petitioner

_____

## PETITION FOR WRIT OF HABEAS CORPUS

_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, KERRY DIMART ALLEN, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the 351st District Court of Harris County, Texas, cause number 844387 styled *State v. Kerry D. Allen.*

Allen is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number 844387 styled *State v. Kerry D. Allen.* (See, Exhibit "A").

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, KERRY DIMART ALLEN, certifies

that the following listed persons have an interest in the outcome of this case.  These

representations are made in order that this court may evaluate possible disqualifications or

recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Petitioner | | |
| Mr. Kerry D. Allen | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | Two Post Oak Central<br>1980 Post Oak Blvd.<br>Suite 1900<br>Houston, TX 77056 | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers<br><br>2813 W. T.C. Jester<br><br>Houston, Texas 77018<br><br>(713) 301-3153 – (cell)<br>(713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. R.P. "Skip" Cornelius | 2028 Buffalo Terrace<br><br>Houston, TX 77019 | Trial Counsel |
| Mr. Alvin Nunnery | 1900 North Loop West; 435<br><br>Houston, TX 77018 | Trial Counsel |
| Mr. Danny Karl Easterling | Easterling & Easterling<br>1018 Preston<br>6th Floor<br>Houston, TX 77002-1877<br>713-228-4441<br>Fax: 713-228-4072 | Second state writ lawyer |

4

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. Steve Morris | 1201 Franklin; 6th Floor<br>Houston, TX 77002<br>713-755-8330 – (office) | First state writ lawyer |
| Allen C. Isbell | 202 Travis<br>Houston, TX 77002<br>713-236-1000 (direct) | Direct appellate counsel |
| | | |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | Asst. Attorney General |
| Ms. Tomee Heining | Austin | Asst. Attorney General |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| *Judges* | | |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Honorable Mark Ellis | 351st District Court<br>1201 Franklin; 14th Floor<br>Houston, TX 77002 | Trial Judge |
| | | |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

### STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## CIRCUMSTANCES SURROUNDING THE FILING OF THIS PETITION

Allen's direct appeal to the Court of Criminal Appeals (CCA) was decided on June 11, 2003.  Allen's state writ was filed on January 8, 2003.  The state writ was pending until April 28, 2010, when the CCA ruled.  Allen's current deadline is therefore April 28, 2011.  28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

Under these incredibly short time strictures, Allen's habeas counsel, despite diligent efforts, have not yet managed to organize the voluminous record in Allen's case and have not had the opportunity to meaningfully review the record in any way. Moreover, counsel have not had the opportunity to conduct any independent investigation or develop a relationship of trust with Allen as required by the professional standards of capital defense attorneys.[1]

## PRIOR COUNSEL

On May 12, 2010, this court appointed Mr. Tom Moran of the law firm SCHNEIDER MCKINNEY as Allen's lawyer.  (Doc. No. 2).  However, Mr. Moran's CJA-30 voucher did not issue until June 23, 2010.  (Doc. No. 3).  On November 18, 2010, Allen wrote to the court

---

[1] *See* 2003 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and United States Supreme Court precedent adopting the ABA Guidelines.  *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), *Florida v. Nixon*, 543 U.S. 175, 191 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

requesting that Moran be relieved as his counsel.  (Doc. No. 5).   In support of his core contention that Mr. Moran had not been communicating with him, Allen attached several plaintive letters as exhibits. *Id*.

Mr. Moran was relieved on January 12. (Doc. No. 8).  Kretzer and Landers were appointed on January 24. (Doc. No. 11).  At the time of new counsel's appointment 271 days out of the 365 days allowed by the statute of limitations had passed.   Further, it is striking that neither Mr. Moran, nor any his predecessors as Allen's court-appointed lawyers, ever even so much as attempted to develop any claims outside the record.

## AN AMENDED PETITION WILL BE FORTHCOMING

Due to these circumstances, this initial petition should be considered a notice pleading that counsel has put together in good faith and in compliance with the relevant rules, using information that is true to the best of counsel's current knowledge and beliefs about the state court proceedings in this matter and the constitutional violations that occurred therein.  *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Court ("Habeas Rules") (outlining general requirements for a federal habeas petition's contents).  When filed, the amended petition will contain a complete and detailed analysis of the facts and law underlying each claim and will contain a detailed description of the factual background of the case, none of which was possible due to the time frame in which this petition was compiled.

## EXHAUSTION

Allen states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1]  Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum.

Allen expressly reserves his right to amend this petition.  In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition."  Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition.  *Id*. at 497-98.  Allen believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held.  At the appropriate time during these proceedings, Allen will present any additional claims through amendments to the petition.

## PROCEDURAL HISTORY

### A.    *Procedural History in State Court.*

---

[1] The burden is on Respondents to demonstrate that Holiday failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

10

In the complaint filed on May 12, 2000, Allen was charged with capital murder of an individual under six years of age alleged to have been committed on May 10, 2000. (C.R. Vol.1, p. 2) Appellant was arrested and held without bond.  Allen was indicted by a Harris County Grand Jury on August 24, 2000, in cause number 844387.  Allen was convicted in cause number 844387 and sentenced to death on May 5, 2001, upon the jury's answers to the special issues.

Allen's direct appeal to the Court of Criminal Appeals (CCA) was decided on June 11, 2003.  Allen's state writ was filed on January 8, 2003.  The state writ was pending until April 28, 2010, when the CCA ruled.

### B.      Procedural History in Federal Court.

Mr. Moran was relieved on January 12. (Doc. No. 8).  Kretzer and Landers were appointed on January 24. (Doc. No. 11).  On April 25, this Court entered a scheduling order upon a joint motion.  (Doc. No. 21).  Our amended petition is due October 31.

Since 2001, Allen has been confined in the Polunsky Unit, and previously the Ellis One Unit, by the Director of the Texas Department of Criminal Justice, and by the warden of the Polunsky Unit.

### Statement of Facts

[Statement of Facts will be provided in the Amended Writ]

### GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS

The following is an overview of capital punishment law in Texas.  This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty.  To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder.  For instance, kidnaping and then killing a person is a capital offense.  So is killing two people, rather than one.  Killing a police officer in his line of duty is a capital offense.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead attorney; the other is the second chair attorney.  Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge.  Death penalty jurisprudence is thick with constitutional and statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failure to do so means that the issues are waived for direct appeal.  Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

12

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense.  The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts.  Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors.  Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700.  Many jurors exercise certain allowable rights not to serve; others cannot be found.  On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order.  Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in

groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first.  If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.

The second method can be referred to as the pool method.  The goal is to create a pool of forty-eight death penalty qualified jurors.  Each juror is questioned by the parties individually. The court rules upon any challenges for cause by the State or Defense.  If the juror is not disqualified, then the juror is added to the pool in consecutive number.  When forty-eight are reached, the court designates a day for strikes.  Beginning with the first juror qualified, the State announces whether it will accept the juror or exercise one of its peremptory challenges.  If not, the Court turns to the Defense, which announces whether it will accept the juror or use a strike.

14

If the juror is not struck by either, then the juror joins the petit jury.  The process ceases when twelve jurors and two alternates are seated.  *See Rousseau v. State*, 824 S.W.2d 579, 582 n.4 (Tex. Crim. App. 1992), *aff'd,* 855 S.W.2d 666, *cert. denied*, 510 U.S. 919 (1993).

