No. 4:11-cv-01676

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

KERRY DIMART ALLEN,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Amended Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
351st District Court of Harris County, Texas

_____

**PETITION FOR WRIT OF HABEAS CORPUS**
_____

**SETH KRETZER**            **JONATHAN LANDERS**
SBN: 24043764              SBN: 24070101

440 Louisiana St, Suite 200   2813 W. T.C. Jester
Houston, Texas 77002        Houston, Texas 77018

(713) 775-3050 (office)      (713) 301-3153 (Office)
(713) 224-3967 (fax)        (713) 685-5020 (fax)
*email: seth@kretzerfirm.com*   *e-mail: jlanders.law@gmail.com*

Court-Appointed Attorneys for the Petitioner

No. 4:11-cv-01676

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

KERRY DIMART ALLEN,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*
_____

Amended Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
351st District Court of Harris County, Texas
_____

**PETITION FOR WRIT OF HABEAS CORPUS**
_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, KERRY DIMART ALLEN, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice, or any other relief allowed by law.  This application follows his conviction and death sentence in the 351st District Court of Harris County, Texas, cause number 844387 styled *State v. Kerry D. Allen.* Allen is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number 844387 styled *State v. Kerry D. Allen.* (See, Exhibit "A").

**Certificate of Interested Parties**

The undersigned counsel of record for Petitioner, KERRY DIMART ALLEN, certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Kerry D. Allen | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | 440 Louisiana Suite 200<br>Houston, Texas 77002 | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers<br>2813 W. T.C. Jester<br>Houston, Texas 77018<br>(713) 301-3153 – (cell)<br>(713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. R.P. "Skip" Cornelius | 2028 Buffalo Terrace<br>Houston, TX 77019 | Trial Counsel |
| Mr. Alvin Nunnery | 1900 North Loop West; 435<br>Houston, TX 77018 | Trial Counsel |
| Mr. Danny Karl Easterling | Easterling & Easterling<br>1018 Preston<br>6th Floor<br>Houston, TX 77002-1877<br>713-228-4441<br>Fax: 713-228-4072 | Second state writ lawyer |
| Mr. Steve Morris | 1201 Franklin; 6th Floor<br>Houston, TX 77002<br>713-755-8330 – (office) | First state writ lawyer |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Allen C. Isbell | 202 Travis<br>Houston, TX 77002<br>713-236-1000 (direct) | Direct appellate counsel |
| | | |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | Asst. Attorney General |
| Ms. Tomee Heining | Austin | Asst. Attorney General |
| | | |
| *Judges* | | |
| Honorable Mark Ellis | 351st District Court<br>1201 Franklin; 14th Floor<br>Houston, TX 77002 | Trial Judge |
| | | |

## Table of Contents

Certificate Of Interested Parties.................................................................................... iii

Table Of Contents ...........................................................................................................v

Designation of Abbreviations and Explanation of the Trial Record...........................1

Statement of Jurisdiction ...............................................................................................1

Exhaustion ......................................................................................................................1

Procedural History..........................................................................................................2
  A. Procedural History in State Court ...............................................................2
  B. Procedural History in Federal Court ..........................................................3
  C. Petitioner is Confined in State Officials ....................................................4

Statement of Facts...........................................................................................................4
  A. Voir Dire .....................................................................................................4
  B. Guilt/Innocence Portion of the Trial .........................................................6
  C. Punishment Portion of the Trial.................................................................10
  D. Lack of Records from Previous Counsel and Investigation of Claims.................12

General Discussion of Capital Punishment Law  in Texas .....................................16

Argument and Authorities ............................................................................................21

   Issue 1: The Texas death penalty scheme violates the Sixth, Eight, and
       Fourteenth Amendments to the United States Constitution by not
       requiring the state to prove aggravating factors relevant to the
       mitigation special issue beyond a reasonable doubt before the jury
       may sentence the defendant to death. .................................................21

   Issue 2: The State of Texas, by requiring individual counties to fund the
       prosecution of capital cases, injects arbitrariness into the selection of
       which cases will be tried as capital cases;   this violates the Eight and
       Fourteenth Amendments to the United States Constitution.   The
       Texas Court of Criminal Appeals' adjudication of this claim resulted
       in a decision that involved an unreasonable application of clearly
       established Federal law.......................................................................28

