is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

**Argument and Authorities**

**Issue One**

**The Texas death penalty scheme violates the Sixth, Eight, and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.**

    **A.**    **Introduction.**

Allen is entitled to habeas corpus relief on this claim because the state court's holding that the petitioner's "reliance on *Apprendi* is misplaced" was contrary to clearly established federal law.  *Allen v. Texas,* 108 S.W.3d 281 (Tex. Crim. App. 2003).  Problematically, the Court of Criminal Appeals concluded:

> *Apprendi* applies to facts that increase the penalty beyond the 'prescribed statutory maximum.' Under Texas Penal Code sections 12.31 and 19.03, the "prescribed statutory maximum" for capital murder is fixed at death. Nothing the jury or judge decided during the punishment phase could have enhanced appellant's sentence beyond the prescribed range. **Further, *Apprendi* did not address who bears the burden of proof but focused on who should be the fact-finder for sentence enhancement.** Point of error twelve is overruled.

*Id*, at 285 (emphasis added).

    **B.**    ***Apprendi* Was Applied to Capital Sentencing in *Ring v. Arizona*.**

In *Ring v. Arizona,* the Supreme Court applied the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to capital sentencing schemes, holding that the Sixth Amendment requires a jury to find the aggravating factors necessary for imposing the death penalty beyond a reasonable doubt.  536 U.S. 584 (2002).  *Ring* overruled a portion of *Walton v. Arizona*, 497 U.S. 639

(1990), that had previously rejected this contention.  *Ring* also essentially overruled the provisions of *Spaziano v. Florida* 468 U.S. 447 (1984) which allowed a judge to impose a death sentence, overriding a jury's recommendation of life imprisonment.

The Court of Criminal Appeals' decision is fundamentally opposed to *Ring*. Furthermore, the Court was incorrect that *Apprendi* did not address who bears the burden of proof.

**C.     The Texas Mitigation Special Issue Includes Consideration of Aggravating Factors.**

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way.  *See* Tex. Code Crim. Pro. art. 37.071 (Art. 37.071).  After a Texas defendant is convicted of capital murder, a series of questions known as "special issues" are submitted to the jury.  *Id.*  Based on the jury's answer to the special issues the defendant will be sentenced to life in prison or death.  *Id.*  In the petitioner's case only two special issues were submitted to the Jury.  *See* C.R. at p 567-576.  Pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question:  "Do you find beyond a reasonable doubt that there is a probability that the defendant, Kerry Dimart Allen, would commit criminal acts of violence that would constitute a continuing threat to society?"  *Id.* at 574.  The state was required to prove this special issue beyond a reasonable doubt, and the jury was instructed that they could not answer this special issue "yes" unless they agreed unanimously.  *Id.* at 568; *See* Art. 37.071(d)(2).  This claim does not involve the first special issue because the jury was required to find this "aggravating factor" beyond a reasonable doubt.

If the jury finds the answer to special issue no. 1 to be "yes," they are instructed to move onto the second special issue, which asks: "Do you find from the evidence, taking into

consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Kerry Dimart Allen, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?"  CR at 575; *See also* Art. 37.071(e)(1).  This is known as the mitigation special issue and was adopted to meet the Eight Amendment requirement that jurors in death penalty cases be allowed to consider all mitigation evidence when considering the death penalty.  *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

The cynosure of this sentencing rubric is Texas Court of Criminal Appeals doctrine interpreting the mitigation special issue to encompass aggravating evidence which is only relevant to the mitigating issue.  In *Jackson v. State*, the Court explained that "we have recently recognized that aggravating circumstances can be considered in connection with the mitigation special issue."  992 S.W.2d 469, 478 (Tex. Crim. App. 1989) (citing *Mosley v. State*, 983 S.W.2d 249, 264-272 (Tex. Crim. App. 1998)).   "In *Mosley*, we explained that aggravating circumstances may be relevant to determine whether a particular mitigating circumstance or set of circumstances is sufficient to warrant a life sentence."  *Id*.  As the Texas mitigation special issue encompasses aggravating circumstances the jury should be instructed that it must find those aggravating circumstances beyond a reasonable doubt before they can consider those factors in answering the mitigation special issue.

> **D.**     **The State Court's determination that *Apprendi* is not applicable to this claim is contrary to clearly established federal law.**

Allen asserts that the State must prove aggravating factors considered by the jury in answering the mitigation special issue beyond a reasonable doubt.  To the contrary, the Court of Criminal Appeals concluded that Allen's reliance on *Apprendi* is misplaced because *Apprendi*

only "applies to facts that increase the penalty beyond the 'prescribed statutory maximum.'" *Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. – 2003). The crux of the Court of Criminal Appeals' analysis is that, "[u]nder Texas Penal Code sections 12.31 and 19.03, the 'prescribed statutory maximum' for capital murder is fixed at death. Nothing the jury or judge decided during the punishment phase could have enhanced appellant's sentence beyond the prescribed range." *Id*. at 284. The holding of Texas's Court of Criminal Appeals is antithetical to that of *Ring v. Arizona*, 536 U.S. 584 (2002).

   *Ring* decided the exact same issue raised here: does *Apprendi* apply to the Arizona capital sentencing scheme even though the statutory maximum for that crime was the death penalty? *Id.* at 591. "In Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." *Id. Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Thus, since *Apprendi* applies to the finding of aggravating factors in *Ring,* this same finding must also apply to aggravating factors in Texas' death penalty jurisprudence.

   *Ring* recognized that "[u]nder Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made." 536 U.S., at 592. It necessarily follows that a Texas capital defendant could not be sentenced to death (the statutory maximum) unless the first special issue was answered "yes" and the second special issue answered "no". Tex. Code Crim. Proc. Art. 37.071 2(d)(2).

The *Ring* Court then went on to explain that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." 536 U.S., at 602. This applies to the issue at hand because the State increased the defendant's sentence to death, based on the juries finding that mitigating evidence did not overcome aggravating evidence so as to warrant a life sentence. "The required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict." *Id*. at 602 (internal citation omitted).

It necessarily follows that *Apprendi* applied to *Ring* despite the fact that the judge's finding did not increase the statutory maximum for the crime *Ring* was convicted of. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Id*. at 609 (citing *Apprendi* at 494, n.19). Likewise, the finding that mitigating evidence does not call for sentence of life is the equivalent of an element of a greater offense, especially where the jury is permitted to consider aggravating factors in deciding on the mitigation special issue.

The Court of Criminal Appeals's decision is contrary to clearly established Supreme Court Precedent because of its holding that *Apprendi* was inaplicable because the statutory maximum is not increased based on the special issue in question.

**E.     The State Court's determination that *Apprendi* does not address who bears the burden of proof is wrong.**

The Court of Criminal Appeals also contradicted controlling precedent in its holding that, "*Apprendi* did not address who bears the burden of proof but focused on who should be the fact-finder for sentence enhancement." 108 S.W.3d, at 287. This contention is problematic because in the immediately preceding paragraph, the Court correctly stated the holding of *Apprendi*:

"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id*. It necessarily follows that this portion of the Court's opinion was contrary to clearly established federal law.

**F.    Harm:  the state court should have instructed the jury that in deciding on the mitigating special issue they were only to take into account aggravating factors which had been proven beyond a reasonable doubt.**

The Texas Court of Criminal Appeals has held that aggravating circumstances may be considered as part of the Texas mitigation special issue**.**  In Allen's case, there were aggravating circumstances which the prosecution urged the jury to consider which could only impinge on the mitigation special issue.  Because these aggravating factors allowed the jury to sentence Allen to death, they should have been proven beyond reasonable doubt.  During closing argument, the Prosecutor urged the jury to consider aggravating circumstances which had not been proven beyond a reasonable doubt and which were relevant only to mitigation.

*1.  Aversions To The Church*

"Some people choose God and God's name to spread their evil, like Kerry Allen." Vol.29, p. 38.

"Think about what a chameleon he is now.  Think of how he gathers the flock.  Think how he ministers and brings people into his confidence.  You don't think he won't be doing that in prison?  He's done that over and over and over again in church after church after church.  People who have opened their hearts to him and trusted him, who have given to him, Kerry Allen is a taker and a user.  And he will continue to be that person in prison."

"He is going to have a whole new population of potential victims.  He will gain those guards' trust.  He will minister to the masses.  How many times have you heard about prison ministry?"

Vol.29. p. 40.

"He just has a new population.  A new population of opportunities if sentenced to life in prison who has a right to be free from a man like that."

 Vol.29. p. 51.

### 2. *Rape Contentions*

"You heard from their own expert that pedophiles do seek out to have their needs met. And Kerry Allen will not stop today, he will not stop tomorrow, he will keep seeking out to fulfill those needs."

Vol.29. p. 51.

"And what did he do when he was given that new chance. He preyed on Kim Jones, her vulnerability, her naivety, her need to have a man in her life, a father for her children, a support mechanism. He raped her son, he beat her son, he raped her daughter, he beat her daughter and ultimately he killed her daughter."

Vol.29 p. 56.

"There's the truth and then there's Kerry's story. Those are the words from his twin sister. The twin sister that he talks about being raped by the uncle that he says he was also raped by. The twin sister who said, 'I wasn't raped, a man exposed himself to me. I told my mother and he went to jail.' But there's the truth and there's Kerry's version."

Vol.29 p.41-42.

### 3. *Rehabilitation Efforts*

But they will have you believe that he's somehow remorseful in that videotape. You heard that Sargeant Binford that he turned on that—that act when the video started rolling. That he went back and forth in his emotions.

Vol.29 p. 50.

"This man has had opportunity after opportunity to rehabilitate, to get a fresh start, to pull into check his meanness and the evil that he perpetrates upon people. And he has chosen not to do that."

Vol.29 p. 52.

"The only way there is even mitigation of any kind is if you believe his sheer statement to the interviewer. And if you don't believe that there's nothing."

Vol.29 p. 53.

"He is responsible for that answer to Special Issue No. 1 that he will be a future threat.  He alone is responsible.  It's not his mama, it's not his daddy, it's not anyone but that man.  Because that man at every turn of his life could have changed the way he went."

Vol. 29 p. 55.

"Nine years, where was Kerry Allen?  I promise you if it had been good deeds they would be here.  For nine years a fugitive.  And then we see Kerry Allen again."

Vol.29. p. 47.

> ### G.     Conclusion.

Allen has shown manifold violations of his Sixth and Fourteenth Amendment rights. This court must overturn his sentence of death.

### Issue Two

**The State of Texas, by requiring individual counties to fund the prosecution of capital cases, injects arbitrariness into the selection of which cases will be tried as capital cases; this violates the Eight and Fourteenth Amendments to the United States Constitution.  The Texas Court of Criminal Appeals' adjudication of this claim resulted in a decision that involved an unreasonable application of clearly established Federal law.**

> ### A.     Discussion of the Issue.

*Texas Code of Criminal Procedure*, Art. 26.052, requires county funds to be used to pay the court costs, investigative fees, and attorneys fees for capital defendants.  Of course, these costs are not the only costs associated with capital cases.  Capital prosecution also imposes substantial cost on a county in the form of prosecutorial and investigative resources, and by tying up district courts for weeks at a time.  After a grand jury has determined that probable cause exists that a defendant committed a capital offense, and after the prosecuting attorney determines that there is sufficient evidence upon which to seek a death penalty, he must decide whether the county coffers have sufficient funds to go forward with a death penalty prosecution.  A capital murder case, in which the State is seeking the death penalty, is extremely expensive.  The

average case costs approximately $2.3 million.  See: "Press Release from Office of State Senator Eddie Lucio, Jr.", dated April 19, 2001 (*Appendix A,* p 7-8, relied upon by the petitioner in state court).  This financial factor is a necessary, practical consideration in each of the 254 counties in Texas when a capital murder indictment is returned.  The result of this financial factor is that counties with large budgets are more likely to pursue a death sentence in any given case than smaller counties with smaller budgets, resulting in an arbitrary selection of which cases will be tried as death cases.

Financial constraints mean that similar capital murders committed by similarly situated defendants will be treated differently, solely because they were committed in different counties. Well-researched, public media articles have recognized this arbitrariness.  *See* Mike Tolson "A Deadly Distinction", *Houston Chronicle*, February 5, 2001 (*Appendix A,* p. 9-24, relied upon by the petitioner in state court).  Tolson's article makes it clear that a cruel anomaly exists within the Texas capital murder system: Geography means everything.  In smaller counties death penalty cases can ruin the county budget and exhaust personnel.  Therefore, they are not prosecuted as death cases.  Tolson points out that financial concerns do not affect decisions in Harris County, allowing for prosecutors to seek the death penalty in almost 60% of the capital cases.  Over the last twenty years the budget for the Harris County district Attorney's Office has increased steadily from $8.3 million to more than $30 million.

In another article, Steve Brewer shares experience of Tom Bridges, district attorney in San Patricio and Aransas counties, whose annual budget was only $292,000.  *See* Steve Brewer, "DA Can Afford To Prosecute With a Vengeance", *Houston Chronicle*, February 3, 2001. (*Appendix A,* 25-30 relied upon by the petitioner in state court).  The article explains the outside influences placed upon District Attorney Bridges from county administrators whenever he

decided to prosecute a capital case.  The article makes it clear the county commissioners, who controlled the budget for Bridge's office, would pressure the district attorney to refrain from prosecuting capital cases because of the great expense associated with them.  *Id.*  However, the article also makes it clear that Harris County does not face the same budgetary obstacles.  The article quotes long standing Harris County District Judge Michael McSpadden as saying "one of the reasons Harris County tries so many capital cases is simple economics - we can afford to." *Id.*

Unfortunately for the petitioner, he was indicted for the offense of capital murder in Harris County, Texas.  Statistical information obtained from the Texas Department of Criminal Justice shows that on January 3, 2003, there were 477 inmates on death row, over one-third (156) of whom received the death sentence out of Harris County.  See, *Appendix A,* p.1 number of offenders currently on Death Row dated 1/03/2003.  Other large counties, such as Bexar, Dallas, and Tarrant Counties, had only 36, 48, and 21 individuals on death row, respectively.  *Id.*  Of the 254 counties in Texas, One hundred and sixty-eight (168) counties have not had a person executed since 1976.  See, *Appendix A,* p. 2-4, Texas Department of Criminal Justice, "County of Conviction for Executed Offenders", http://www.tdcj.state.tx.us/stat/dr_county_conviction_exec uted.html.  Since that same date, Harris County has had 116 persons executed.  *Id.*  During that same period 35 people from Bexar County, 45 from Dallas County, and 36 from Tarrant County have been executed.  *Id.*  Today, Harris County continues to lead the way with 106 offenders currently on death row, out of a total of 303.  See, *Appendix A,* p. 5-6 http://www.tdcj.state.tx.us/stat/dr_county_conviction_offenders.html.

Texas' statute defining capital murder restricts the homicides subject to the death penalty, and the statutory special issues submitted to the jury determine which capital murder defendants

receive the death penalty.  If every similarly situated capital murder defendant in every county in Texas faced the death penalty whenever the district attorney felt the evidence warranted seeking the death penalty, the only variable would be the normal discretion given the prosecuting attorney in any criminal case.  However, the financial burden placed upon each county changes the equation dramatically.  This is demonstrated by the lopsided statistics showing which counties send people to death row.  The ability to prosecute a death penalty case depends upon the amount of funds available.  The amount of funds available is determined by county commissioners who decide the budget for the district attorney's offices, and of course by the total amount of funds available to the county commissioners.  It is logical that district attorney's offices in counties with large tax bases will have larger budgets than those in smaller and more rural counties.  As shown by the discussion above, district attorneys in counties with large budgets are free to pursue the death penalty in circumstances where district attorneys in smaller counties could not.  Therefore, the decision to prosecute a death penalty case in Texas is not determined solely by the nature of the offense or the offender himself or by the discretion of the district attorney, but also by financial resources available to the district attorneys in Texas' 254 counties.  This factor renders the administration of the death penalty in Texas arbitrary and capricious in the Constitutional sense.

### B.      The State Court's Decision.

This issue was raised by the applicant as his fourteenth point of error to the Court of Criminal Appeals on direct appeal.  That court ruled as follows:

> In the instant case, appellant attempts to provide a factual basis in support of his claim. He points to tables from the Texas Department of Criminal Justice's website showing the number of offenders sentenced to death and the number of offenders executed from each county in Texas. These tables indicate higher numbers for Harris County than any other county.

Appellant also relies on a press release that states that a death penalty case in Texas costs taxpayers an average of $2.3 million and that "[r]ural counties cannot always afford to try a death penalty case." See Press Release, Office of State Senator Eddie Lucio, Jr., District 27, *Landmark bill adding Life Without Parole as sentencing option in capital cases passes in Senate Committee on Criminal Justice,* April 19, 2001. Appellant next claims that two articles from the Houston Chronicle newspaper demonstrate that "[f]inancial constraints mean that similar capital murders committed by similarly situated defendants will be treated differently, based solely on which county has jurisdiction of the offense." See M. Tolson, *A Deadly Distinction,* HOUSTON CHRON., Feb. 5, 2001; S. Brewer, *DA Can Afford to Prosecute with a Vengeance,* HOUSTON CHRON., Feb. 3, 2001.

Appellant asserts: "Financial constraints in each of the 254 counties control the decision whether to seek the death penalty. The risk of facing the death penalty has been greater, substantially, in Texas counties with bigger budgets than in all the remaining counties." Appellant has given us information regarding the number of offenders sentenced to death and the number of offenders executed from each county in Texas, but he has failed to provide us with budgetary data for each of these counties.

The fact that Harris County, a large county with a large budget, sentences more offenders to death than any other county in Texas, does not in and of itself establish disparate treatment among similarly situated defendants. In fact, one of the articles cited by appellant states that the "history of ample budgets" is only one of several factors that contribute to the higher number of death penalty convictions in Harris County. See M. Tolson, *A Deadly Distinction,* HOUSTON CHRON., *287 Feb. 5, 2001. Appellant has made no threshold showing of disparate treatment between himself and other similarly situated defendants. Point of error fourteen is overruled.

*Allen v. Texas*, 108 S.W.3d 281, 286-287 (Tex. Crim. App. 2003) (internal footnotes omitted).

The Court of Criminal Appeals clarified their holding three years later in the case *Crustinger v. Texas*, 206 S.W.3d 607, 611-613 (Tex. Crim. App. 2006). In that case the court made it clear that they did not rule against the petitioner on this claim because he failed to present budgetary data for the counties in Texas, but rather because they believe prosecutors have discretion to seek the death penalty in a given case. *Id.* In *Crustinger*, the defendant made the same argument presented here in the form of a motion to quash the indictment which was ruled on by the trial court. *Id.* at 611. At a hearing on the motion, the defendant presented

budgetary data for at least 100 counties in Texas.  *Id.* at 612.  This was apparently done in an attempt "make a threshold showing of disparate treatment" as direct by the Court of Criminal Appeals in the petitioner's case.  *Id.*

The trial court denied *Crustinger's* motion, and this was appealed to the Court of Criminal Appeals who held:

> **Although we pointed out that the appellant failed to provide us with budgetary data in *Allen*, appellant has overestimated the significance of that statement. Because a prosecutor has discretion to seek or not to seek the death penalty in a given case, *Hankins*, 132 S.W.3d at 387; *Cantu v. State*, 842 S.W.2d 667, 692 (Tex.Crim.App.1992); *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (holding prosecutorial discretion not unconstitutional), the amount of resources available, if a factor at all, is only one of numerous factors that may bear upon the exercise of a prosecutor's discretion.** The exercise of prosecutorial discretion in an individual case necessarily employs the consideration of various factors including but not limited to: the facts of the case itself, the heinousness of the crime, whether the victim was defenseless, the location of the crime, the callousness of the execution, the particular defendant's history, and the level of the defendant's participation in the offense. We have held that prosecutorial discretion does not violate the Eighth and Fourteenth Amendments. *Hankins*, 132 S.W.3d at 387; *Ladd v. State*, 3 S.W.3d 547, 574 (Tex.Crim.App.1999). Given the broad discretion that a prosecutor possesses when deciding whether to pursue the death penalty, appellant cannot show that the trial court abused its discretion in failing to quash the indictment and declare the death penalty unconstitutional. Appellant's first point of error is overruled.

*Id.* at 612-613 (**emphasis added**).  This clarification shows that the Court of Criminal Appeals overruled the petitioner's argument on the grounds that it is constitutionally permissible to give prosecutors the discretion to decide which murder cases should or should not be prosecuted as capital death cases.  It is striking that the Court did not mention the county budget as a factor properly taken into account by a prosecuting attorney.  According to the Court of Criminal Appeals, the simple fact that one county might prosecute a murder and seek the death penalty, when another county faced with the same facts, because of lack of resources, would not, is just one of the "various factors" embedded in prosecutorial discretion.

**C.    The Court of Criminal Appeals decision on this issue involved an unreasonable application of clearly established federal law.**

Under the second clause of 28 U.S.C.A. § 2254(d)(1), "a state court decision is 'an unreasonable application of clearly established' Supreme Court precedent if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Foster,* 293 F.3d at 776 (quoting *Williams*, 529 U.S. at 407-08). As precedent for their ruling on this issue the state court cited *Gregg v. Georgia,* 428 U.S. 153, 199 (1976) (holding prosecutorial discretion not unconstitutional). The main holding of *Gregg* was that the "punishment of death does not invariably violate the Constitution." *Id.* at 169. However, the petitioner in that case also argued that the death penalty was arbitrarily applied in Georgia because of "the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law." *Id.* at 199. The Supreme Court addressed this argument as follows:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.*

*Id.* at 199 (emphasis added).

Based on this review of *Gregg,* it is clear that the state court was correct in ruling that "a prosecutor has discretion to seek or not to seek the death penalty in a given case." *Crutsinger,* 206 S.W.3d at 612. However, the state court unreasonably applied this rule to the petitioner case. The issue raised by the petitioner is not whether prosecutors should be allowed discretion

in deciding what cases are death worthy.  The issue raised by the petitioner is whether or not the United States Constitution allows defendants to be treated differently based solely upon the location where their offense was committed.  The petitioner established at the state level that district attorneys in Texas are forced to take more than the facts of the offense and the offender into account when deciding whether or not to pursue the death penalty.  More specifically, the petitioner made a showing that a defendant accused of murder in Harris County, where the petitioner was tried, is more likely than similarly situated defendant's in other counties to be charged with capital offenses.  This has nothing to do with the facts of the case or the background of the defendant.

Justice Whites concurrence demonstrates the unreasonable application of *Gregg*.  In concurring with the idea that a prosecutor's discretion to seek the death penalty does not violate the constitution, Justice White explained:

> Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. . . Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly "similar." If the cases really were "similar" in relevant respects it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary.

*Gregg,* 428 U.S. at 225 (White, J., concurring in the judgment).  The petitioner is alleging that the Texas death penalty scheme is unconstitutional because it injects factors unrelated to the crime itself into the decision making process.  Specifically, by requiring individual counties to fund costly death penalty litigation, the Texas scheme injects arbitrariness into the selection

process, creating a system were similarly situated defendants are treated differently based solely on the location where they are tried.  The petitioner is not alleging that the Texas penalty scheme is unconstitutional merely because prosecutors have discretion to decide which cases are death worthy.  It is for this reason that state court's decision is an unreasonable application of Supreme Court precedent.

> **D.**     **The State of Texas, by requiring individual counties to fund the prosecution of capital cases, injects arbitrariness into the selection of which cases will be tried as capital cases; this violates the Eight and Fourteenth Amendments to the United States Constitution.**

The petitioner asserts that the State of Texas, by requiring each individual county to fund death penalty prosecution, injects arbitrariness into the death selection process.  Financial constraints in each of the 254 Texas counties control the decision whether to seek the death penalty.  That the risk of facing the death penalty has been greater in Texas Counties with the largest budget is clear.  This violates the Eight and Fourteenth Amendments in the United States Constitution.  Further, that "[w]hen a defendant's life is at stake, the [Supreme] Court has been particularly sensitive to insure that every [constitutional] safeguard is observed."  *Gregg,* 428 U.S. at 187 (*citing Powell v. Alabama*, 287 U.S. 45, 71 (1932); *Reid v. Covert*, 354 U.S. 1, 77 (Harlan, J., concurring in result)).

"As the Court recognizes, a single general directive animates and informs our capital-punishment jurisprudence: '[t]he death penalty [may not] be imposed under sentencing procedures that creat[e] a substantial risk that [the death penalty] would be inflicted in an arbitrary and capricious manner.'"  *Sawyer v. Whitley,* 505 U.S. 333, 367 (1992) (Stevens, J., concurring) (*citing Gregg v. Georgia,* 428 U.S. 153, 188 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.).  Based on this principle the Court has insisted "upon general rules that ensure consistency in determining who receives a death sentence." *Kennedy v. Louisiana,* 554 U.S. 407,

436 (2008); *see also California v. Brown,* 479 U.S. 538, 541 ("The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion.").  The problem with the death penalty as administered in Texas is that there is no consistency in determining who will receive the death penalty.  As explained by the articles submitted by the applicant in Appendix *A,* many counties in Texas are reluctant to pursue the death penalty because of the high cost associated with doing so, and because they lack the resources to consistently seek the death penalty.  However, counties like Harris County, where the District Attorney enjoys a huge budget, have the capability to pursue the death penalty at will.  This creates a situation where similarly situated defendants, charged with similar murders, will be treated differently simply because they are accused of committing their crimes in different counties.

The Texas funding scheme flies in the face of the Supreme "Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all."  *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982).  It is for this reason that the petitioner requests this Court to find that the state court unreasonably applied clearly established Supreme Court Precedent to this case.  While it is true that prosecutors are allowed discretion in deciding how to proceed with capital cases, this does not apply to the issue at hand.  Texas' funding scheme injects arbitrariness into the Texas capital punishment scheme, and therefore violates the Eight and Fourteenth Amendment's to the United States Constitution.  The harm to the petitioner is clear; because he was tried in Harris County, his chances of being sentence to death were greater than a similarly situated defendant who was tried in a smaller county with less funding to seek the death penalty.  The petitioner asks this court to reverse the sentence of death handed down in his case, and also request any other relief allowed by law.

### Issue Three

**The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland* and *McKoy v. North Carolina.***

The petitioner is entitled to habeas corpus relief on this claim because the state court's adjudication: (1) unreasonably applied clearly established federal law by construing *Mills* and *Mckoy* in an unreasonably, and unconstitutionally, narrow way; (2) was contrary to clearly established federal law because it claimed that misleading jurors about their individual power to consider mitigating evidence does not violated the Eighth and Fourteenth Amendments; and (3) resulted in an unreasonable determination of the facts in light of the jury instructions given in the petitioner's case.

### A.      The Enigmatic Texas 12-10 Rule.

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way.  *See* Tex. Code Crim. Pro. art. 37.071 (Art. 37.071).  This was true during the petitioner's trial and remains so today.  In the petitioner's case only two special issues were submitted to the jury.  *See* C.R. at p 567-576.  Pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question:  "Do you find beyond a reasonable doubt that there is a probability that the defendant, Kerry Dimart Allen, would commit criminal acts of violence that would constitute a continuing threat to society?"  *Id.* at 574.  The state was required to prove this special issue beyond a reasonable doubt, and the jury was instructed that they could not answer this special issue "yes" unless they agreed unanimously.   *Id.* at 568; *See* Art. 37.071(d)(2);  Further, the jurors were instructed that they could not answer this special issue "no" unless ten or more jurors agreed.  *Id.*

More important to this issue is the second special issue asked in the petitioner's case.  In his case the jury was instructed that they should answer special issue no. 2 only if they answered special issue no. 1 "yes."  CR at 568.  Because the jury answered special issue no. 1 in the affirmative they moved on to special issue no. 2 which asked:  "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Kerry Dimart Allen, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?"  CR at 575; *See also* Art. 37.071(e)(1).  However, the jury was also instructed that they may not answer special issue no. 2 "no" unless they agreed unanimously, and that they may not answer special issue no. 2 "yes" unless ten or more of them agreed to do so.  CR at 568.

The verdict form used in the petitioner's case gave the jury two options in answering each special issue.  *Id.* at 574, 575.  They could only answer yes or no.  *Id.*  Further, the jury was instructed that "should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2 the court will sentence the defendant to death."  *Id.* at 569.  The Jury was not instructed as to what would happen if the requisite number of jurors failed to agree on either issue, or if it was even possible to return a verdict without reaching an agreement on one of the special issues.

What is strange about the Texas special issue rule, or 12-10 rule, is that the Code of Criminal Procedure specifically states that "[i]f the jury returns a negative finding on any issue submitted under Subsection (b) of this article [future dangerousness] or an affirmative finding on an issue submitted under Subsection (e) [mitigation] of this article *or is unable to answer any issue submitted under Subsection (b) or (e)* of this article, the court shall sentence the defendant

to confinement in the institutional division of the Texas Department of Criminal Justice for life."
Art. 37.071(g).  However, "[t]he court, the attorney representing the state, the defendant, or the
defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a
jury to agree on issues submitted under Subsection (c) or (e) of this article."  Thus, the Texas 12-
10 rule hides from jurors the fact that one or more jurors, who believe that a life sentence is
proper have the power to follow their belief, and that the end result will be a life sentence, even
though they were not able to convince their fellow jurors to vote on their side.

### B.       Clearly Established Supreme Court Precedent.

The Supreme Court's ruling in *Mills v. Maryland* has been described by that court as
follows:

> [In *Mills v. Maryland*] we reversed a death sentence imposed under Maryland's
> capital punishment scheme because the jury instructions and verdict form created
> "a substantial probability that reasonable jurors ... well may have thought they
> were precluded from considering any mitigating evidence unless all 12 jurors
> agreed on the existence of a particular such circumstance." We reasoned that
> allowing a "holdout" juror to prevent the other jurors from considering mitigating
> evidence violated the principle established in *Lockett v. Ohio*, 438 U.S. 586
> (1978), that a sentencer may not be precluded from giving effect to all mitigating
> evidence.

*McKoy v. North Carolina,* 494 U.S. 433, 439-440 (1990).  The *Mills* court ruled that the
petitioner's sentence could not stand where it was *possible* that some "jurors were prevented
from considering factors which may call for a less severe penalty [than death.]"  *Mills v.
Maryland,* 486 U.S. 367, 376 (1988) (internal quotations removed).  Petitioner Mill's death
sentence was overturned because of the possibility that individual jurors were prevented from
giving effect to mitigating evidence on the ground that all of the jurors did not agree on the
existence of particular mitigating evidence.  The principle established from this ruling is that all
jurors in capital cases must be able to give weight to any mitigating evidence presented, and that