requiring unanimous agreement that certain evidence mitigates in favor of a life sentence violates the 8th and 14th Amendments.

This principle is applicable to the Texas 12-10 rule. While Texas' scheme does not require unanimous agreement by the jurors before a life sentence can be imposed, it does affirmatively mislead jurors into believing that their independent belief that a life sentence is proper is irrelevant unless nine other jurors agree with them. Texas capital jurors, and the jurors in the applicant's case, are explicitly told that they can not return a "yes" verdict on special issue no. 2 unless ten or more of them agree to do so. Further, by statute, Texas capital jurors are precluded from being told that a single juror's refusal to answer "no" on special issue no. 2 will result in a life sentence. Thus, *individual* jurors in Texas are denied the ability to give weight to mitigating evidence they believe calls for a life sentence unless they can get nine other jurors to agree with them.

The statutory mandate that jurors must be affirmatively misled to believe that their individual vote does not count only exasperates the problem. *See* Art. 37.071 Sec. 2 (a). The Supreme Court in *Mills* pointed out that "common sense and what little extrinsic evidence we poss suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so." *Mills v. Maryland,* 486 U.S. 367, 383 (1988). As the jurors in Texas are not instructed to do so, and indeed are instructed that death will be imposed unless 10 or more jurors disagree with that decision, a single hold out juror will clearly be pressured to set aside his conscience and vote with his remaining jurors. After all, the verdict form provided to jurors only allows one of two answers to the special issues, yes or no. The pressure this rule puts on a single holdout juror is obvious.

That *Mills* requires each individual juror be able to give effect to any mitigating evidence they personally deem relevant was made clear in *McKoy:*

> *Mills* requires that *each* juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death. This requirement means that, in North Carolina's system, *each* juror must be allowed to consider all mitigating evidence in deciding Issues Three and Four: whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death.

*McKoy v. North Carolina*, 494 U.S. 433, 442-443 (1990) (*emphasis added*). Once again, the Texas statute at issue violates this clearly established federal principle by instructing jurors that they cannot give effect to mitigating evidence which calls for life in prison unless nine of their counterparts agree with them.

This argument is supported by the 7th Circuit's decision in *Kubat v. Thieret,* 867 F.2d 351 (7th Cir. 1989). In *Kubat* the trial court erroneously instructed the jury in a capital case that it must "*unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence" before a life sentence would be imposed. *Id*. at 369. The *Kubat* Court, relying on *Mills*, held that the death sentence imposed in that case must be overturned "on the grounds that one or more of the jurors might have been precluded from considering mitigating factors." *Id.* at 373. The court explained as follows:

> The same analysis applies in Kubat's case. Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity. As discussed in part III, A., 2., above, there is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 372. While the jurors in the petitioner's case were not instructed that they had to be unanimous in their decision that mitigating circumstances called for life in prison, they were

instructed that at least ten jurors must agree before a life sentence would be granted. Just like the *Kubat* jurors, they were never expressly informed that one single juror could prevent the death sentence from being imposed. Thus, there is a substantial possibility that one or more of the petitioner's jurors might have been precluded from granting mercy because of their mistaken belief that sufficient mitigating factors had to be found by ten or more jurors. For this reason *Mills* applies to the petitioner case just as it did to Kubat's.

In *Davis v. Mitchell* the Sixth Circuit granted relief to a habeas petitioner on similar grounds, reversing the ruling of the district court. *Davis v. Mitchell,* 318 F.3d 682 (6th Cir. 2003). In that case, "[i]mmediately following the trial court's instruction regarding mitigating circumstances, the trial judge . . . gave the jury a unanimity instruction, stating, 'Now, as you know, since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement.'" *Id.* at 684. In addition, the "judge gave the jury a so-called 'acquittal-first' instruction stating that it must first analyze whether the elements allowing the death penalty were present, and only if they were not present, should the jury move on to consider life imprisonment." *Id.* In reaching their decision the Sixth Circuit noted that "[i]nstructions that leave a jury with the impression that juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eighth Amendment, and therefore the writ of habeas corpus must issue setting aside the death sentence."

In analyzing the issue in *Davis* the Sixth Circuit reviewed the Federal Death Penalty Act enacted in 1994. The court noted that under this act "[a]ny one or more jurors may find the existence of a mitigating factor and may then consider that factor in weighing the aggravating and mitigating factors even though other jurors may not agree that the particular mitigating factor has been established. This weighing decision must be made by *each juror giving individual*

*consideration to the aggravating factors unanimously found by all of the jurors and such mitigating factors as may be found by each juror.*" *Id.* at 686-687 (emphasis added).  The court then went onto note that the reason for adopting this language in the Federal Death Penalty Act was to "bring us into conformity with Tuesday's Supreme Court decision in Maryland versus Mills" which held that "even if one juror says there was mitigating circumstances of any sort, the death penalty cannot be imposed." *Id.*  The Sixth Circuit then agreed with Congress that the Eight Amendment and "*Mills* require[] that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* (internal citation omitted).

These cases all show that clearly established federal law requires that capital jurors be made aware of their individual "power to prevent the death penalty by giving effect to mitigating circumstances absent an agreement of the other jurors regarding the presence of those mitigating circumstances." *Id.* at 690.  Texas capital jurors are given this power statute, but they are also affirmatively misled about this power, as required by the same statute.  Art. 37.071, sec. 2 (a), (g).  Finally, it is because reasonable jurors, upon receiving instructions identical to those provided to the jury in the petitioner's case, may have believed they did not individually have the power to stop the infliction of the punishment of death that the Texas 12-10 rule violates the 8th and 14th Amendment's as interpreted by *Mills* and *McKoy*.

### C.     The State Court's Decision.

The petitioner first attacked the Texas 12-10 rule via a pretrial motion which was denied by the trial court.  CR at 76, 85-88, 91.  Allen later renewed his challenges to the Constitutionality of this law in his State Writ of Habeas Corpus as Claims 31 and 32.  *See* State Writ at p. 319-335.  The state trial court addressed these claims by adopting the State's findings

44

of fact and conclusions of law without change. *See* Respondent's Proposed Finding of Fact and Conclusion of Law and Order, adopted by Trial Court on February 17, 2010 at p. 17-19, 30-31 (State Finding of Facts and Conclusion of Law). The trial court's findings of fact and conclusions of law were adopted by the Texas Court of Criminal Appeals on April 28, 2010. *Ex Parte Allen,* 2010 WL 1209947 (Tex. Crim. App. 2010).

The State Court denied this claim on the following basis: "The applicant fails to show that the "10-12" rule and/or the prohibition against informing the jury of the effect of a single "no" vote renders Tex. Code. Crim. Pro. art. 37.071 unconstitutional." State Finding of Facts and Conclusion of Law, at 31. As authority for this ruling the court cited *Williams v. State,* 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) and *Lawton v. State,* 913 S.W.2d 542, 558-9. *Id.* In *Williams* the defendant contended that Art. 37.071's "requirement that ten or more jurors must agree in order to answer certain special issues "no" violates the proscriptions set forth by the Supreme Court in *Mills v. Maryland,* 486 U.S. 367 (1988) and *McKoy v. North Carolina,* 494 U.S. 433 (1990)." *Williams,* 913 S.W.2d at 490. In that case, the CCA overruled this claim by noting that they had "previously decided this issue against appellant's position." *Id.* The CCA cited two cases, *Lawton* and *Hughes,* as authority for denying *William's* Claim. *Id.*

In *Hughes* the appellant argued that the requirements of the 12-10 rule were "unconstitutional because it prevent[ed] jurors from individually considering and giving effect to evidence mitigating against the imposition of the death penalty," citing *Mills* and *McKoy* as authority. *Hughes v. State,* 897 S.W.2d 285, 300 (Tex. Crim. App. 1994). The CCA addressed this claim as follows:

> Under the capital sentencing scheme at issue in *Mills,* jurors were given the impression that they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of a particular circumstance. *Mills,* 486 U.S. at 384, 108 S.Ct. at 1870. The critical factor there was not the

45

> unanimity requirement in general, but the impression that all of the jurors must agree on the existence of the *same* mitigating circumstances before the mitigating evidence could be given effect. The scheme at issue in *McKoy* also prevented the jury from considering any mitigating factor it did not unanimously find. The Texas scheme does not require jurors to agree on the existence of the same mitigating evidence. Further, the Texas scheme allows a single juror to give effect to mitigating evidence by voting "no" on any special issue. The fact that they do not know the effect of their answers does not subject appellant to cruel and unusual punishment under the United States Constitution.

*Id.* In reaching this conclusion the CCA has unreasonably applied the holdings of *Mills* and *McKoy* by construing them in an unreasonably narrow way. While *Mills* specifically concerned "the impression that all of the jurors must agree on the existence of the *same* mitigating circumstances before the mitigating evidence could be given effect," *id.,* it also "requires that *each juror* be permitted to consider and give effect to mitigating evidence when deciding the ultimate question of whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442-443 (1990). Thus, the state court's decision on this matter involves an unreasonable application of clearly established Supreme Court precedent.

Also, the CCA's claim that "the Texas scheme allows a single juror to give effect to mitigating evidence by voting "no" on any special issue" cruelly twist this issue around. While it is true that Art. 37.071, sec. 2 (g) calls for a life sentence in the event the jury fails to answer one of the special issues, that same article expressly prohibits anyone from notifying the jury of this power. Art. 37.071, sec. 2 (a). This is strikingly similar to the facts of *Mills* where "nothing in the verdict form or the judge's instructions even arguably is construable as suggesting the jury could leave an answer blank and proceed to the next stage in its deliberations." *Mills,* 486 U.S. at 378-79. Further, the CCA is completely ignoring the mandate by the Supreme Court in *Mills* concerning a jury's verdict: "With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported

on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict." *Id.* at 376. Of course, "[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Id.* at 377. Thus, the CCA's belief that a single holdout juror will know they have the power to stop the infliction of the death penalty, when they are instructed otherwise, was contrary to clearly established federal law because it confronts a set of facts materially indistinguishable from the facts in *Mills* yet arrives at a result different from the Supreme Court. *See Foster v. Johnson*, 293 F.3d 766, 766 (5th Cir. 2002) (discussing AEDPA standard of review).

*Lawton v. State,* 913 S.W.2d 542, (Tex. Crim. App. 1995), was also cited by the state court as precedent for overruling the petitioner's claim. *Lawton* meets the AEDPA standard for the same reason that *Hughes* does. In *Lawton,* the CCA once again denied a claim attacking the Texas 12-10 law. *Lawton v. State,* 913 S.W.2d at 558-59. Once again the CCA unreasonably construed *Mills* and *McKoy* in a narrow way by limiting their holdings to cases in which the jury instructions "require the unanimous agreement of the jury to give effect to mitigating circumstances." *Id.* Once again the CCA misses the point that each individual juror in a capital case must be given the ability to consider and act upon all mitigating evidence. The CCA in *Lawton* also points out that if the "jury is hung eleven to one, the defendant will be sentenced to life imprisonment." *Id.* at 358. Of course the CCA does not point out that the jurors are not told this, and that the jurors are in reality mislead to believe they must answer the special issues either yes or no.

Finally, the *Lawton* court explains that the argument "that jurors will be misled lacks merit; every juror knows that capital punishment cannot be imposed without the unanimous

agreement of the jury on all three special issues. The jury is not informed of the consequences of a hung jury, but each juror will know that without his or her vote the death sentence cannot be imposed." *Id.* Not only is this an unreasonable determination of the facts in light of the instructions given to the jury in this case, but this is also contrary to Supreme Court president as established in *Mills*. Once again, *Mills* instructs us that when a jury verdict can be support on one ground but not another, the verdict must be set aside. *Mills,* 486 U.S. at 376. In this case it is possible that the jury would recognize that a hung jury would result in a sentence of life. However, it also entirely possible that the jury would follow the courts instructions and feel obligated to answer each special issue either yes or no, especially where "nothing in the verdict form or the judge's instructions even arguably is construable as suggesting the jury could leave an answer blank and proceed to the next stage in its deliberations." *Id.* at 378-79.

The bottom line is that the Texas 12-10 rule, and the statutory requirement that Texas capital juries be affirmatively mislead about the possibility of a single juror giving effect to mitigating evidence, violates the Eighth and Fourteenth Amendments. The CCA opinions relied on by the state to uphold the 12-10 rule are unreasonable applications of, and contrary to, clearly established federal precedent, and the involve unreasonable determinations of the facts in light of the jury instructions given to the Texas Juries. The CCA's continued refusal to correct this problem is even more alarming in light of their recognition that it is entirely plausible that Texas juries are misled by this law.[4]

---

[4] *See Draughon v. State,* 831 S.W.2d 331, (Tex. Crim. App. 1992):
> We take it to be past serious dispute that the features of Texas capital sentencing procedure about which Appellant here complains are uncommonly enigmatic. For instance, there is no such thing as a hung jury at the punishment phase of a Texas capital murder trial, in the sense that unresolved issues might later be litigated at a retrial of the same case. Failure of the jurors to agree automatically results in a sentence of life imprisonment. Art. 37.071(e), V.A.C.C.P. But the jurors don't know this. Indeed, the law prohibits the parties and the trial judge alike from telling them so. Art. 37.071(g), V.A.C.C.P. Instead, the instructions they receive from the court suggest that a sentence of life imprisonment is not possible unless ten jurors agree to answer one or more special

**D.     Harm Analysis.**

In *Mills*, the Supreme Court ruled that the petitioner's sentence could not stand where it was *possible* that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" *Mills v. Maryland,* 486 U.S. 367, 376 (1988) (internal quotations removed). Further, "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio,* 438 U.S. 586, 605 (1978) (plurality opinion). In the petitioner's case, it is entirely possible that at least one juror was prevented from giving effect to their belief that evidence presented at the mitigation stage of the petitioner's trial was sufficient to call for a sentence of life in prison.

At the petitioner's trial it became apparent that the petitioner had suffered abuse and neglect throughout his life. Allen had told his first wife Sonji, years before the instant offense, that he had been molested by his uncle as a child. *R.R.* vol. 27 at 155. Bettina Wright, who had

---

punishment questions in the negative. Art. 37.071(d), V.A.C.C.P. Accordingly, if one assumes that jurors are told during *voir dire,* as they nearly always are, that a negative answer to one or more of the statutory punishment questions necessarily results in life imprisonment, it is conceivable that they will surmise later instructions requiring ten votes for a negative answer mean that a life sentence will not be imposed otherwise.

. . .

More troubling, however, is the implication that our statutes, by requiring consensus, inhibit the free exercise by each juror of his individual judgment about the propriety of a death sentence. *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Again, however, it is not that jurors are somehow forbidden to cast or prevented from casting a negative vote unless nine other jurors agree to do so as well. Rather, it is the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be *impossible* unless ten of them agree that renders the procedure constitutionally suspect. But, because the jury instructions of which Appellant here complains are not reasonably susceptible of such an interpretation, we are satisfied that no juror would be misled by them into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one. At worst the jury would simply not know the consequence of failing to agree. And, as we have already indicated, there is no apparent constitutional inhibition to concealing from jurors the consequence of their deliberations, so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere. *Cf. Davis v. State,* 782 S.W.2d 211, 221–222 (Tex.Crim.App.1989), *cert. denied* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520.

49

reviewed records related to Allen and interviewed him also shed light on his background. She found that he had been a survivor of chronic sexual abuse during his childhood. R.R. vol. 28, p. 6. She believed that this abuse started at an early age and continued through all his childhood. Testimony was presented to the effect that Allen had been forced to masturbate and perform oral sex on his uncle as child, that he was fondled and sexually assaulted by his brother, and that he was raped by a stranger as a teenager. *Id.* 13. There was also evidence presented that Allen and his twin sister were conceived during the sexual assault of their mother. *Id.* at 12. There was further testimony presented which outlined how detrimental chronic abuse such as this is to the psychological development of a child. *Id.* at 6-12. Basically, there is a belief that constant abuse at a young age retards psychological development and prevents those abused from fully developing in the same way as a child who is not abused. *Id.*

It is also clear that the jury was interested in Bettina Wright's testimony. During their three day deliberation on punishment, the jury wrote three notes to the court asking for clarification concerning Mrs. Wright's testimony. C.R. at 579-82. This is strong evidence that at least one juror was holding out in favor of a life sentence.

Also interesting is that the jury in this case expressed its confusion over the 12-10 rule before it was even given the jury instructions in this case. At the close of evidence in the punishment phase, before the jury was read the jury instructions, the following exchange took place:

50

(Jury seated.)

THE COURT: All right, be seated.

What says the Defense?

MR. NUNNERY: Your Honor, at this time the Defense rests.

THE COURT: What says the State?

MS. McCORVEY: Your Honor, the State rests and closes.

THE COURT: All right, ladies and gentlemen, that's it. The evidence is concluded. We are going to recess the trial.

51

Again, I want to remind you of the admonishments we've given about the news media coverage and such like that. You've been faithful to follow that so far and I hope that you continue.

Remember, of course, that tomorrow the arguments will be made. You will then start deliberations. Since it is a possible that you may be sequestered I want you to prepare for that. Just to be on the safe side, bring two days' worth of stuff just to be on the safe side.

In any event we will argue the

> case. We're going to start a little bit earlier. Let's start at 9:30 tomorrow so we can get the case to you a little bit earlier and then let y'all deliberate the case. So, we'll start at 9:30 tomorrow.
>
> Does anybody have any questions? All right, we'll see you at -- Mr. Kove?
>
> JUROR: No question. I just want you to be aware that there is some confusion on our part from the instructions we heard originally on the 12/0 vote versus the 10/2.
>
> THE COURT: It will all be in the Court's Charge.
>
> JUROR: That's all we need to know.

R.R. vol. 29, at 3. As the jurors were confused about this rule based on the knowledge they had gained during voir dire, it seems outrageous to believe the jurors knew that a single hold out voter could prevent the death penalty from being imposed. There is a distinct possibility that the jurors mistakenly believed they had to answer a special issue no. 2 yes or no, and that a life sentence could be imposed only if 10 jurors agreed, which is consistent with the instructions given to the jury in this case.

As there is a distinct possibility that the individual jurors in the petitioner's case were prevented from individually considering mitigating evidence the petitioner's sentence cannot

53

stand. The petitioner requests this court to reverse the death sentence handed down in his case and to order a new sentencing hearing be held which complies with the requirements of the 8th and 14th Amendments.

## Issue Four

**The State trial court violated petitioner's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against Juror Berg.**

The trial court's review of this claim, raised in the applicant's State Writ of Habeas Corpus, which was adopted by the Texas Court of Criminal Appeals, involved an unreasonable application of clearly established Federal Law, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

### A.   Statement of the Facts.

Gordon Arthur Berg strongly favored the death penalty because he thought it was a deterrent and because it saved taxpayers the tremendous cost of keeping a convicted person incarcerated for life. He stated that there were certain cases in which he did not think there were any possible mitigating circumstances that would prohibit the use of the death penalty:

> Q. (prosecutor) . . . Can you tell me in your own words what is your opinion about the death penalty as a form of punishment in our society?
>
> A. Personally, I favor it. I think it is a deterrent. I think there are certain cases where I don't think there is any mitigating circumstances that would prohibit the use of it.
>
> . . . . .
>
> A. And I feel also it saves the State and the tax payers a tremendous amount of cost in keeping a convicted person incarcerated for their natural born life.
>
> . . . . .

> Q. Based upon what you're saying now I assume that you would not necessarily favor life without parole as a substitute for the death penalty?
>
> A. No. (R.R. 5, 43,44).
.  .  .  .
> Q. . . . In other words, your personal opinion, what you told me is . . . that you believe the death penalty is appropriate and you think if nothing for one reason that if the crime dictates it ought to be given and one of the reasons you might want to give it, too, in addition for the crime dictating it is that it saves taxpayers' money?
>
> A. That's a good interpretation, yes. (R.R. 5, 49).

Immediately after this exchange the prosecution basically asked Venireman Berg if he would be able to take the oath "to a true verdict render based upon the law and the evidence." *Id*. Referring to the previous day when the trial judge spoke at length to a large pool of potential jurors about the legal process and the two punishment issues in a Texas capital case, Berg stated he agreed wholeheartedly with the guilt/innocence question, but that he disagreed on the mitigation question.

> Q. . . . And then you take the law given to you by the Court which basically says you'll make your decision based upon this evidence and not based on your personal opinion. Can you do that?
>
> A. Let me answer that based on the last point of discussion yesterday concerning the two questions asked of the jury.
>
> Q. Right.
>
> A. I agree wholeheartedly in the first question. If he's guilty, he's guilty. I disagree on the second part.
>
> Q. Okay.
>
> A. Being a father and grandfather of three kids under the age of six, I would have difficulty looking at any mitigating circumstances on capital murder of a child under six.

55

> Q: Okay. Now you're saying that not knowing what that evidence might be, right?
>
> A: That's correct.(R.R. 5, 49-50).

After making a lengthy, general statement, the prosecutor asked: "Is your mind open to listening to whatever evidence that is presented?" Berg answered "Yes" (R.R. 5, 59). This is a theme that would be established throughout the examination of venire person Berg; the record clearly shows that Berg may "listen" to whatever is presented, but that he had a bias or prejudice to the mitigation issue. He was not open to consider the mitigation issue, unless the mitigation was something like "a mercy killing". The prosecutor offered some possible types of mitigating evidence: 1) person high on drugs; 2) person had a mental disability; 3) person was borderline mentally retarded; 4) person had an extremely abusive childhood (the example given being a person "locked up in a closet . . . until they were let loose")  (R.R. 5, 60).

Then, he asked:

> Q. . . . My question to you is: Are you the person who will wait or is your mind already made up before you ever hear what the evidence is?
>
> A.  I would listen to the evidence.  I personally feel that I would probably – –  it would take quite a bit to convince me that there were mitigating circumstance.
>
> Q.  As I hear you – –
>
> A.  And I would – – I do not give a great credibility to the examples you used.
>
> Q.  I understand.
>
> A.  But I would listen to them before I made a decision. (R.R. 5, 62)

Later, after another lengthy speech by the prosecutor, covering almost three pages of transcript (R.R. 5, 62-65), Berg was led to answer that he could be fair and open in regard to the mitigation issue:

> Q. . . . You take into consideration all of the circumstances in determining whether it's sufficiently mitigating. And can you give a fair consideration to that?
>
> A. Yes. (R.R. 5, 65)

After leading Berg to this urged conclusion, the prosecutor ended his examination. R.R. 5, 66.

The defense began its examination by confirming with Berg that upon entering the court room on the morning in question, and "being a grandfather and grandfather with grandkids under the age of six, there wouldn't be any mitigation that [he] would go for." *Id.* at 67. Berg confirmed that this was truly how he felt at the beginning of his examination. *Id.* Then the defense asked Berg if he still felt the same way after his questioning by the State, to which he replied:

> A. I think there's some enlightment [sic] because there are a couple of areas that in personal beliefs that I would consider the evidence as it's presented. I have some very strong feelings concerning the killing of child.
>
> Q. Okay.
>
> A. (Berg) And if – – if it wasn't based on more of a humanitarian life support or something like that, I would – – I'm being honest with you and saying I would have difficulty accepting circumstances of intoxication, being high or because of abuse as a child themselves of saying, "Hey, those are mitigating circumstances" It might – – I would probably go along if there was – –
>
> Q. A mercy killing?
>
> A. Mercy killing or something like that, yes.

57

> Q. . . . It's [sic] sounds like what you've just said to me is that you will listen to all of the evidence. You're agreeing to listen to all of the evidence. But it seems like you're also trying to tell us and saying specifically to Mr. McClellan that you haven't heard any of the examples that he gave that you would actually go for or think that they actually mitigated the crime other than a mercy killing. Is that what you said?
>
> A. That's correct. (R.R. 5, 67-69)

Berg said that while he was committing to listening to the evidence as it's presented, he wanted the court to know his "personal reluctance" to find mitigating circumstances in a child's killing (R.R. 5, 70). Defense counsel inquired whether he remembered the allegations in the indictment. Berg remembered that the indictment alleged that the murder occurred by striking the child with a hand or unknown object (R.R. 5, 70). Obviously, these facts do not suggest "a mercy killing" or a "pulling the plug" situation.

Finally, Berg reiterated his reservations about whether he would let his personal feelings interfere with his obligations as a juror.

> Q. Is there anything as you sit there now – we've literally badgered you with all of these questions - anything that–you would honestly say bothers you about you sitting on this jury?
>
> A. **I have reservations whether or not I would let my personal feelings interfere**. And that's the reason I stated that when I came in because **that's the thing that bothered me through the evening last night**.
> . . . .
>
> A. I feel that I can be unbiased and from past histories I've been unbiased, but **I have that twinge of reservation**. (R.R. 5, 71-72 emphasis supplied)
> . . . .
>
> A. To reiterate what I said a minute ago, I feel like I could render an honest verdict to the first question. And I would be open to hearing the evidence and I would, to the best of my ability, keep an open mind to the evidence that was presented for mitigation. **But I have the feeling that there is a possibility and there is a**

58

> **reservation of how strong that mitigating circumstance would have to be for me to vote no.**
>
> Q. Are you telling me that you – that even as you sit there now, you haven't heard any evidence, that you, in that situation – if we put that hypothetically, you would be leaning against any mitigation, you would be biased against it?
>
> A. No, I'm saying that I would, to the best of my ability, give it a total open mind to the – **but I have that slim reservation. And I want to be honest and say it's there.** (R.R. 5, 80-81, emphasis supplied)
>
> Q: I appreciate you being really honest with us. Thank you very much?
>
> A: If I said anything else it would be a lie. *Id.* at 81.

After this, applicant challenged him for cause.

> MR. CORNELIUS: Judge, we challenge him for cause. I think the overall tenor of his examination, if you consider the answers he gave and not all the speeches that Mr. McClellan made, I think he overwhelmingly shows that he could not give the Defendant a fair trial. He could not fairly consider the evidence in the case. We make a challenge for cause.
>
> MR. NUNNERY (co-counsel): And just to add, I think his word "I have reservations," is functional equivalent to, I would be leaning against it and I am bias toward it. The very first thing out of this juror's mouth, before any questions were even asked, he came in here saying I understood what the Judge told me on yesterday, but because I have three children under the age of six and also I read that mitigation question, I understand it. I want y'all to know from the outset that I come in with an inherent bias against it.
>
> However hard he tried and however inconsistent with Mr. McClellan's questions, he tried to over come that. He ended up still saying, "I have reservations against it and I want you to know." And he bent over backward saying he was honest about it. I think under <u>Morgan v. Illinois</u>, he's challengeable. And I also think, Judge, under the Code that says that if a juror has a bias or leaning in a direction, he is challengeable.

59

> And under <u>Whitt</u>, Judge, I think his feelings toward mitigation substantially impairs his ability to carry out his performance as a juror in this type of case. (R.R. 5, 82-83)

The Court denied the challenge. (R.R. 5, 83).

Based on venire person Berg's testimony it is clear that while he agreed he could listen to the facts presented concerning mitigation he was also concerned that in a case concerning the murder of child he would not be able to impartially deliberate on the mitigation issue. Berg essentially told the court that absent a mercy killing situation, there would be no mitigation evidence that would prevent him from voting "no" to the issue of whether mitigating circumstances existed to warrant life in prison as opposed to death. To state this another way, Berg essentially stated that he would always vote in a manner requiring death in the event he found the defendant guilty of murdering a child, unless the murder was a mercy killing situation.

    **B.    The State Court's Ruling.**

Petitioner Allen raised this claim in his State Writ of Habeas Corpus as grounds for relief 17, 18 , and 19. *See* Petitioner's State Writ, at 220-247. The state trial court ruled on this issue by adopting the State's proposed findings of fact, conclusion of law and order. *See* Respondent's Proposed Finding of Fact and Conclusion of Law and Order, adopted by Trial Court on February 17, 2010 at 11-13, 26-27(State Finding of Facts and Conclusion of Law). Included in this order, among other findings, were the following findings: