> And under <u>Whitt</u>, Judge, I think his feelings toward mitigation substantially impairs his ability to carry out his performance as a juror in this type of case. (R.R. 5, 82-83)

The Court denied the challenge. (R.R. 5, 83).

Based on venire person Berg's testimony it is clear that while he agreed he could listen to the facts presented concerning mitigation he was also concerned that in a case concerning the murder of child he would not be able to impartially deliberate on the mitigation issue. Berg essentially told the court that absent a mercy killing situation, there would be no mitigation evidence that would prevent him from voting "no" to the issue of whether mitigating circumstances existed to warrant life in prison as opposed to death. To state this another way, Berg essentially stated that he would always vote in a manner requiring death in the event he found the defendant guilty of murdering a child, unless the murder was a mercy killing situation.

## B.     The State Court's Ruling.

Petitioner Allen raised this claim in his State Writ of Habeas Corpus as grounds for relief 17, 18 , and 19. *See* Petitioner's State Writ, at 220-247. The state trial court ruled on this issue by adopting the State's proposed findings of fact, conclusion of law and order. *See* Respondent's Proposed Finding of Fact and Conclusion of Law and Order, adopted by Trial Court on February 17, 2010 at 11-13, 26-27(State Finding of Facts and Conclusion of Law). Included in this order, among other findings, were the following findings:

47.     The Court finds that, during the voir dire of venireperson Berg, Berg initially stated that there were no mitigating circumstances prohibiting the use of the death penalty, and he would have trouble considering mitigating evidence for the capital murder of a child under six years old; that Berg immediately retreated from his original position on mitigating evidence when the prosecutor explained the nature of mitigating evidence and a juror's duty to consider it; and, that, in response to additional questioning, Berg stated that his mind was open to listening and considering mitigating evidence, that he would give fair consideration to mitigating evidence, that he was unbiased and committed to listening to the evidence, and, that he had no bias against the mitigation special issue (V R.R. at 43-4, 50, 57-8, 62, 65-72, 80-1).

50.     The Court finds that the applicant fails to demonstrate that venireperson Berg's views concerning mitigation would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412 (1985); *Clark v. State*, 929 S.W.2d 5, 6-7 (Tex. Crim. App. 1996); *Vuong v. State*, 830 S.W.2d 929, 942 (Tex. Crim. App. 1992).

*Id.* at 11, 13.

20.     In the alternative, the trial court did not abuse its discretion in denying the applicant's challenge for cause to venireperson Berg based on Berg's views regarding mitigating evidence. *See Heiselbetz v. State*, 906 S.W.2d 500, 508 (Tex. Crim. App. 1995)(the weight that each juror gives to particular "mitigating" evidence is left to the individual's discretion).

*Id.* at 27.

The Texas Court of Criminal Appeals then went on to adopt the trial judge's findings and conclusions of law, and denied relief. *Ex Parte Allen,* 2010 WL 1209947 (Tex. Crim. App. 2010).

      **C.**    **The state court's ruling resulted in a decision that involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.**

As this application for a writ of habeas corpus arises out of a state proceeding which violated the Constitution of the United States it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254 (a).  Under AEDPA, "a federal court cannot grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Hughes v. Dretke,* 412 F.3d 582, 588-89 (5th Cir. 2005) (citing 28 U.S.C. § 2254(d)).

The "contrary to" and "unreasonable application" clauses under section 2254(d)(1) have independent meaning. *Williams v. Taylor,* 529 U.S. 362, 405 (2000). Under the second clause, "a state court decision is 'an unreasonable application of clearly established' Supreme Court precedent if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Foster,* 293 F.3d at 776 (quoting *Williams*, 529 U.S. at 407-08).  A Federal Court may also grant habeas relief when the state court's adjudication of a claim resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C.A. § 2254 (d)(2).

In the petitioner's case the state court's ruling that "the applicant fail[ed] to demonstrate that venireperson Berg's views concerning mitigation would prevent or substantially impair the performance of his duties in accordance with his instructions and oath" was an unreasonable application of clearly established Supreme Court precedent and resulted in an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  While the Supreme Court has stated that "the question of a challenge for bias is a 'factual issue'" under §2254(d), the petitioner will discuss this claim under both prongs because a discussion of the unreasonable application prong (§2254(d)(1)) will help to establish that the unreasonable determination prong (§2254(d)(2)) has been met.

The state court was correct to identify the proper standard, based on the guarantee of an impartial jury for capital defendants emanating from the 6th and 14th Amendments, for when a prospective juror may be excluded for cause.  "That standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotations omitted).  However, the state court unreasonably applied this standard to the applicant's case when it ruled that the record did not establish that Berg's views would prevent or substantially impair the performance of his duties in the petitioner's case.

In *Witt*, the Supreme Court upheld a trial court's exclusion for cause of venireperson Colby.  *Id.* at 430.  The trial court in that case excused potential juror Colby based on the following exchange between the state and the potential juror:

> "[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

"[A. Colby:] I am afraid personally but not-

"[Q]: Speak up, please.

"[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down." Tr. 266-267.

*Id.* at 415-416.

In upholding the challenge for cause to Colby the Court in *Witt* clearly decided, based on the exchange above, that Colby's views on the death penalty would substantially impair the performance of his duties as juror. This is in spite of the fact that Colby never explicitly stated that his views would interfere with his duties, but rather stated that he "was afraid" and he thought they would. In reaching their decision the Court further stated that the standard identified above "does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question and answer sessions which obtain results in the matter of a catechism." *Id.* at 425.

Applying the principles of *Witt* to the petitioner's case shows that the state court unreasonably applied the correct standard to the facts of the petitioner's case. In the petitioner's case, venireperson Berg went out of his way to explain that he had reservations about his ability to impartially serve on a jury in a case which involved the murder of a child. Although he repeatedly explained that he would listen to the facts presented at the trial, he also made it clear that he would vote for death if he found the petitioner guilty, unless the murder was related to a mercy killing. Clearly this shows that Berg's views concerning the murder of child would substantially impair the performance of his duties as a juror in the petitioner's case.

This point is driven home by the Supreme Court's view that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence aggravating and mitigating circumstances as the instruction require him to do." *Morgan v. Illinois,* 504 U.S. 719, 729 (1992). Further, "based on the requirements of impartiality embodied in the Fourteenth Amendment, a capital defendant may challenge for cause any such juror who maintains such views." *Id. See also Morgan v. Illinois,* 504 U.S. 716, 740 (1992) ("Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.") While Berg did not expressly claim that he would vote for death every time, he was necessarily alluding to the idea that he would vote for death every time in a case which involved the murder of a child. Therefore, he was a constitutionally impermissible juror in the applicant's case and should have been struck for cause. *See, e.g., Ross v. Oklahoma,* 487 U.S. 81, 83-84 (1988) (juror who declared that if the jury found petitioner guilty he would vote to impose death automatically should have been removed for cause.)

These cases show that the trial court unreasonably applied clearly established Supreme Court precedent in arriving at its conclusions of law and fact, however, they also show the trial court unreasonably determined that Berg's views would not substantially impair the performance of his duties as juror in the applicant's case. This unreasonable determination of the facts established by the record is quite likely a result of the state court's unreasonable factual finding that Juror Berg "was unbiased and committed to listening to the evidence, and, that he had no bias against the mitigation special issue." State Finding of Facts and Conclusion of Law, at 12.

While the state court was correct in stating that Berg would listen to the evidence, it failed to recognize that juror Berg repeatedly explained that he had reservations about serving on a capital jury that would decide the fate of a man accused of murdering a child. Juror Berg made it clear that he was doubtful that any amount of mitigation evidence would prevent him from answering the special issues in a way that would result in a life sentence. His bias arose not from the act of murder itself, but from the act of murdering a child, and he was clearly concerned he would not be able to follow the law in such a case. He repeatedly brought this to the court's attention, and it cannot be doubted that he was biased against finding sufficient mitigation for a sentence of life in the petitioners case..

**D.** **The failure of the trial court to exclude Juror Burg for cause violated the petitioner's right to a fair and impartial jury.**

It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (*citing Wainwright v. Witt,* 469 U.S. 412 (1985); *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)). While it is true that Juror Berg did not sit on the petitioner's jury, the court's failure to exclude Berg caused the petitioner to use a preemptory challenge against the venireman, which prevented him from using that strike on another biased potential juror. Unfortunately for the petitioner, who is an

African American Male, the trial court's failure strike Berg for cause allowed another venireperson, Mrs. Smith, to serve on the jury in spite of her bias against "black people."

The procedure used in this capital trial involved qualifying a pool of people and then using the peremptory challenges after the entire pool was qualified.  As each potential juror was presented to the parties, the State elected to accept or to excuse.  If the State elected to accept a potential juror, the defense chose whether to accept or excuse.  On the morning the lawyers were to choose the jury from qualified pool, the applicant requested an additional peremptory strike to use against Gordon Berg because the court had overruled his challenge for cause.  He used a peremptory strike on Berg, and immediately requested another peremptory (R.R. Vol. 21, p. 3, 26-27).  The court denied this request.  After using his fifteen peremptory strikes, he was forced to accept Linda Smith, Juror No. 348, because "we don't have any more strikes" (R.R. Vol. 21, p. 32).  While petitioner did not articulate why he would have used a peremptory on Ms. Smith and why she was not an acceptable juror, her answers during voir dire raised several grave concerns.  She said that she believed one group of people is more dangerous than others, and that group of dangerous people were "Blacks" (R.R. Vol. 19, p. 211).  Specifically, she said: ". . . It seems like to me that the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks. "(R.R. Vol. 19, p. 212).

Also, she was strongly in favor of the death penalty.  On a scale of 1 to 10, with 10 being the person who would give the death penalty in every circumstance, she said that she would fall "between about a five and a seven" (R.R. Vol. 19, p. 217).  Certainly, her tendency toward giving the death penalty and her fear of "blacks" as the group who commits "the most violent crimes" made her an objectionable juror.  Applicant was forced to take her because the judge had denied a peremptory strike to replace the one he used on Berg.

Because the trial judge denied the applicant one more peremptory challenge, he forced the applicant, a black male, to be tried by Mrs. Linda Smith who strongly favored the death penalty and who believed that "the group of people that seem to commit the most violent crimes from my point of view . . . are blacks."

The applicant requested a peremptory challenge because he had to use one on potential juror Berg, whom the judge refused to remove for cause. Berg favored the death penalty because it saves the taxpayers a tremendous cost in keeping a convicted person incarcerated for life. He expressed a bias against those who killed children to the extent that he did not believe any mitigation could exist, except in a "mercy killing". His answers reflect a bias against the defendant and against the law of mitigation which Allen was justified in availing himself of.

### E.    Conclusion.

One of the most fundamental constitutional rules surrounding the death penalty is that a jury's ruling on a person's life or death must be impartial. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). The trial court violated this rule by refusing to strike venireperson Berg for cause, which lead to venireperson Smith being on the applicant's jury despite the fact that she was prejudiced against black people. The state court's refusal to grant relief on this claim, and the state courts' decisions were both an unreasonable applications of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Based on the foregoing the applicant request that this court grant this Writ and reverse the conviction in his case.

**Issue Five**

**Petitioner's trial counsel were ineffective for failing to subpoena witnesses who were key to the mitigation special issue.**

This claim was not raised in the state courts. Petitioner recognizes that generally, where the ineffectiveness of trial counsel is not apparent from the record, the correct vehicle for asserting a claim of ineffectiveness of trial counsel is a writ of habeas corpus. *See Massaro v. United States*, 538 U.S. 500 (2003). However, in the present case, the ineffectiveness of trial counsel was not discovered until undersigned counsel was able to get into contact with Investigator Gerald Bierbaum, who confirmed that witnesses essential to the presentation of mitigating evidence were identified by the trial counsel, but were not subpoenaed to the trial. Specifically, witnesses who could confirm the severe abuse suffered by the petitioner as a child had been identified, but were not subpoenaed to the trial. *See* Appendix B, Declaration of Gerald Bierbaum.

> **A.    Petitioner requests this court stay and abey the present preceding so that he can properly litigate this claim in state court.**

Federal precedent has firmly established that federal district courts should not entertain unexhausted claims raised in writs of habeas corpus. *See Rose v. Lundy,* 455 U.S. 509 (1982). This idea is based on the "interests of comity and federalism [which] dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v. Webber,* 544 U.S. 269, 273 (2005). However, this doctrine was established in the era before AEDPA was enacted when there was no statute of limitations related to the filing of federal habeas petitions. *Id.* at 274. With the enactment of AEDPA came the strict one year statute of limitations on the filing of federal petitions. 28 U.S.C. § 2244(d). In *Rhines,* the Supreme Court recognized the difficulty faced by petitioners when trying to balance the effect of the exhaustion requirement on one hand

with the short statute of limitations on the other.  After discussing the goals of AEDPA and the role of *habeas corpus* in general, the Court decided that it is proper for district courts to stay and abey federal writs so that unexhausted claims can be presented to the state courts in limited circumstances.  *Rhines,* 544 U.S. at 277.  The Court decided that it was proper to stay and abey a petitioners claims when: (1) "the district court determines there [is] good cause for the petitioner's failure to exhaust his claims first in state court ;" and (2) the unexhausted claims are potentially meritorious.  *Id.*[5]

Until the recent past, Texas' capital petitioners had a hard time establishing that they had potentially meritorious claims as required by *Rhines* because the Court of Criminal Appeals refused to hear any writ applications while there was a parallel federal writ pending.  *See Ex Parte Soffar*, 143 S.W. 3d 804, 804 (Tex. Crim. App. 2004).  However, in *Ex Parte Soffar* the Court of Criminal Appeals determined it would consider properly presented subsequent writs if the federal district court had granted a stay of the federal proceedings.

The question then becomes whether or not Allen can show good cause for his failure to raise this claim during his state habeas proceedings.  In Allen's case, the basis of his failure to raise this claim was the complete failure of his state habeas counsel to provide effective assistance during the state habeas proceedings.  As outlined below, a preliminary investigation into the state habeas counsels' actions show that he completely failed to investigate claims outside the record of the trial, and it is possible that he never met with his client.

Finally, the petitioner points out that until recently established precedent held that "ineffectiveness of state habeas counsel furnishes no basis for cause to excuse a procedural

---

[5] In *Rhines,* the Supreme Court also noted that "if a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief."  *Rhines*, 544 U.S. at 278.  In the event this court finds that a stay and abeyance is improper, he request that this claim be dismissed from the current proceedings.

default." *Hatten v. Quarterman,* 570 F.3d 595, 605 (5th Cir. 2009) (*citing In re Goff,* 250 F.3d 273, 276 (5th Cir.2001)).  However, the Supreme Court's holding in *Maples v. Thomas*, 2012 U.S. Lexis 905 (2012) turns this previously established precedent on its head.

### B.   Habeas Counsel's deficient performance establishes cause for the petitioner's failure to raise this claim, as shown by *Maples*.

"Cause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] ... impeded [his] efforts to comply with the State's procedural rule.'"   *Id.* at 24-25. (citing *Coleman,* 501 U.S., at 753, 111 S.Ct. 2546). However, the general rule has always been that negligence of habeas counsel is not cause.  *Id.*  In spite of this rule the Supreme Court in *Maples* found cause based on a habeas attorney's deficient performance.   The *Maples* Court relied on the fact that Maples' attorney had effectively withdrawn from his case, therefore "[h]aving severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative." *Id.* at 26.  The Petitioner now claims that his state habeas counsel's failure to properly investigate the state writ of habeas corpus was "so serious that counsel was not functioning as the counsel," the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 667 (1984).  As he was not functioning as counsel, he had effectively abandoned his client at the state habeas level.

In order to show the deficiencies of his state habeas counsel the petitioner will explain how his state habeas counsel failed to comply with the "Duties of Habeas Corpus Counsel" as identified by the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel. (available at http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/Texas CapitalGuidelines.pdf).

The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows:

> Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.

*Id.* at 30.  Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place." *Id.*  The State Bar also directs that "without exception, habeas corpus counsel has a duty to meet the capital client face-to-face as soon as possible" and that the counsel, or another member of his team "should make every effort to establish a relationship of trust with the client."

Records obtained from the Harris County Auditor's office affirmatively show that state habeas counsel completely failed to perform any of the above mandated duties.  *See* Exhibit C.  According to these records, of the more than 228 hours spent by the state habeas attorney on the state writ, *none of these hours were spent visiting with, or interviewing the client*.  The records also show a complete failure to review any documents in the possession of the trial attorneys, and a complete failure to contact any people responsible for investigating the petitioner's case.  This would explain why the state habeas counsel failed to identify or raise any claims related to ineffective assistance of counsel at the punishment stage.  It appears that the only interaction the state habeas counsel had with his client was through an investigator who visited petitioner Allen once, in relation to a record based jury claim.  *See* Exhibit C.

Based on the records in Exhibit C, it is clear that the state habeas counsel was not acting as an effective habeas attorney.  He spent no time investigating claims outside of the record.  He spent a total of 228.75 hours working on his state writ (not including time printing the writ).  *Id.*  Of that time 172.5 Hours were spent on research and writing, and 56.25 hours were spent reading the record.  This is what one would expect from a direct appeal counsel, not a habeas attorney.

In effect, the state habeas counsel was not acting as a habeas counsel at all, he had effectively abandoned his client, all the while giving his client the idea that 'habeas' work was being completed.

This point is driven home by the State Bar of Texas' first enumerated "general responsibility" of habeas counsel, which states:

> a. Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.  (Id. at 30)

State Bar of Texas' Guidelines and Standards for Texas Capital Counsel at 30.  However, this principle was not followed by the applicant's state level habeas counsel who based his entire writ on the appellate record.

The state writ (authored by Stephen Morris) runs over 800 pages yet contains little of substance.  Strikingly, the quasi-substance in the state writ appears to have been copied and pasted from the state direct appeal (authored by Allen Isbell).  For example, Isbell's point number one read, "The Trial Court Abused Its Discretion in Denying Appellant's Challenge to Gordon Arthur Berg In That His Views Would Prevent And Substantially Impair the Performance of His Duties as A Juror In Considering the Mitigation Issue."

Similarly, Morris's Claim for Relief Number 17 reads, "The Trial Court Abused its Discretion in Denying Appellant's Challenge to Gordon Arthur Berg in That His Views Would Prevent and Substantially Impair the Performance of His Duties as a Juror in Considering the Mitigation Issue."  Each and every other one of the arguments made by Mr. Isbell (in the direct appeal) were quoted in full by Mr. Morris (in the habeas brief).  The state habeas counsel's failure to act as counsel is the equivalent of abandoning his client, for that reason the petitioner

asks this court to find the deficient performance of the state habeas counsel is sufficient cause to stay and abet the petitioner's case and allow the petitioner to return to state court.

### C.      This claim is potentially meritorious.

As this Court knows there are two elements to an ineffective assistance of counsel claim. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (2003).  The first element concerns the trial counsel's failure to call as witnesses the persons the defense team had identified who could provide support to the petitioner's assertions that he had been severely abused as a child.

This claim is based on the information uncovered by the undersigned counsel in their conversation with Gerald Bierbaum who was an investigator in the petitioner's trial case.  (*See Appendix B,* Declaration of Gerald Bierbaum.)  Bierbaum remembers Alvin Nunnery being lead counsel for mitigation.  Importantly, he also remembers that "Ms. Milstein and I discovered some testimony that supported the physical and sexual abuse Mr. Allen suffered during prior to his leaving home as a teenager." *Id.*  This leaves the question, why were none of these supporting witnesses called by the petitioner's defense team to testify in trial?  After all, evidence of abuse confirmed by people who knew the defendant in the past is stronger than the same evidence relayed by a doctor who has only interviewed the defendant a few times.  Indeed, the jury signaled this by asking the judge if Bettina Wright (the doctor) had actually met with the applicant's family.  C.R. Vol. II at 581,582.  She had not.

The answer to why the witnessed were not called was also addressed by Bierbaum in his

Declaration.  *See* Appendix B.  He recalls as follows:

> As the trial approached, we selected witnesses to testify. I recall that some of the
> selected witnesses refused to come to the trial in Houston after learning about the
> mitigating evidence to be presented.  I recall this troubled the defense team
> greatly because their testimony would have verified the abuse that Mr. Allen
> revealed.  I believe the team assumed these witnesses would cooperate because of
> their interviews.  I believe that we did not have enough time to pursue out of state
> subpoenas when we found out the witnesses would not willingly appear.

*Id.*  It appears that the witnessed were not subpoenaed originally because the defense expected

them to come to trial if requested, but that the witnesses backed out as the trial date neared.  No

subpoenas were ever filed for the witnesses, and the likely result is that the jury gave less

weight to the evidence of past abuse in the petitioner's life than they would have if these

witnesses had been subpoenaed.

The petitioner claims it was ineffective assistance of counsel to fail to subpoena these

witnesses in a timely manner.  While the factual basis for this claim has not been fully

established, the petitioner does assert that failure to call witnesses has been found to be

ineffective assistance of counsel in the past. *See, e.g., Goodman v. Bertrand*, 467 F.3d 1022,

1029 (7th Cir. 2006) (holding that trial counsel was ineffective for failing to call witness who

counsel knew could present evidence that client was not the person who committed the crime,

and stating that such could not be considered a tactical decision.);  *Mathews v. Abramajtys*, 319

F.3d 780 (6th Cir. 2003) (upholding district court's grant of writ of habeas corpus, focusing on

trial counsels failure to present potential alibi witness);  *Pavel v. Hollins,* 261 F.3d 210 (2nd Cir.

2001) (holding that trial counsel's decision not to call two important fact witnesses could not be

seen as plausible strategic decision making or adequate pretrial investigation where counsel

knew they would provide useful non-cumulative trial testimony);  *Montgomery v. Peterson,* 846

F.2d 407 (7th Cir. 1988) (upholding district court's grant of habeas corpus on the grounds that trial counsel was ineffective for failing to speak with and call as a witness the only disinterested witness who could confirm the defendant's alibi). By failing to subpoena the witnesses in question, whose existence is verified by the sworn statement of Gerald Bierbaum, the defense team effectively asked the jury to rely on the petitioner's word that he had been heavily abused as a child. Had these witnesses been properly subpoenaed there would have been support for the defense's claim that the defendant was indeed abused as a child.

The failure of the defense to subpoena these witnesses also prejudiced the defendant. Under *Strickland*, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The defendant will be able to meet this standard because the record makes it clear that the jury was concerned that no one other than the defendant had corroborated his account of childhood abuse. *Se* C.R. Vol. II at 581,582. Further, the jury took three days to decide that the death sentence was appropriate in this case. It is very likely that the jury decided that the defendant had lied about his claims of abuse and therefor disregarded the defense arguments in favor of mitigation. After all, this is what the prosecution repeatedly asked the jury to do in closing argument. *See* R.R. Vol. 29 at 42 (prosecutor claiming that Kerry was not raped by his uncle, unsupported by evidence), 53 (prosecutor saying there is no mitigation unless you believe the defense investigator who had interviewed Allen). Had the defense called the witnesses who could have corroborated the allegations of both physical and repeated sexual abuse the defendant suffered as a child there is a great probability the result of the proceeding would have been different. Specifically, had the jury

heard about this abuse from someone with firsthand knowledge the jury would likely have found that this strong mitigation evidence called for a sentence of life in prison.

### D.       Conclusion: Proper Motions Forthcoming.

While this claim has not been properly exhausted at the state court level the petitioner has established cause for the failure to exhaust, and that the claim is potentially meritorious. For this reason the petitioner asks this court to Stay and Abey this proceeding so that he can present this claim to the state court before returning to federal court.

In the coming weeks, petitioner will present to the Court motions necessary to develop the factual basis for this claim, and then, assuming the factual basis is established, the petitioner will formally request this court to stay abey further proceedings until the state court has had the chance to rule on this issue.  Finally, petitioner would point out that this claim has not been fully developed because the petitioner was not able to show cause for his failure to raise this claim at the state level until the Supreme Court's decision in *Maples* issued on January 18, 2012.

### Relief Requested

WHEREFORE, Allen respectfully prays this Court:

1.    Order that Allen be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Allen to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Allen be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which

are identified or uncovered in the course of discovery and that Allen be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.   Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.   Issue a writ of habeas corpus to have Allen brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.   In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Allen brought before it to the end that he may be relieved of his unconstitutional sentences;

6.   Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Petitioner KERRY DIMART ALLEN asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights. He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Allen from custody, or alternatively, to reverse his conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Allen also asks the Court to allow a reasonable time to amend this petition rather than to dismiss for failure to exhaust remedies. He also requests reasonable time to respond to the State's answer to this petition. Finally, he asks for such other relief as the Court finds the Allen justly entitled.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana; Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (fax)

seth@kretzerfirm.com

/s/ Jonathan Landers
_____

Jonathan Landers
2813 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT-APPOINTED LAWYERS FOR PETITIONER
KERRY ALLEN

**Certificate of Service**

I certify that a true and correct copy of the foregoing motion was served on all counsel of record by filing on the ECF System on this 1st Day of February, 2012.

_____

Seth Kretzer