Both prosecutors and defense attorneys generally prefer the pool method.  Both sides can exercise their strikes intelligently, eliminating the jurors at the extremes based on their death penalty views.  This method benefits the defense by allowing identification of each of the *Morgan v. Illinois* jurors who managed to escape a cause challenge, before using any strikes.  (In *Morgan v. Illinois*, the Supreme Court held that a juror who would automatically impose the death penalty for a capital murder regardless of the mitigating circumstances may be removed for cause.  *See* 112 S. Ct. 2222 (1992).)

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues.  The questions have varied over the years.

The method of answering the special issues is complicated.  If the jurors unanimously answer all three questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the

15

defendant is sentenced automatically to life in prison.  There is no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

In a non-capital case, jurors are informed of the effects of parole.  In 1990, Texans amended the state constitution to require juries to be informed when a defendant becomes eligible for parole.  In the 1970s and 1980s, there was concern that defendants served only a fraction of their sentence.  Those supporting accurate sentencing wanted jurors to know when the defendant would be eligible for parole so that this could be taken into consideration when deciding the sentence.

In sharp contrast, in a death penalty case jurors are not permitted to know this information.  A defendant who is tried for the death penalty, but who receives a life sentence, is eligible for parole only after he has served forty years.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly

16

after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

### Claim One

Texas code of criminal procedure, Art. 37.071, Sec. 2(e), violates the Eighth and Fourteenth Amendments to the united States Constitution by not requiring the State to prove any aggravating factors relevant to the mitigation issue beyond a reasonable doubt before the jury may answer the mitigation issue "no."

### Claim Two

The capital murder scheme, as interpreted by the Texas Court of Criminal Appeals, violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution because there is no meaningful appellate review of the special issues which determine the infliction of the death penalty.

### Claim Three

The death penalty scheme as administered in Texas violates the Eighth and Fourteenth Amendments to the United States Constitution by requiring county-by-county financial responsibility for prosecuting capital cases which injects an unconstitutional arbitrariness in the treatment of capital murder defendants.

### Claim Four

Texas code of criminal procedure, Art. 37.071, violates the Eighth and Fourteenth Amendments to the United States Constitution by prohibiting informing the jurors that a single holdout juror could cause the imposition of a life sentence.

## Claim Five

The Texas "12-10" rule violated petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution, as construed by *Mills v. Maryland*.

## Claim Six

The death penalty as administered in Texas constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

## Claim Seven

Claim Seven:  The "dual-track" habeas process for Texas Capital cases violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by preventing meaningful state habeas review of capital cases, which in turn prevents meaningful federal habeas review. This claim is specifically applicable to the petitioner's case as it prevented meaningful federal review of whether the state trial court violated petitioner's sixth and fourteenth amendment rights to an impartial jury and due process by denying his challenge for cause against juror Berg.

## Claim Eight.

The state trial court violated petitioners Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against juror Berg.

## Claim Nine.

Claim Nine:  Petitioner was denied a fair trial, due process of law, and effective assistance of counsel in violation of the Sixth Amendment, eighth, and the Fourteenth Amendment to the United States Constitution based on trial counsel's performance.

## Claim Ten.

Petitioner was denied effective assistance of counsel during his direct appeal in violation of  the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## Claim Eleven

Petitioner was denied effective assistance of counsel in pursuing state habeas remedies in violation of his rights to equal protection, due process, and access to the courts as provided by the United States Constitution.

## Claim Twelve

Executing the petitioner would violate the Eighth and Fourteenth Amendments to the United States constitution as construed by the Supreme Court in *Atkins v. Virginia.*

### DETAILED ARGUMENTS

### Claim 1:

Texas code of criminal procedure, Art. 37.071, Sec. 2(e), violates the Eighth and Fourteenth Amendments to the united States Constitution by not requiring the State to prove any aggravating factors relevant to the mitigation issue beyond a reasonable doubt before the jury may answer the mitigation issue "no."

This claim was presented to the Texas Court of Criminal Appeals on direct appeal as point of error number 12, it was also raised as point of error number 28 in the state writ of habeas corpus.

### STATEMENT OF FACTS

Appellant submitted a written pretrial motion complaining that the Texas capital sentencing scheme is unconstitutional.  Among other reasons, appellant complained that the mitigation special issue found in *Texas Code Criminal Procedure*, Art. 37.071, Sec. 2(e) is facially unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence introduced for purposes of Art. 37.071, Sec. 2(e).  (C.R. I, 76-77).  The trial judge overruled the motion (R.R. 29, 5).

### SUMMARY OF THE ARGUMENT

Retreating from earlier decisions, the Texas Court of Criminal Appeals has imported the idea of aggravating evidence into *Texas Code of Criminal Procedure*, Art. 37.071, Sec. 2(e),

19

which deals with mitigating evidence in the punishment phase of capital trials.  This permits the State to introduce evidence of aggravating circumstances related to Art. 37.071, Sec. 2(e), which is not relevant to the other special issues.  The jury is to consider this evidence of aggravating circumstances in answering the mitigation issue.

This triggers the principle in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) that the State has the burden to prove beyond a reasonable doubt any factual decision that determines whether a defendant receives a greater sentence.  When the "future dangerousness" issue is answered in the State's favor, the factual determination regarding the mitigation issue does determine the maximum penalty.

Further, the United States Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase.  See e.g., *Walton v. Arizona*, 110 S.Ct. 3047, 3055 (1990)(State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden...to prove the existence of aggravating factors").  The legal principle in *Walton* applies to the statutory "Penry" special issue today because, by judicial construction, this special issue has become a conduit for aggravating factors.

<u>Claim 2:</u>

**The capital murder scheme, as interpreted by the Texas Court of Criminal Appeals, violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution because there is no meaningful appellate review of the special issues which determine the infliction of the death penalty.**

This claim was presented to the Texas Court of Criminal Appeals on direct appeal as point of error number 13, it was also raised as point of error number 29 in the state writ of habeas corpus.

### SUMMARY OF THE ARGUMENT

There is no meaningful appellate review of the "selection decision" regarding who receives the death penalty in Texas. The Court of Criminal Appeals refuses to do a factual or a legal sufficiency review of the mitigation issue. It refuses to do a factual sufficiency review of the future dangerousness issue. A legal sufficiency review of the affirmative answer to the future dangerousness issue, which the Court of Criminal Appeals claims to do, means that it will always affirm the jury's affirmative answer to the future dangerousness issue.

To pass there are two separate decisions involved in any death sentence: "eligibility" and "selection". *Tuilaepa v. California*, 512 U.S. 967,971, 114 S.Ct. 2630,2634, 33 L.Ed.2d 246 (1972). To pass constitutional scrutiny, both decisions must be subject to meaningful appellate review, ensuring that the death penalty is not imposed arbitrarily or irrationally. *Parker v. Dugger*, 498 U.S. 308,321, 111 S.Ct. 731,739, 112 L.Ed.2d 812,826 (1991); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 246 (1972). The "eligibility decision" means that the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. In Texas, only those defendants convicted of an offense under *Texas Penal Code*, Sec. 19.03 are eligible for the death penalty. The Court of Criminal Appeals gives a meaningful appellate review of the "eligibility decision" by reviewing the evidence for legal sufficiency and for factual sufficiency. *Jones v. State*, 944 S.W.2d 642,647-648 (Tex.Crim.App. 1996).

21

The problem is in the appellate review of the "selection decision" which is determined by a jury after it convicts a person of capital murder. This "selection decision" is based on the jury's answer to two or possibly three special issues. The first issue is commonly called the "future dangerousness issue" and the third issue is commonly called the "mitigation issue". Appellant's complaint is that the Texas Court of Criminal Appeals has interpreted the death penalty statutes in a way that a person whom the jury has "selected" to die does not receive a meaningful appellate review of that selection.

## Claim 3:

**The death penalty scheme as administered in Texas violates the Eighth and Fourteenth Amendments to the United States Constitution by requiring county-by-county financial responsibility for prosecuting capital cases which injects an unconstitutional arbitrariness in the treatment of capital murder defendants.**

This claim was presented to the Texas Court of Criminal Appeals on direct appeal as point of error number 14. Petitioner also filed a Pre-Trial Motion seeking to preclude the State from seeking the death penalty because the county-by-county financial burdens imposed by the State of Texas renders the administration of the statutory death penalty scheme unconstitutional. (C.R. I, 92-120). The trial judge summarily denied the motion (R.R. 3, 3-5).

### SUMMARY OF THE ARGUMENT

At the time of appellant's trial, each of the 254 counties in Texas had to finance the prosecution of death cases in its jurisdiction. The prosecution and defense of a death case costs approximately $2.3 million dollars. This means that only counties with very large budgets can prosecute such cases. A defendant in a county with a large budget is likely to receive the death penalty, whereas a similarly situated defendant in one of the remaining counties will not be at

22

risk to receive the death penalty.  Statistics showing which counties send people to death row confirm this fact.  The financial arrangement whereby each county has had to bear the expense of death penalty litigation has caused the death penalty in Texas to be administered in an arbitrary, unconstitutional manner.

The Eighth and Fourteenth Amendments to the *United States Constitution* protect every capital defendant from the wanton and capricious imposition of the death penalty.  This protection extends not only to the death penalty scheme itself, but the manner in which it is administered.  The manner in which the state of Texas finances the prosecution of death penalty cases has caused the death penalty in Texas to be administered in an arbitrary therefore unconstitutional manner.  Further, funding the death penalty in this way violates the equal protection clause of the 14th Amendment.

## Claim 4:

**Texas code of criminal procedure, Art. 37.071, violates the Eighth and Fourteenth Amendments to the United States Constitution by prohibiting informing the jurors that a single holdout juror could cause the imposition of a life sentence.**

This claim was raised in the State Writ as claim for relief no. 31.  The district court addressed this issue on the merits in its adopted Finding of Facts, Conclusion of Law and Order, which was adopted by the Texas Court of Criminal Appeals.  See *Ex Parte Allen*, No. Wr. 73,586-01, 2010 WL 1709947, at 2 (Tex. Crim. App. 2010).

### Summary of the Argument

TEX. CODE CRIM. PROC. ART. 37.071 provides that in order for the trial court to impose a death sentence, all twelve jurors had to answer all of the "special issues" affirmatively; to impose

23

a life sentence, at least ten jurors had to answer any of the special issues negatively.  A failure of a capital sentencing jury to garner the requisite number of votes either way resulted in the imposition of a life sentence.  However, Applicant's jurors were not informed that if they failed to reach a collective decision either way -- if one juror answered "no" to any special issue -- the court would impose a life sentence.  Instead, they were instructed by the trial court that the jury must either unanimously agree to answer all of the "special issues" affirmatively (in which case a death sentence would be imposed), or ten or more jurors were to agree to answer one or more of the "special issues" negatively (in which case a life sentence would be imposed).

The collective operation of these provisions of Article 37.071, upon which Texas capital sentencing jury charges are modeled, has come to be known as the "12-10 rule."[1]  This feature of 37.071 creates the potential for considerable confusion among reasonable jurors.  The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme.  *See California v. Brown*, 479 U.S. 538, 541 (1985); *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985).  The Texas statute implicitly informs a juror that, absent similar votes from nine other jurors, his or her "no" vote to a special issue -- e.g. a vote against the imposition of the death penalty -- is meaningless because it cannot alone be sufficient to result in a life sentence.

Texas' 12-10 rule generates the danger that confused jurors otherwise disposed to hold out on voting for a death sentence will conform to a "majority rules" mentality.  Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless

---

[1] See Robert J. Clary, *Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 St. Mary's L. J. 353, 358-59 (1987).

unless nine others join them; if a majority of other jurors are firmly voting "yes," holdouts may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so."). Such a belief on the part of a juror is contrary to Texas law, which dictates that if a capital juror is unable to agree on an answer to any of the special issues, the court must sentence the defendant to life.

In *Davis v. State*, 782 S.W.2d 211 (Tex. Crim. App. 1989), the Texas Court of Criminal Appeals acknowledged the possibility that "`a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock.'" *Id*. at 221, quoting *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982), *affirmed*, 719 F.2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984). However, the *Barfield* opinion quoted in *Davis* also speculated that it was just as likely that a life prone juror would refuse to consider the evidence and the views of her fellow jurors in favor of a death sentence if she knew her steadfastness would result in a life sentence. *Id*. The *Barfield* opinion, cited with approval by the Texas Court of Criminal appeals concluded that:

> Neither scenario results in a "reliable" or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as of giving it.

*Id.*, *see also Sterling v. State*, 830 S.W.2d 114, 121-122 (Tex. Crim. App. 1992) (citing *Davis* with approval and noting Sterling failed "to point to any facts or circumstances which render the statute unconstitutional *as to him* (emphasis added)).

Support for the proposition that a juror in the minority may be subject to coercion, and that such coercion results in a constitutionally unreliable sentence, is found in the United States Supreme Court's cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to requiring further jury deliberations.   *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S. 448, 450 (1926).  In such cases, this Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear `in some degree, serious although not measurable, an improper influence upon the jury.'"  *Lowenfield*, 484 U.S. at 239 (citing *Brasfield*, 272 U.S. at 450).   Put another way, Texas' "12-10 rule" is a built-in impermissible "dynamite charge," which the Supreme Court has recognized as a possible Eighth Amendment violation in the capital sentencing context.  *See Lowenfield*, 484 U.S. at 240-41.

In *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit noted that the instructions to Kubat's jury stated the law as to whether a unanimous verdict was required to find a mitigating circumstance both correctly and incorrectly. However, they reasoned that the fact that the jury had heard a correct explanation of the law did not rescue the law's constitutionality:

> At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits.  At best, it may have entered the jury room confused.  Indeed, even if only one juror had been confused, the reliability of the verdict is undermined.  For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to

26

the views of the other eleven because of the mistaken belief that unanimity was required.

*Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989).  As the reasoning of the Seventh Circuit reveals, there is little Constitutional difference between a jury being instructed that they must find a mitigating circumstance unanimously, and a jury being left in the dark about that issue.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has Constitutional implications. In *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) the Court, by a 7-2 majority, held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence.  *Id*. at 2196 (plurality opinion per Blackmun).  The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested."  *Id*. at 2195.  The information about petitioner's parole eligibility was of "obvious relevance . . . to the jury's formidable sentencing task."  Id. at 2197.  The parallel is obvious: the significance of an individual vote of "no" to either of the special issues was of "obvious relevance" to any jury, but they were denied information on this point.  Justice Souter's concurring opinion in **Simmons** makes the reliability concerns raised by potential jury confusion even clearer: "Whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning. . . ."  Id. at 2198 (Souter, J., concurring).   The jurors in petitioner's case were told they could vote "no" to a special issue, but were never told what the result of that single vote would be, as a result, they may have misunderstood the meaning of their vote.  Thus, the Texas capital-sentencing scheme

"diminish[ed] the reliability of the sentencing determination."  **Beck v. Alabama**, 447 U.S. 625,

638 (1980).

In this way, **Article 37.071's** "12-10 Rule" injected arbitrariness into the proceedings and

created an unreliable sentencing determination -- a constitutional violation of the highest order in

the capital sentencing context.[2]  *See* **State v**. **Williams,** 392 So.2d 619, 631 (La. 1980) (on

rehearing). In **Williams,** the court stated:

> In the present case the jurors were not fully informed of the consequences of their
> votes and the penalties which could result in each eventuality.  They were not told
> that, by their failure to decide unanimously, they would in fact decide that the
> court must impose a sentence of life imprisonment. . . .  *Instead, the members of
> the sentencing body were left free to speculate as to what outcome would be in the
> event there was no unanimity.*  Under these circumstances, individual jurors could
> rationally surmise that in the event of a disagreement a new sentencing hearing,
> and perhaps a new trial, before another jury would be required.

**Williams,** 392 So.2d at 631 (emphasis added).  Such a risk of speculation and confusion was

held to be a constitutional violation by the Louisiana Supreme Court.

As the petitioner's rights as guaranteed by **U.S. Const. Amend. VII & XIV** have been

violated, the sentence of death should be vacated and the cause remanded to the trial court for

further proceedings.

**Claim 5:**

**The Texas "12-10" rule violated petitioner's rights under the Eighth and Fourteenth
Amendments to the United States Constitution, as construed by *Mills v. Maryland*.**

---

[2] See *Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) (noting that capital sentencing proceedings made
unreliable by coercion of jurors violate Eighth Amendment); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)
(opinion of Stewart, Stevens, & Powell, JJ.) (holding that mandatory death sentences deprive defendants of reliable,
individualized sentences in violation of Eighth Amendment); *Cf. Gardner v. Florida*, 430 U.S. 349 (1977) (plurality
opinion) (holding that capital-sentencing procedures which restrict defendant's ability to offer mitigating evidence
lead to unreliable capital sentencing proceedings that violate due process clause of Fourteenth Amendment).

This claim was raised in the State Writ as claim for relief no. 32.  The district court addressed this issue on the merits in its adopted Finding of Facts, Conclusion of Law and Order, which was adopted by the Texas Court of Criminal Appeals.  See *Ex Parte Allen*, No. Wr. 73,586-01, 2010 WL 1709947, at 2 (Tex. Crim. App. 2010).

## Summary of the Argument

The 12-10 rule also violates the Eighth Amendment principle in *Mills v. Maryland*, 486 U.S. 367 (1988),[3] that it is unconstitutional to instruct capital sentencing jurors in a manner leading reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors are in agreement that a particular mitigating factor or factors exist.  That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors[4] as to whether the mitigating evidence offered by the capital defendant warrants a negative answer to at least one special issue, thus resulting in the imposition of a life sentence.  *See Mills*, 486 U.S. at 373-75.  Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will cave into a "majority rules" mentality is too great under the Eighth Amendment.  *See Mills*, 486 U.S. at 383 ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so.").

---

[3]  See also *McKoy v. North Carolina*, 494 U.S. 433 (1990) (holding that it is a violation of the Eighth Amendment to require a unanimous verdict as to mitigating circumstances in capital sentencing trials).

[4]  In *Mills,* the threshold number was twelve; under the Texas statute, the threshold number is ten.

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.[5]  *See Kubat v. Thieret*, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989).  In *Kubat*, in finding a *Mills* violation, the Seventh Circuit was faced with a capital sentencing scheme virtually identical[6] to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. . . .  [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373; *cf. Andres v. United States*, 333 U.S. 740, 752 (1948) (reasoning that, in a federal death penalty case, a juror uninformed as to the consequences of a less-than-unanimous

---

[5]  Under the Texas statute at issue here, jurors were not asked to find specific mitigating factors which were to be weighed against specific aggravating factors, as was true in *Mills*.  Rather, as this Court is aware, Texas' unique capital sentencing scheme instead only asks jurors to answer three "special issues" -- whether a capital defendant committed the crime "deliberately" and whether the capital defendant would pose a "future threat" to society if given a life sentence.  *See* TEX. CODE. CRIM. PRO. ART. 37.071(b) (Vernon's 1989).

However, as the United States Supreme Court has repeatedly held, Article 37.071(b)'s "special issue" format permits juries to consider and give proper mitigating effect to almost all types of mitigating evidence.  *See Johnson v. Texas*, 119 S. Ct. 2658, 2670 (1993) ("A Texas capital jury deliberating over the Special Issues . . . is likely to weigh mitigating evidence as it formulates . . . answers in a manner similar to that employed by capital juries in `pure balancing' states."); *Adams v. Texas*, 448 U.S. 38, 46 (1980) (in deliberating special issues, jurors answer "on the basis of all relevant evidence not only why the death sentence should be imposed but also why it should not be imposed").  Thus, for purposes of Applicant's arguments herein, this Court must treat the Texas capital sentencing scheme as one in which jurors weigh mitigating factors against aggravating factors, just as jurors do under a "pure" balancing statute.

[6]  In *Kubat*, as in *Mills,* the jury was instructed that the threshold number of jurors required for a life sentence was twelve; in Texas, capital sentencing juries are instructed that the threshold number is ten.  The difference is irrelevant since the possibility for one or more jurors "caving in" and not voting for a life sentence based on particular mitigating evidence is identical.

30

verdict "might reasonably conclude that, if they cannot all agree to grant mercy, then the verdict of death must stand unqualified").

The Ninth Circuit has similarly construed the Court's decision in *Mills*.  *Mak v. Blodgett*, 970 F.2d 614, 624-625 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).  The *Mak* court stated:

> The Supreme Court has held that, where the underlying statute does not require unanimity [in assessing a life sentence], due process will not tolerate instructions that could reasonably be interpreted by a jury to preclude consideration of any mitigating factor unless a such a factor was unanimously found to exist. . . .  As in **Mills**, "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the `improper' ground, we must remand for resentencing."

Id. at 625 (citations omitted) (quoting *Mills v. Maryland*, 486 U.S. 367, 377 (1988)).        In *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) the appellant argued the 12-10 rule could mislead the jury to believe that a sentence less than death was not possible unless ten or more jurors answered one of the special issues in the negative.  *Id*. at 337.  The *Draughon* opinion recognized that "it is conceivable that. . .[the jury] will surmise later instructions requiring ten votes for a negative answer [to] mean that a life sentence will not be imposed otherwise." *Id*.  The Court further acknowledged that is was "troubled" by the implication of Draughon's argument "that. . .[the Texas sentencing scheme], by requiring [a] consensus [of ten votes for a "no" answer to a special issue], inhibit[s] the free exercise by each juror of his individual judgment about the propriety of a death sentence."  *Id*. at 338.  However, the Court stated:

> [I]t is the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be *impossible* unless ten of them agree that renders the procedure constitutionally suspect.  But, because the jury instructions of which Appellant here complains are not reasonably susceptible of

31

> such an interpretation, we are satisfied that no juror would be misled by them into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one.

*Id*. at 338.  However, the Court of Criminal Appeals failed to consider the possibility that Texas' 12-10 rule would mislead the jury to believe a mistrial would result from the jury's failure to garner 12 "yes" votes or 10 ten "no" votes, resulting in one or more jurors basing his or her determination on an incorrect understanding of the law.

Even before the United States Supreme Court's decision in **Mills**, at least one other state court has recognized the constitutional infirmity in a sentencing determination made after a jury had "thrown away" their dissenting vote because they could not sway a majority of their fellow jurors.  In **People v. Durre**, 690 P.2d 165 (Colo. 1984), the jury was instructed according to Colorado law, which called for them to explicitly note any mitigating or "additional mitigating" factors they found and weigh them against the aggravating factors they found.  *Id*. at 175-76. The jury was not told how to find the mitigating factors or whether they had to agree on which factor called for leniency. *Id***.**  The foreman returned a jury form reflecting that they had found aggravating circumstances and had found no mitigating circumstances, and thus that Durre should be sentenced to death. *Id*. at 170.  However, the foreman attached a note to the form saying that though they could neither "claim the mitigating circumstances" nor "deny the aggravating circumstances," nevertheless several jurors had concluded that Durre should not die. *Id*.  The trial judge personally interviewed the five dissenting jurors, who told him that even though they felt that Durre should be spared, they agreed with the "verdict."  *Id*. at 170 & n.10. The trial judge, however, dismissed their votes against death as the product of mere "conscientious difficulties" and sentenced the defendant to death in accordance with the general verdict. *Id*. at 170.

The Colorado Supreme Court reversed the death sentence, dismissing as "faulty" the state's contention that "jury findings on mitigation and aggravation involve no consideration whatever of the issue of punishment."  *Id*. at 171.  That court intoned:

> Without such an instruction [on the effect of their verdict], the jury will not only be required to labor in the dark about what it is actually deciding by its verdicts but also, of equal importance, will be ill-equipped to fulfill its function of serving

as the vital link between contemporary community values and the propriety of the life-and-death decision which its verdicts necessarily resolve.

*Id*. at 173.  Therefore, the Colorado Supreme Court ruled that jurors must be explicitly informed of the results of their findings of mitigating and aggravating circumstances.  *Id*. at 174 & n.15. Any one of Applicant's jurors may have believed that  by holding out for a life sentence, a mistrial would be declared.[7]   This aspect of Texas' 12-10 rule is a **Mills** violation *a fortiori*. That is, a reasonable juror may have believed, contrary to Texas law, that they had no ability to give mitigating effect to **any and all types of mitigating circumstances** unless at least nine other jurors also voted for life.

Applicant recognizes that "[a] critical assumption underlying [the] system [of trial by jury] is that juries will follow the instructions given them by the trial judge."  *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (plurality opinion).  Here, though, the instructions themselves were deficient: they "did not tell the whole truth, because [they] did not tell the jurors what to do in the event of a disagreement."  *Gacy v. Welborn*, 994 F.2d 305, 307 (7th Cir. 1993), *cert*. *denied* 114 S. Ct. 269 (1993).  *Boyde v. California*, 494 U.S. 370, 380 (1990), held the proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence."  Applicant has demonstrated that there is a reasonable likelihood that the jury applied

---

[7]  The Louisiana Supreme Court explained the consequences of leaving the jury in the dark thus:

Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial before another jury would be required.  Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings.

*State v. Williams*, 392 So.2d 619, 634-35 (La. 1980).

Texas' 12-10 scheme in an unconstitutional manner resulting in an unreliable sentencing determination. Applicant's sentence of death should therefore be vacated and the cause remanded for a new punishment hearing.

## Claim 6:

**The death penalty as administered in Texas constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.**

This claim was raised in the State Writ as claim for relief no. 33. The district court addressed this issue on the merits in its adopted Finding of Facts, Conclusion of Law and Order, which was adopted by the Texas Court of Criminal Appeals. See *Ex Parte Allen*, No. Wr. 73,586-01, 2010 WL 1709947, at 2 (Tex. Crim. App. 2010).

### SUMMARY OF THE ARGUMENT

The capital sentencing procedures employed in the post-**Furman** era are *per se* unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by *Furman*.

At least regarding the death penalty as it is presently being administered in Texas, it is *per se* unconstitutional under the Eighth and Fourteenth Amendments. In particular, the present Texas capital sentencing scheme -- including the statutory "Penry" special issue -- is unconstitutional because it permits the very type of open-ended discretion condemned by the Supreme Court in *Furman*.

Accordingly, Applicant's sentence of death should be vacated.

## Claim 7:

35

The "dual-track" habeas process for Texas Capital cases violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by preventing meaningful state habeas review of capital cases, which in turn prevents meaningful federal habeas review.  This claim is specifically applicable to the petitioner's case as the dual-track system possibly prevented meaningful federal review of whether the state trial court violated petitioner's sixth and fourteenth amendment rights to an impartial jury and due process by denying his challenge for cause against juror Berg.

This claim was raised in the State Writ as claim for relief no. 37.  The district court addressed this issue on the merits in its adopted Finding of Facts, Conclusion of Law and Order, which was adopted by the Texas Court of Criminal Appeals.  See *Ex Parte Allen*, No. Wr. 73,586-01, 2010 WL 1709947, at 2 (Tex. Crim. App. 2010).

<u>**Factual Background**</u>

We begin with the state habeas statute itself, as enacted in 1995.  Prior to that time there was no fixed statutory timetable for filing a habeas application.  As of the effective date of September 1, 1995, a habeas application must be filed within the time period specified by section 4 of Article 11.071**.**  Two alternative provisions apply.  An application must be filed 180 days after appointment of counsel, or 45 days after the filing of the State's brief on direct appeal, whichever is later.  Only one 90-day extension is permitted.  Because this makes the direct appeal and habeas application time-periods overlap, rather than having the direct-appeal process precede the habeas process, the Applicant will refer to the amended system as the "dual-track" system.

Under the statute, the petitioner's first state application for writ of habeas corpus was due on Monday, January 20, 2003, despite the fact that the direct-appeal process in the Applicant's underlying case was not complete.  An opinion in the direct appeal was not issued until June 11, 2003, meaning that the counsel appointed for state writ purposes did not have the ability to

review the direct appeal decision before filing the state writ in this case.  Further, because of the strict exhaustion requirements imposed on federal writs by 28 U.S.C. § 2254, Texas' dual track system can effectively bar valid federal constitutional claims from being reviewed by federal courts.

<strong>S<small>UMMARY OF THE</small> A<small>RGUMENT</small></strong>

At least in the United States, the writ of habeas corpus commonly has been used for postconviction relief.   In this context "postconviction" does not merely mean relief sought after the entry in the trial court of a judgment of conviction, but rather means relief sought after the direct appellate process became final.

Postconviction relief is needed in order to cure shortcomings inherent in the direct-appeal record.  This consideration is illustrated by the three major sources of postconviction habeas litigation, i.e. involuntary plea claims, ineffective assistance claims, and claims that exculpatory evidence was withheld.  As to each of those situations, a direct appeal generally cannot be efficacious because the appellate record is inadequate.  In theory the dual-track system allows for development of an adequate record just as the old system did, but in practice something of great value is lost.  This is the ability of the state habeas counsel to review the direct appeal for issues such as trial counsel's ineffective assistance of counsel in properly preserving important federal constitutional claims.

The petitioner was personally affected by the dual track system in his case.   In the petitioner's trial he was denied his Sixth and Fourteenth Amendment Rights to an impartial jury and due process when the trial court denied his challenge for cause against juror berg.  The direct appeal counsel, apparently believing that this issue had been properly preserved, raised this issue

37

as in the first three points of error in his state direct appeal brief.  *See Allen v. Texas,* 108 S.W. 3d 281, 282 (Tex. Crim. App. 2003).  However, the court of appeals decided that trial counsel failed to preserve error.  *Id.*  Surely, had the state writ counsel had the ability to review the state court's decision on direct appeal he would have included this as a claim of ineffective assistance of counsel.  After all, while the state writ counsel did not appear to conduct any outside the record investigation, it does appear that he at least read the record in this case.  It is because the petitioner was effectively denied the rights to equal protection, due process, and access to the courts on a valid constitutional claim that he asks this court to find that the Texas dual track system violates his rights under the Federal Constitution.

## Claim 8:

**The state trial court violated petitioners Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against juror Berg.**

This claim was raised on direct appeal as point's of errors 1-3.  While the Court of Criminal Appeals decided that this claim was not preserved for appeal, it should be decided on the merits for the reasons discussed in Claim 7.  Further, applicant reserves discussion of whether this claim has been defaulted for his expanded habeas brief.

## STATEMENT OF FACTS

Gordon Arthur Berg strongly favored the death penalty because he thought it is a deterrent and because it saves the taxpayers a tremendous cost in keeping a convicted person incarcerated for life.  He stated that there are certain cases in which he did not think there is any possible mitigating circumstances that would prohibit the use of the death penalty.

Q. (prosecutor) . . . Can you tell me in your own words what is your opinion about the death penalty as a form of punishment in our society?

A. Personally, I favor it. I think it is a deterrent. I think there are certain cases where I don't think there is any mitigating circumstances that would prohibit the use of it.

. . . . .

A. And I feel also it saves the State and the tax payers a tremendous amount of cost in keeping a convicted person incarcerated for their natural born life.

. . . . .

Q. Based upon what you're saying now I assume that you would not necessarily favor life without parole as a substitute for the death penalty?

A. No. (R.R. 5, 43,44).

. . . .

Q. . . . In other words, your personal opinion, what you told me is . . . that you believe the death penalty is appropriate and you think if nothing for one reason that if the crime dictates it ought to be given and one of the reasons you might want to give it, too, in addition for the crime dictating it is that it saves taxpayers' money?

A. That's a good interpretation, yes. (R.R. 5, 49).


Referring to the previous day when the trial judge spoke at length to a large pool of potential jurors about the legal process and the two punishment issues in a capital case, Berg stated he agreed wholeheartedly with the first question, but that he disagreed on the mitigation question.

Q. . . . And then you take the law given to you by the Court which basically says you'll make your decision based upon this evidence and not based on your personal opinion. Can you do that?

A.  Let me answer that based on the last point of discussion yesterday concerning the two questions asked of the jury.

Q.  Right.

A.  I agree wholeheartedly in the first question.  If he's guilty, he's guilty.  I disagree on the second part.

Q.  Okay.

A.  Being a father and grandfather of three kids under the age of six, I would have difficulty looking at any mitigating circumstances on capital murder of a child under six.  (R.R. 5, 49-50).

After making a lengthy, general statement, the prosecutor asked: "Is your mind open to listening to whatever evidence that is presented?"  Berg answered "Yes" (R.R. 5, 59).  But, when the prosecutor asked questions about the mitigation issue the record shows clearly that Berg may "listen" to whatever is presented, but that he had a bias or prejudice to the mitigation issue.  He was not open to consider the mitigation issue, unless the mitigation was something like "a mercy killing".  The prosecutor offered some possible types of mitigating evidence: 1) person high on drugs; 2) person had a mental disability; 3) person was borderline mentally retarded; 4) person had an extremely abusive childhood  (R.R. 5, 60). Then, he asked:

Q. . . . My question to you is: Are you the person who will wait or is your mind already made up before you ever hear what the evidence is?

A.  I would listen to the evidence.  I personally feel that I would probably – –  it would take quite a bit to convince me that there were mitigating circumstance.

Q.  As I hear you – –

A.  And I would – – I do not give a great credibility to the examples you used.

40

Q.  I understand.

A.  But I would listen to them before I made a decision.
(R.R. 5, 62)

Later, after another lengthy speech by the prosecutor, covering almost three pages of

transcript (R.R. 5, 62-65), Berg seems to answer that he could be fair and open in regard to the

mitigation issue:

Q. . . . You take into consideration all of the circumstances
in determining whether it's sufficiently mitigating.  And can you
give a fair consideration to that?

A.  Yes.   (R.R. 5, 65)

However, subsequently, in answering questions from the defense attorney, Berg reiterated that "a

mercy killing" or something like a "mercy killing" is the only "mitigating evidence" that could

lead him to answer the second special issue "yes".

A.  (Berg)  And if – – if it wasn't based on more of a
humanitarian life support or something like that, I would – – I'm
being honest with you and saying I would have difficulty accepting
circumstances of intoxication, being high or because of abuse as a
child themselves of saying, "Hey, those are mitigating
circumstances" It might – – I would probably go along if there was
– –

Q.  A mercy killing?

A.  Mercy killing or something like that, yes.

Q. . . . It's (sic) sounds like what you've just said to me is
that you will listen to all of the evidence.  You're agreeing to listen
to all of the evidence.  But it seems like you're also trying to tell us
and saying specifically to Mr. McClellan that you haven't heard any
of the examples that he gave that you would actually go for or
think that they actually mitigated the crime other than a mercy
killing.  Is that what you said?

A.  That's correct.  (R.R. 5, 68-69)

41

Berg said that while he was committing to listening to the evidence as it's presented, he wanted the court to know his personal reluctance to find mitigating circumstances in a child's killing (R.R. 5, 70).  Defense counsel inquired whether he remembered the allegations in the indictment.  Berg remembered that the indictment alleged that the murder occurred by striking the child with a hand or unknown object (R.R. 5, 70).  Obviously, these facts do not suggest "a mercy killing" or "pulling the plug" situation.

Finally, Berg reiterated his reservations whether he would let his personal feelings interfere with his obligations as a juror.

> Q.  Is there anything as you sit there now – we've literally badgered you with all of these questions - anything that you would honestly say bothers you about you sitting on this jury?
>
> A.  **I have reservations whether or not I would let my personal feelings interfere**.  And that's the reason I stated that when I came in because **that's the thing that bothered me through the evening last night**.
> . . . .
>
> A.  I feel that I can be unbiased and from past histories I've been unbiased, but **I have that twinge of reservation**.  (R.R. 5, 71-72 emphasis supplied)
> . . . .
>
> A.  To reiterate what I said a minute ago, I feel like I could render an honest verdict to the first question.  And I would be open to hearing the evidence and I would, to the best of my ability, keep an open mind to the evidence that was presented for mitigation.  **But I have the feeling that there is a possibility and there is a reservation of how strong that mitigating circumstance would have to be for me to vote no.**
> Q.  Are you telling me that you – that even as you sit there now, you haven't heard any evidence, that you, in that situation – if we put that hypothetically, you would be leaning against any mitigation, you would be biased against it?

A.  No, I'm saying that I would, to the best of my ability, give it a total open mind to the – **but I have that slim reservation. And I want to be honest and say it's there.** (R.R. 5, 80-81, emphasis supplied)

After this, appellant challenged him for cause.

MR. CORNELIUS: Judge, we challenge him for cause.  I think the overall tenor of his examination, if you consider the answers he gave and not all the speeches that Mr. McClellan made, I think he overwhelmingly shows that he could not give the Defendant a fair trial.  He could not fairly consider the evidence in the case.  We make a challenge for cause.

MR. NUNNERY (co-counsel): And just to add, I think his word "I have reservations," is functional equivalent to, I would be leaning against it and I am bias toward it.  The very first thing out of this juror's mouth, before any questions were even asked, he came in here saying I understood what the Judge told me on yesterday, but because I have three children under the age of six and also I read that mitigation question, I understand it.  I want y'all to know from the outset that I come in with an inherent bias against it.

However hard he tried and however inconsistent with Mr. McClellan's questions, he tried to over come that.  He ended up still saying, "I have reservations against it and I want you to know."  And he bent over backward saying he was honest about it.  I think under <u>Morgan v. Illinois</u>, he's challengeable.  And I also think, Judge, under the Code that says that if a juror has a bias or leaning in a direction, he is challengeable.

And under <u>Whitt</u>, Judge, I think his feelings toward mitigation substantially impairs his ability to carry out his performance as a juror in this type of case. (R.R. 5, 82-83)

The Court denied the challenge. (R.R. 5, 83).

43

The procedure used in this capital trial involved qualifying a pool of people and then using the peremptory challenges after the entire pool was qualified.  As each potential juror was presented to the parties, the State elected to accept or to excuse.  If the State elected to accept a potential juror, the defense chose whether to accept or excuse.  On the morning the lawyers were to choose the jury from qualified pool, appellant requested an additional peremptory strike to use against Gordon Berg because the court had overruled his challenge for cause.  He used a peremptory strike on Berg, and immediately requested another peremptory (R.R. 21, 3,26-27).  The court denied this request.  After using his fifteen peremptory strikes, he was forced to accept Linda Smith, Juror No. 348, because "we don't have any more strikes" (R.R. 21, 32).  While appellant did not articulate why he would have used a peremptory on Ms. Smith and why she was not an acceptable juror, her answers during voir dire contained several legitimate concerns.  She said that she believed one group of people is more dangerous than others, and that group of dangerous people were "Blacks" (R.R. 19, 211).  Specifically, she said:

> . . . It seems like to me that the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks.  (R.R. 19, 212).

Appellant is a black male.  Also, she was strongly in favor of the death penalty.  On a scale of 1 to 10, with 10 being the person who would give the death penalty in every circumstance, she said that she would fall "between about a five and a seven" (R.R. 19, 217).  Certainly, her tendency toward giving the death penalty and her fear of "Blacks" as the group who commits "the most violent crimes" made her an objectionable juror.  Appellant was forced to take her because the judge had denied a peremptory strike to replace the one he used on Berg.

## Summary of the Argument

An accused has a right to a trial by an impartial jury. *United States Constitution*, Sixth Amendment. This right is denied when the trial judge erroneously overrules an accused's challenge that a venire person could not be fair and impartial, and either the venire person sits on the jury because the accused has no remaining peremptory challenges to prevent it, or the accused is forced to use a peremptory challenge against the venire person, exhausts his remaining peremptory challenges, and is forced to accept an objectionable juror.

Petitioner's sixth and fourteenth amendment rights were thus violated when the trial judge denied petitioner's challenge for cause to juror Berg. For this reason the petitioner asks this court to reverse his conviction in this case.

**Claim 9:**

**Petitioner was denied a fair trial, due process of law, and effective assistance of counsel in violation of the Sixth Amendment, eighth, and the Fourteenth Amendment to the United States Constitution based on trial counsel's performance.**

The fundamental right to a fair trial guaranteed by the Fourteenth Amendment's due process clause and the Sixth Amendment guarantee a defendant the right to counsel, which in turn guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In *Strickland*, the Supreme Court held that in order to prevail on a claim of ineffective assistance of his defense counsel, "[f]irst, the defendant must show that counsel's performance was deficient . . . [s]econd, the defendant must show that the deficient performance prejudiced his defense." *Strickland v.Washington,* 466 U.S. at 687. Petitioner alleges that he was denied the effective assistance of counsel at his capital trial for the following reasons.

a. Counsel failed to conduct an adequate pretrial investigation into the State's case and the potential defenses available to Petitioner, including, but not limited to, defenses involving

Petitioner's psychological and neurological mental state before, during, and after the murders for which he was charged. There is a reasonable probability that these defenses, if properly raised, would have been able to overcome the government's contention that Petitioner possessed the requisite mental state to intentionally and with premeditation kill the victims and that would supported the defenses of lack of mental responsibility and lack of a specific intent to kill, based on the combined effects of organic brain damage and Petitioner's traumatic childhood;

b. Counsel failed to develop and present compelling mitigation evidence available to Petitioner, including, but not limited to, evidence of Petitioner's history of psychological, physical, emotional and sexual abuse and neglect, a disruptive and chaotic family history, a long history of mental health problems, including organic brain damage, and humanizing evidence of Petitioner's good character and positive personality traits. Had such evidence been presented, there is a reasonable probability that Petitioner would not have been sentenced to death;

c. Counsel failed to seek the appointment of proper experts and investigators, including a mitigation specialist, a trauma expert, and others, to evaluate Petitioner's psychological, educational, neurological and social history, as well as that of his family;

d. Counsel failed to develop and provide to its own mental health expert the available records and information regarding Petitioner's family and his psychological, educational, neurological and social history which were necessary to perform a thorough and accurate evaluation;

e. Counsel failed to adequately prepare for the sentencing phase of the trial and failed to ensure the presence of necessary witnesses for Petitioner mitigation presentation;

f. Counsel failed to adequately prepare the witnesses he did call to the stand during Petitioner's mitigation presentation;

46

h. Counsel failed to request the appropriate jury instructions at the guilt/innocence and penalty phases and failed to object to erroneous instructions given by the trial court;

i. Counsel failed to adequately investigate Petitioner's medical and mental health history and status. Counsel also failed to ensure that Petitioner was afforded a competent mental health evaluation, which would have conclusively revealed that Petitioner suffered from organic brain damage and trauma throughout his life and at the time of the crimes, which impaired Petitioner's ability to form the requisite intent to convict on the murder charges and would have mitigated his culpability for the offenses;

j. Counsel failed to ensure that appropriate diagnostic testing was performed by its mental health experts;

k. Counsel failed to develop and present evidence which would have indicated that Petitioner was remorseful for his crimes and had accepted responsibility for his actions.

l. Counsel failed to adequately file and litigate motions for expert assistance and further failed to protect the record on appeal by ensuring that the trial court ruled separately on each;

m. Counsel failed to properly develop and present evidence that the petitioner is mentally retarded so that his execution would be unconstitutional under *Atkins v. Virginia.*

n. Counsel failed to identify that the jury instruction given at the punishment phase violated the petitioners 8th and 14th Amendment rights by narrowly construing the evidence which could be considered in mitigation and not allowing all mitigation evidence presented to be considered.

o. Counsel failed to preserve the Sixth and Fourteenth Amendment violation caused by the trial court when it overruled counsel's challenge for cause against juror Burg.

p.  Trial counsel was ineffective in failing to object to the trial court's comments on the weight of the evidence in the presence of the jury.

q.   Trial counsel was ineffective for failing to object to the state's improper jury argument.

r.   Counsel was ineffective for failing to object to the trial court's decision to allow jurors to separate, to talk on the phone to unknown people, and communicated with the jury off the record during the punishment phase of the trial.

s. petitioner is entitled to habeas relief.

## Claim 10:

**Petitioner was denied effective assistance of counsel during his direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

Applicant contends that appellate counsel owes Applicant a duty of competent representation.  This is particularly true in a capital case, because "there is a significant difference between the death penalty and the lesser punishments." Beck v. Alabama, 447 U.S. 625, 637 (1980).  The constitutional standard for judging the effectiveness of counsel under the sixth amendment is a two-prong test, requiring that the petitioner show: (I) counsel's performance was so "deficient," that is, that counsel did not provide" reasonably effective assistance," and (ii) that counsel's errors "prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.  An attorney is ineffective if he or she "fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, at 688. (1984).  Appellate level right to effective assistance of counsel is rooted in the Sixth Amendment right to effective assistance of counsel. *Evitts v. Lucey,* 105 S.Ct. 830 (1985).  Petitioner claims his appellate counsel was ineffective in the following ways:

48

a.  Counsel failed to raise as a point of error that the jury instruction given at the punishment phase violated the petitioners 8th and 14th Amendment rights by narrowly construing the evidence which could be considered in mitigation and not allowing all mitigation evidence presented to be considered.

b.  Counsel failed to raise the claims addressed in point of error number nine which could have been raised on direct appeal.

c. Counsel failed to raise the issue that the trial counsel failed to object to the trial courts repeated comments on the weight of the evidence.

d.  Counsel failed to raise any issues concerning the trial courts allowing of the jury to separate during deliberations, allowing the members of the jury to communicate with unknown persons during deliberations, and the trial courts off the record communications with the Jury.

e. Petitioner is entitled to habeas relief

## Claim 11:

**Petitioner was denied effective assistance of counsel in pursuing state habeas remedies in violation of his rights to equal protection, due process, and access to the courts as provided by the United States Constitution.**

Petitioner incorporates his argument concerning Texas's dual track habeas system into claim eleven, based on the idea that the limited time period for Texas habeas *might* have caused some of the deficiencies in state habeas counsel performance.

Further, in way of introduction for this claim, petitioner would point out that on March 21, 2011, the Supreme Court granted a petition for a writ of certiorari in the case of Maples v. Thomas, 2011 U.S. Lexis 2314 (No. 10-63).  The question being considered is:

> Whether the Eleventh Circuit properly held – in conflict with the decisions of this Court and other courts – that there was no ―cause to excuse any procedural default where petitioner was blameless for the default, the State's own conduct

contributed to the default, and petitioner's attorneys of record were no longer functioning as his agents at the time of any default.

More recently, after certiorari was granted in the *Maples* case, the Supreme Court granted a stay of execution in two cases that raise the same ineffectiveness of habeas counsel claim that petitioner is presenting in this petition.  The Supreme Court has issued a stay in the Arizona case *Cook v. Arizona*, 2011 U.S. Lexis 2817 (April 4, 2011) (No. 10-9742) and in the Texas case *Foster v. Texas*, 2011 U.S. Lexis 2819 (April 5, 2011) (No. 10-8317).

The *Foster* case is of particular importance here because it involves Texas law.  The *Foster* petition, which is currently pending before the Supreme Court, raises the following question:

> Whether the rights to equal protection, due process, and access to the courts demand that condemned prisoners be afforded the effective assistance of counsel in pursuing state habeas remedies with respect to claims, such as innocence and ineffective assistance of trial counsel, that can only be raised in state habeas proceedings and if not raised there are thereafter barred?

(Ex. 24 [Petition for Writ of Certiorari at 239, *Foster v. Texas*, 2011 U.S. Lexis 2819 (Jan. 10, 2011) (No. 10-8317)].)  While this claim will be fully developed in petitioner's amended writ, petitioner now claims that he was denied equal protection, due process, and access to the courts by ineffective assistance of counsel at during his state writ proceedings.

Petitioner claims that his state habeas counsel was ineffective in the following ways:

a.  Counsel failed to present the claim that trial counsel was ineffective in failing to properly preserve the Sixth and Fourteenth Amendment violation caused by the trial court when it overruled counsel's challenge for cause against juror Burg.

b.  Petitioner incorporates all claims from  claims nine and ten, and asserts that state writ counsel was ineffective for failing to raise any and all of these claims.

c.  Counsel was ineffective for failing to do *any* investigation outside of the record of the trial and direct appeal.  Including: developing mitigation evidence which was not presented at trial because of trial counsel's ineffectiveness: developing a factual basis to show that it would be a violation of the *Atkins v. Virginia* to execute petitioner because of his mental limitations: and developing a factual basis the petitioner was incapable of forming the requisite intent to commit capital murder.

d.  Petitioner was prejudiced as a result of the state writ counsel's deficient performance.

## Claim 12:

**Executing the petitioner would violate the Eighth and Fourteenth Amendments to the United States constitution as construed by the Supreme Court in *Atkins v. Virginia.***

Petitioner incorporates the argument from claim 11.  The petitioner alleges that no meaningful "outside of the record review" was completed by state habeas counsel in this case, and as a result no one has ever properly investigated whether executing the petitioner would violate the eight and fourteenth amendments to the United States constitution.  For this reason petitioner now asserts just that, and would point out that the factual basis for this claim will be presented in his amended petition.

### Conclusion

As this petition demonstrates, Petitioner Allen's rights under the federal constitution were violated, unremedied by the Texas courts.

### RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.    Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Allen to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Allen be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Allen brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.    In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Holiday brought before it to the end that he may be relieved of his unconstitutional sentences;

6.    Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Applicant KERRY DIMART ALLEN asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Holiday from custody, or alternatively, to reverse Garcia' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
Two Post Oak Central
1980 Post Oak Blvd.
Suite 1900
Houston, TX 77056
(713) 775-3050 (work)
(713) 623-0329 (FAX)

seth@kretzerfirm.com

/s/ Jonathan Landers
_____
Jonathan Landers
2813 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT APPOINTED LAWYERS FOR PETITIONER
KERRY ALLEN

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing motion was served on all counsel of record by filing on the ECF System on this 28th day of April, 2011.

_____

Seth Kretzer