   Issue 3: The Texas 12-10 Rule, and the law prohibiting jurors from being
       informed that their individual vote that life is the proper sentence will

**lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by Mills v. Maryland and McKoy v. North Carolina. ......................................................................................................38**

**Issue 4:**     **The State trial court violated petitioner's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against Juror Berg. .........................................54**

**Issue 5:**     **Petitioner's trial counsel were ineffective for failing to subpoena witnesses who were key to the mitigation special issue.. ......................69**

**Relief Requested**.................................................................................................................**77**

**Certificate Of Service** .........................................................................................................**80**

**Designation of Abbreviations And**
**Explanation of the Trial Record**

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

**Statement of Jurisdiction**

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and Amendments Five, Six, Eight, and Fourteen, of the United States Constitution, and Section Nine, Clause Two of the United States Constitution (habeas corpus).

**Exhaustion**

Allen states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1]  Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum. Allen expressly reserves his right to amend this petition.  In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition."  Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition.  *Id*. at 497-98.

---

[1]The burden is on the Director to demonstrate that Holiday failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

**Procedural History**

A.      **Procedural History in State Court.**

In the complaint filed on May 12, 2000, Petitioner Allen was charged with capital murder of an individual under six years of age alleged to have been committed on May 10, 2000. C.R. Vol.I, p. 2. Allen was arrested and held without bond.  Allen was indicted by a Harris County Grand Jury on August 24, 2000, in cause number 844387.  *Id.* at 11.  Allen was convicted in cause number 844387 and sentenced to death on May 5, 2001, upon the jury's answers to the special issues.  *Id.* at 585-86.

Before Allen's trial, his attorneys filed numerous motions seeking to preclude the prosecution from seeking the death penalty.  *Id.* at 62, 76, 92, 102, 107, 112.  Each of these motions was denied by the trial court.  *Id.*  These motions included attacks on Texas' capital punishment laws based on the following theories:  (1) the statutory "*Penry*" special issue is unconstitutional because it fails to place the burden of proof on the state regarding aggravating evidence, *Id.* at 76, (2)  the statutory "*Penry*" special issue is unconstitutional because it permits open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia, Id.* at 77, (3) the statutory capital sentencing scheme in Texas is unconstitutional because it does not permit meaningful appellate review, *Id.* at 79, (4) the Texas sentencing statute's definition of "mitigating evidence" is unconstitutional because it limits the concept of mitigation to factors that render a capital defendant less morally "blameworthy" for the commission of capital murder, *Id.* at 82, 102 (5) the Texas "10-12" rule violates the Eight Amendment Principle in *Mills v. Maryland*, *Id.* at 85 (6) the county-by-county funding of death penalty prosecutions violates the

Eight Amendment, Due Process Clause, and Equal Protection Clauses of the Fourteenth Amendment, *Id.* at 92.

Allen C. Isbell was appointed to represent Allen on his direct state appeal.  C.R. Vol. 2, P 625.  The Court of Criminal Appeals filed their opinion affirming the judgment of the trial court on June 11, 2003.  Steve Morris was appointed to represent Allen in his state Writ of Habeas Corpus on May 16, 2001.  The state writ was filed on January 8, 2003, while the direct appeal was still pending in the Court of Criminal Appeals.  On January 28, 2009, while the state Writ of Habeas Corpus was still pending in the trial court, Steve Morris was replaced by Danny Easterling as the state writ attorney on account of Steve Morris being hired by the Harris County District Attorney's office.  (*See Harris County District Clerk, Cause No.* 844387A).   On September 9, 2009, the Harris County District Attorney's office was recused from the state writ proceedings because petitioner's former state writ counsel, Steve Morris, had joined the District Attorney's office.  *Id.*  The office of the Attorney General of Texas was appointed as district attorney *pro tem* on that same date.  *Id.*  The trial court ruled on Allen's state writ on February 17, 2011, by adopting the State's Proposed Findings of Facts and Conclusions of Law in its entirety.  *Id.*  The Court of Criminal Appeals adopted the trial court's findings and conclusions on April 28, 2010.  *Id.*

**B.     Procedural History in Federal Court.**

On May 12, 2010, this court appointed Mr. Tom Moran as Allen's lawyer.  (Doc. No. 2).  However, Mr. Moran's CJA-30 voucher did not issue until June 23, 2010.  (Doc. No. 3).  On November 18, 2010, Allen wrote to the court requesting that Moran be relieved as his counsel.  (Doc. No. 5).   In support of his core contention that Mr. Moran had not been communicating with him, Allen attached several plaintive letters as exhibits. *Id.*  Mr. Moran was relieved on

January 12. (Doc. No. 8).  Kretzer and Landers were appointed on January 24. (Doc. No. 11). Petitioner's initial brief was due on April 28, 2011.  (Doc. No. 21)  Petitioner was given until October 31, 2011, to file this revised writ.  *Id.*  On October 26, 2011, petitioner's filing deadline was once again extended to its current date of February 1, 2012.  (Doc. No. 14)

### C.     Petitioner is Confined by State Officials.

Since 2001, Allen has been confined in the Polunsky Unit, by the Director of the Texas Department of Criminal Justice, and by the warden of the Polunsky Unit.

### Statement of Facts

This statement of fact is intended to introduce the factual basis for the claims presented below, and to give the court a general outline of the facts presented at Allen's trial.  Where it is necessary, the factual basis for individual claims will be expanded upon within the claim itself.

### A.     Voir Dire.

Voir dire in the petitioner's case was conducted using the 'pool' method.  On the first day of voir dire a large venire panel was brought into the court room and many venire persons were immediately excused by agreement of the parties based on their answers to jury questionnaires. R.R. vol. 4, p. 3.  After this, the Trial Judge conducted voir dire for the remainder of the first day. *Id.* at 1-245.  During the judge's voir dire potential juror's who had identified themselves as unfit to serve on the petitioner's jury were excused by agreement.  *See, e.g.,* R.R. vol. 4, p. 129-30.

After the initial group voir dire individual venire persons were called back to court to be examined by both counsel for the state and counsel for the defendant.  *See, e.g.,* R.R. vol. 5. After conducting voir dire of individual venire persons, both sides were given the opportunity to present strikes for cause.  *Id.* at 31.  Those venire not struck for cause were placed in a pool of

potential jurors.  This process was continued until a sufficient number of potential jurors had been identified.  After a sufficient number of potential jurors were selected from the original venire pool, a date was set for both sides to conduct preemptory strikes on the potential jurors. *See, e.g.,* R.R. vol. 21, p. 3-40.  On the appointed, date the State was given the opportunity to strike first, and if they failed to do so the defense was given the same opportunity.  *Id.* at 27-40. If neither side used one of their strikes to remove the venire person then the person was placed on the jury.

Particularly relevant to this application for Writ of Habeas Corpus is the failure of the trial court to grant the petitioner's strike for cause on a venire person, Mr. Gordon Berg.  During individual voir dire Berg expressed that he was strongly in favor of the death penalty because he thought it was a deterrent and because he thought it saved the tax payers money. R.R. vol. 5, p. 43,44.  More importantly, throughout the individual voir dire Juror Berg expressed reservations about his fitness a juror in the petitioner's case[2].  *Id.* 49-50, 62, 67-72, 80-81.  Specifically, Berg had reservations about whether or not he could be a fair juror in a case which concerned the murder of a young child.  *Id.*  Berg repeatedly expressed his concern that no mitigation evidence would prevent him from answering the special issues in such a way so as to prevent the death penalty from resulting.  *Id.*

After the individual voir dire the defense challenged Berg for cause on the grounds that his "feelings toward mitigation substantially impair[] his ability to carry out his performance as a juror in this type of case."  *Id.* at 82-83.  The court denied this challenge.  *Id.*  On the morning the lawyers were to choose the jury from the final qualified pool, the petitioner's attorneys requested an additional peremptory strike to use against Berg because the court had overruled his challenge for cause.  Petitioner's attorneys used a peremptory strike on Berg, and immediately requested

---

[2] The text of venire person Berg's testimony will be discussed in greater detail below.

another peremptory (R.R. Vol. 21, p. 3, 26-27).  The court denied this request.  After using his fifteen peremptory strikes, Allen was forced to accept Linda Smith, Juror No. 348, because "we don't have any more strikes" (R.R. Vol. 21, p. 32).   While petitioner did not articulate why he would have used a peremptory on Ms. Smith and why she was not an acceptable juror, her answers during voir dire raised several grave concerns.  She said that she believed one group of people is more dangerous than others, and that group of dangerous people were "Blacks" (R.R. Vol. 19, p. 211).  Specifically, she said: ". . . It seems like to me that the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks. "(R.R. Vol. 19, p. 212).   Unfortunately for the petitioner, because his trial attorneys had exhausted their peremptory strikes and were not granted any additional strikes, they were forced to accept Juror Smith despite her bias against people of the petitioner's race.

### B.    Guilt/Innocence Portion of the Trial.

In November of 1999,  Petitioner Allen, Kimberly Jones[3] and her four children - Denzel age 4, Champagn age 3, Kienna Baker age 2, and Tristen age 1 - started living together in the Redford Square Apartments in Houston, Harris County, Texas. R.R. vol. 22, p. 64, 73-78.  She had met Allen downtown at a bus stop recently before moving in with him.  *Id.* at 68.  At the time she was 23 and he was 40.  *Id.* at 69.   Allen was unemployed for the majority of the time he and Ms. Jones were together; Ms. Jones worked at various jobs, primarily in housekeeping at various hotels.  Allen became the primary baby sitter and disciplinarian for the small children, and he repeatedly punished Kienna and the other children for urinating on themselves.  R.R. vol. 22, p. 87, 94-97.

---

[3] Ms. Jones was compelled to testify in this case, and was granted immunity in return for her testimony.  R.R. vol. 22, p. 51.

On May 10, 2000, Ms. Jones went to work at the Radison Hotel.  Her time card shows that she worked from 7:53 a.m. until 12:35 p.m. R.R. vol. 21, p. 64.  When she left the apartment, the children were asleep in bed.  Allen was awake in the living room. R.R. vol. 21, p. 107-108.  Shortly after noon, Allen called the Radison Hotel and told Elizabeth Hoskins, manager for housekeeping, that he needed to talk with Ms. Jones because there was an emergency involving one of her children *Id.* at 60,66.  This message was relayed to Mrs. Jones, but Mrs. Jones did not immediately leave to go check on her children, instead she waited for about 15 minutes before leaving.  *Id.* at 66-67.  At this point Ms. Jones began walking back to the apartment complex.  Allen met her in the parking lot.  Allen was sweating profusely and had a fast hart beat.  R.R. vol. 22, p. 113.  Allen said, "I didn't do anything to her.  I didn't do anything to her."  He told her that Kienna had peed on herself and that he had spanked her.  He said that he put her on the toilet, that she fell off the toilet and bumped her head.  When she didn't move, he tried to wake her up by shaking her.  *Id.* at 113; R.R. vol. 23, p. 64.

They ran to the apartment.  *Id.* at 114.  Kienna Baker's lifeless body was in a bedroom.  She did not have any clothes on, except for a pair of boy's underwear that was soaking wet.  Ms. Jones took off the boy's underwear and put girl's underwear on Kienna.  Kienna's hair was not combed and there was Vaseline in the room where she was found.  *Id.* at 114-120. Foam was coming out of Kienna's mouth and nose. *Id.*  Allen told her not to call 911.  *Id.*  They went to another apartment to get bus fare so Allen could get away.  R.R. vol. 22, p. 121-123.  Then, they went to some pay phones where Ms. Jones called 911.  *Id.* at 124-125.  Ms. Jones also testified that she had hit Kienna with belts as a form of punishment, but that she had not done this for a couple of weeks at the time Kienna died.  *Id.* 141-142.  She said that she had begun whipping her children with belts before she ever met Kerry, that she began doing this before her children could

speak, and that she thought it was a correct way to treat a child who misbehaves.  R.R. vol. 23, p. 20-30.

The fire department was dispatched at 1:15 p.m.  Captain Leonard Cherry arrived at 1:18p.m.  He found Kienna Baker in the back bedroom.  She was lifeless.  White froth was coming from her nostrils.  He attempted to locate something the child might have ingested, but he was not able to find anything that would account for the child's condition.  R.R. vol. 21, 80-89.  His attempts to revive the child were unsuccessful. *Id.* at 21, 72,74-75,78.  EMT's from the Houston Fire Department arrived on the scene at 1:33 p.m.  When they arrived they found a fire truck already at the scene and firemen performing CPR.  *Id.* at 96-108.  The EMT's took over the life saving attempts and continued to administer CPR on the child and gave the child medication. *Id.*

Allen locked himself and the other three children in another bedroom and told Ms. Jones not to tell the police that he was in the house.  R.R. vol. 22, p. 127,129,130.  Finally, she told the police he was in the bedroom.  When he would not unlock the door, the police kicked in the door.  Allen had fled out the back window.  R.R. vol. 22, p. 132,133.

The ambulance took Kienna Baker to the Southeast Memorial Hospital where the child was pronounced dead at 2:08 p.m.  R.R. vol. 21, p. 113,120,135.  At 6:51 p.m., her body was taken to the medical examiner's facility.  Dr. Lee Ann Grossberg Krishnan, assistant medical examiner, conducted an autopsy and ruled that the cause of death was blunt force injuries to the chest and abdomen R.R. vol. 22, p. 41.  The child likely died within an hour of sustaining the injuries.  *Id.* at 29.  Dr. Grossbery discussed numerous other bruises and scars found on the child in varying states of healing.  R.R. vol. 21, p. 150-170.  She testified that even an adult should not have as many scars as this child did.  *Id.* at 183.  There was also testimony presented that there

had been trauma to the vagina and anus of the child, however these injuries were not the cause of death.  *Id.* at 180-190; R.R. vol. 22, p. 42.  The examiner did admit that some of the bruising found on the child could have been caused by medical personnel performing CPR.  *Id*. at 216.

Dr. Christi Kim and Director James Bolding of the infamous Houston Crime Lab also testified at Allen's trial.  R.R. vol. 24, p.73-125.  The basic thrust of their testimony is that semen was found in the child's underpants, however the DNA test was inconclusive because there was not enough biological matter to identify the source of the DNA.

When he arrived on the scene, around 3pm, the investigating officer, Sgt. Binford, began speaking with Ms. Jones, who pointed out the black belt which was apparently used by Ms. Jones and Allen to punish the children.  R.R. vol. 24, p. 135.  He also found two Bibles sitting open on the living room couch of the apartment.  The Bibles were open to Mathew 9, verse 18, which describes one of the miracles of Jesus where he placed his hand on a dead little girl and brought her back to life.  *Id.* at 137-138.  After leaving the crime scene he took Ms. Jones with him to the hospital, where he relayed that her child had been pronounced dead.  *Id.* at 138-140. The detective stayed at the hospital for around one and a half hours, he then left and went back to the homicide office.  He took Ms. Jones with him.  *Id.* at 141.  Based on his experience with Ms. Jones Sgt. Binford concluded that "she is a lady of below average intelligence."  *Id.* at 133. After his meeting with Ms. Jones Sgt. Binford had only one suspect.  It was Kerry Allen.  *Id.* at 141.

On May 12, 2000, Allen surrendered himself to Forrest Cornell McGeehee, Jr., at the Harris County jail.  R.R. vol. 23, p. 175-80.  Allen was crying and said there had been an accident and that Kienna had been killed.  McGeehee called Sgt. Binford of the Houston Police Department homicide division R.R. vol. 23, p. 179-183.  When Sgt. Binford arrived Allen was

still crying.  Sgt. Binford told Allen he was the only suspect, and Allen said, "I know." R.R. vol. 24, p. 165.  Allen volunteered to go to Sgt. Binford's office.  *Id.* at 164.  On the way to Sgt. Binford's vehicle, Allen said, "I should never have done it.  My temper gets control." *Id.* at 166).

After the presentation of evidence at this phase of the trial the Jury found Allen guilty of the capital murder of Kienna.  R.R. vol. 25, p. 110.

### C.  Punishment Portion of the Trial.

The mitigation case presented by the state began with the admission of evidence, stipulated to by the defense, concerning Allen's prior conviction for aggravated sexual assault. R.R. vol. 26, p. 1-10.  The indictments introduced by the state show that the defendant pled guilty to knowingly penetrating the anus of a child less than fourteen years old, with his finger. *Id.*  The State also called witnesses that established Allen failed to follow the requirements of registering as a sex offender, and that by doing so he violated parole.  *Id.* 55-99.  Carla Jones, Allen's ex-wife, described Allen as a controlling person who would snap and become violent at times.  *Id.* at 11-46.  The state also presented Sonji Allen, Allen's first wife, who testified that Allen would often become abusive in their relationship.  Liza Turner testified that Allen met her at a church where he was acting as the youth pastor, and started an inappropriate relationship with her when she only 11 or 12 years old.  *Id.* 165-182.  The state also called some of the officer's involved in investigating Allen's case.  *Id.* at 205; R.R. vol. 27, p. 3.

The defense called a clinical psychologist from Dallas who testified two the low probability that Allen would commit futures acts of violence while incarcerated.  R.R. vol. 27, p. 14-83.  They also called pastors and friends who knew Kerry from the time when he was a child in St. Louis, as well as those that knew him as an adult.  None of Allen's family were called to

testify.  Finally, the defense called Bettina Wright, a clinical social worker who had met with Allen and who had reviewed reports created by defense investigators.

Many themes important to the claims raised in this writ are apparent from evidence introduced at the punishment phase of Allen's trial.  One of these themes is the repeated references to Allen's inability to find or hold a job, which was also established through the testimony of Kim Jones during the punishment phase.  Sonji Allen, Allen's first wife explained that Allen did not have job when they were first married, and that the entire time they lived together in St. Louis he never had a job for more than a couple of weeks, although he would go looking for work.  R.R. vol. 26, p. 117.  This trend continued when Sonji lived in Texas with the petitioner.  R.R. vol. 26, p. 122, 124.  The same information was reported by Venessa Henry, the mother of the children the petitioner plead guilty to assaulting prior to the case hand.  She reported that during the time Allen was living at her house he did not have job and did not help around the house.  *Id*. at 189.  Indeed, testimony established that for a while times were so difficult for Allen that he was homeless and lived in a shelter.  R.R. vol. 27, p. 89-90.

Another continuing theme throughout the trial was repeated testimony which raises doubts about Allen's mental status.  Sonji Allen testified that Allen tried to commit suicide twice during their relationship.  *Id.* at 152, 153.  On the first occasion Allen took some pills and drank some wine in an attempt to take his life. *Id.* This lead to his stomach being pumped and being interviewed by a psychiatrist.  *Id.*  The second attempt consisted of Allen placing his head in a stove and turning the gas on, he was found by the person he and Sonji were staying with before he lost consciousness.  Sonji also expressed concerns that Allen was possessed by some sort of spirits or at least had a split personality.  *Id.* at 155, 158.

Further, throughout the punishment phase evidence was introduced establishing a pattern of abuse and neglect throughout Allen's life.  Allen had told his first wife Sonji, years before the instant offense, that he had been molested by his uncle as a child.  *Id.* at 155.  Bettina Wright, who had reviewed records related to Allen and interviewed him also shed light on his background.  She found that he had been a survivor of chronic sexual abuse during his childhood.  R.R. vol. 28, p. 6.  She believed that this abuse started at an early age and continued through all his childhood.  Testimony was presented to the effect that Allen had been forced to masturbate and perform oral sex on his uncle as child, that he was fondled and sexually assaulted by his brother, and that he was raped by a stranger as a teenager.  *Id.* 13.  There was also evidence presented that Allen and his twin sister were conceived during the sexual assault of their mother.  *Id.* at 12.  There was further testimony presented which outlined how detrimental chronic abuse such as this is to the psychological development of a child.  *Id.* at 6-12.  Basically, there is a belief that constant abuse at a young age retards psychological development and prevents those abused from fully developing in the same way as a child who is not abused.  *Id.*

After three days of deliberations the jury in this case returned their verdict.  They found that the petitioner would constitute a continuing threat to society, and that there were no sufficient mitigating circumstances to warrant that a sentence of life imprisonment be imposed.  During their three day penalty phase deliberations the jury twice requested to review the testimony of Bettina Wright, who had relayed the information concerning the chronic sexual abuse of the petitioner.  This suggests that at least some of the jurors were holding out in favor of a life sentence based on the information presented by this witness.  C.R. Vol. II at 581,582.

**D.**     **Lack of records from previous counsel and investigation of claims.**

Shockingly, the undersigned counsels were only able to obtain one bankers box of records from all previous counsels combined.  A review of the trial transcripts will show that Attorney Skip Cornelius conducted the defense for the guilt/innocence stage of the trial, while Alvin Nunnery conducted the punishment phase.  Skip Cornelius is the only attorney related to this case who was able to provide the undersigned counsel with a file.  Mr. Cornelius explained that Mr. Nunnery would be the one who had the records relating to punishment.

Alvin Nunnery was difficult to get into contact with.  Eventually, undersigned counsel, Jonathan Landers, ran into Mr. Nunnery at the Harris County Criminal Court House.  Nunnery explained that he had no records relating to the petitioner's case.  He believed he would have passed all records along to the state appeal or habeas counsel.  Neither of these attorney's had any records beyond a copy of their filings.  Further, it is not clear if the state habeas attorney even reviewed files from the trial attorneys.  The lack of mitigating documents was troubling, especially because of the strong mitigating evidence alluded to in the trial transcripts.  This lead the undersigned counsel to conduct an inquiry into the extent of the mitigation investigation undertaken by the defense team.  Specifically, undersigned counsel noted that not a single member of the petitioner's family had been called to verify the abuse the defendant suffered as a child.

The first step undersigned counsel took was to contact those who had taken part in the petitioner's case.  Bettina Wright, who testified at the defendant's trial about the abuse he suffered as a child explained that she only keeps records for five years, and that she had long since destroyed all records relating to this case.  She did not remember much about the specifics of the case.  Next undersigned counsel attempted to locate Lisa Milstein, who, according to documents obtained from the Harris County Auditor's Office traveled to St. Louis to conduct an

investigation for the defense.  Milstein could not be reached, and a simple Google search leads to the reason why: after her involvement in the petitioner's case she apparently was using illegal drugs with witnesses who she was attempting to get statements from.  She no longer works as a capital investigator.

However, things changed when the undersigned counsel was able to track down Gerald Bierbaum, who also assisted in the investigation of Allen's case.  (*See Appendix B,* Declaration of Gerald Bierbaum.)  He now works for the Federal Public Defender in Nevada.  Bierbaum remembers Alvin Nunnery being lead counsel for mitigation, and also remembers giving his entire work product to Nunnery.  Importantly, he also remembers that "Ms. Milstein and I discovered some testimony that supported the physical and sexual abuse Mr. Allen suffered during prior to his leaving home as a teenager."  *Id.*  This leaves the question, why were none of these supporting witnesses called by the petitioner's defense team to testify in trial?  After all, evidence of abuse confirmed by people who knew the defendant in the past is stronger than the same evidence relayed by a doctor who has only interviewed the defendant a few times.  Indeed, the jury signaled this by asking the judge if Bettina Wright had actually met with the applicant's family.  C.R. Vol. II at 581,582.

The answer to why the witnesses were not called was also addressed by Bierbaum in his Declaration.  *See* Appendix B.  He recalls as follows:

> As the trial approached, we selected witnesses to testify. I recall that some of the selected witnesses refused to come to the trial in Houston after learning about the mitigating evidence to be presented.  I recall this troubled the defense team greatly because their testimony would have verified the abuse that Mr. Allen revealed.  I believe the team assumed these witnesses would cooperate because of their interviews.  I believe that we did not have enough time to pursue out of state subpoenas when we found out the witnesses would not willingly appear.

*Id.* It appears that the witnesses were not subpoenaed originally because the defense expected them to come to trial if requested, but that the witnesses backed out as the trial date neared.  No subpoenas were ever filed for the witnesses, and the likely result is that the jury gave less weight to the evidence of past abuse in the petitioner's life than they would have if these witnesses had been subpoenaed.

It seems obvious that the state trial counsel's failure to subpoena witnesses who had direct knowledge of the petitioner's abusive childhood would be an issue which state habeas counsel would raise at the state habeas level. However this did not happen, possibly because the state habeas counsel failed to raise claims which were not directly related to the record.  In fact, as will be discussed below, it appears that the state habeas attorney completely failed to act as a habeas counsel should.  According to records obtained from the Harris County Auditor's office, of the more than 228 hours spent by the state habeas attorney on the state writ, *none of these hours were spent visiting with, or interviewing the client*.  Based on the Auditor's record, it is clear that the state habeas counsel was not acting as an habeas attorney, but rather as a second shot appellant attorney.  He spent no time investigating claims outside of the record.  He spent a total of 228.75 hours working on his state writ (not including time printing the writ).  Of that time 172.5 Hours were spent on research and writing, and 56.25 hours were spent reading the record.  This is what one would expect from a direct appeal counsel, not a habeas attorney.  The majority of claims raised by the state habeas attorney were copy and pasted directly from the state appeal.  This most likely accounts for the state habeas attorney's failure to raise an ineffective assistance of counsel claim related to the failure of the defense to subpoena witnesses necessary for the defense.

## General Discussion of Capital Punishment Law in Texas

The following is an overview of capital punishment law in Texas.  This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty.  To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder.  For instance, kidnaping and then killing a person is a capital offense.  So is killing two people, rather than one.  Killing a police officer in his line of duty is a capital offense.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead attorney; the other is the second chair attorney.  Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The reason for this is state and federal law require all issues raised on appeal to be first presented to the trial judge.  Death penalty jurisprudence is thick with constitutional and statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failure to do so means that the issues are waived for direct appeal.  Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty

litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense.  The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts.  Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors.  Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700.  Many jurors exercise certain allowable rights not to serve; others cannot be found.  On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order. Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first.  If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.

The second method can be referred to as the pool method.  The goal is to create a pool of forty-eight death penalty qualified jurors.  Each juror is questioned by the parties individually. The court rules upon any challenges for cause by the State or Defense.  If the juror is not disqualified, then the juror is added to the pool in consecutive number.  When forty-eight are reached, the court designates a day for strikes.  Beginning with the first juror qualified, the State announces whether it will accept the juror or exercise one of its peremptory challenges.  If not,

the Court turns to the Defense, which announces whether it will accept the juror or use a strike. If the juror is not struck by either, then the juror joins the petit jury.  The process ceases when twelve jurors and two alternates are seated.  *See Rousseau v. State*, 824 S.W.2d 579, 582 n.4 (Tex. Crim. App. 1992), *aff'd,* 855 S.W.2d 666, *cert. denied*, 510 U.S. 919 (1993).

Both prosecutors and defense attorneys generally prefer the pool method.  Both sides can exercise their strikes intelligently, eliminating the jurors at the extremes based on their death penalty views.  This method benefits the defense by allowing identification of each of the *Morgan v. Illinois* jurors who managed to escape a cause challenge, before using any strikes.  (In *Morgan v. Illinois*, the Supreme Court held that a juror who would automatically impose the death penalty for a capital murder regardless of the mitigating circumstances may be removed for cause.  112 S. Ct. 2222 (1992).)

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called "special issues."  The questions have varied over the years.

The method of answering the special issues is complicated.  If the jurors unanimously answer all questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the

defendant is sentenced automatically to life in prison.  There is no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

In a non-capital case, jurors are informed of the effects of parole.  In 1990, Texans amended the state constitution to require juries to be informed when a defendant becomes eligible for parole.  In the 1970s and 1980s, there was concern that defendants served only a fraction of their sentence.  Those supporting accurate sentencing wanted jurors to know when the defendant would be eligible for parole so that this could be taken into consideration when deciding the sentence.

In sharp contrast, in a death penalty case jurors are not permitted to know this information.  A defendant who is tried for the death penalty, but who receives a life sentence, is eligible for parole only after he has served forty years.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal