IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KERRY DIMART ALLEN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civ. Action No. 4:11-mc-1676 |
| | § | ECF |
| RICK THALER, | § | |
| Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| Respondent. | § | |
| | § | |

**RESPONDENT THALER'S
ANSWER WITH BRIEF IN SUPPORT**

Petitioner Kerry Dimart Allen was properly convicted and sentenced to death for the capital murder of Kienna Lashay Baker, a child under six years of age.  I CR[1] 2; II CR 563, 574-75, 585-86.  Allen now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254.  However, he has failed to demonstrate that he is entitled to relief.  The Director denies all allegations of fact made by Allen except those supported by the record and those specifically admitted herein.[2]

---

[1]    "CR" refers to the Clerk's Record—the transcript of pleadings and documents filed with the clerk during trial—followed by page number.

[2]    An electronic copy of Burton's state court records was filed on May 17, 2012.  *See* ECF No. 16 ("ECF" refers to the Southern District's Official Court Electronic Document Filing System, followed by a docket entry number).

## PETITIONER'S ALLEGATIONS

In this federal habeas proceeding, Allen alleges five constitutional violations:

1. The Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Constitutional Amendments by not requiring the State to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.

2. The State of Texas, by requiring individual counties to fund the prosecution of capital cases, injects arbitrariness into the selection of which cases will be tried as capital cases, in violation of the Eighth and Fourteenth Constitutional Amendments.

3. The Texas "12-10" Rule and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland,* 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990).

4. The state trial court violated Allen's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against veniremember Berg.

5. Allen's trial counsel were ineffective for failing to subpoena witnesses who were key to the mitigation special issue.

## STATEMENT OF THE CASE

Allen was convicted of capital murder in April 2001, and sentenced to death in May 2001, for the capital murder of Kienna Lashay Baker, a child under six years of age.  II CR 563, 574-75, 585-86.  The Texas Court of Criminal Appeals (CCA) affirmed Allen's conviction on direct appeal.  *Allen v. State,* 108

2

S.W.3d 281 (Tex. Crim. App. 2003), *cert. denied,* 540 U.S. 1185 (2004).

Allen filed an application for postconviction writ of habeas corpus on January 10, 2003.  SHCR[3] 2-355.  The trial court adopted the State's proposed findings of fact and conclusions of law and recommended denying relief.  SHCR 894-929.  The CCA adopted those findings and denied relief.  *Ex parte Allen,* WR-73,586-01, 2010 WL 1709947 (Tex. Crim. App. Apr. 28, 2010).

## STATEMENT OF FACTS

### I.   Facts of the Crime.

Forty-year-old Allen met Kienna Baker's mother, twenty-three-year-old Kim Jones, at a bus stop during the fall of 1999.  22 RR 63-68, 71, 78-79.  During the course of a forty-minute conversation, Allen told Jones that he was an evangelist preacher.  22 RR 69-71.  Allen asked Jones if she had any children; Jones told him about her four children.  22 RR 64, 68-69.  The two exchanged telephone numbers; Allen called Jones that night and she agreed to go on a date with him.  22 RR 69-72.  After dating a short period of time, Allen and Jones moved in together.  22 RR 72-74, 77-79.  Allen had only seen Jones's children on one occasion, but he wanted them to live with them in the apartment.  22 RR 74-75.  The six of them moved into a two-bedroom apartment in November 1999.

---

[3]     "SHCR" refers to the Clerk's Record from the state habeas proceedings.

22 RR 78-79, 90.

Over the next six months, Jones worked while Allen watched the children. 22 RR 83-87; 23 RR 81-82. Typically Allen was left alone with the children from 8:00 a.m. until 4:30 p.m., while Jones was working. 23 RR 81-82, 87. Allen took over as disciplinarian for the children after he and Jones moved in together. 23 RR 89. Allen devised rules for the children and would not allow them to play outside; all four children were generally required to stay in the one bedroom the children shared. 22 RR 81-82, 89-90. The children began losing weight because Allen withheld food from them as a form of punishment. 22 RR 101-02. Jones testified that Allen did not like two-year-old Kienna and that he mainly picked on her for wetting herself. 22 RR 81-82, 94. When Kienna had an accident, Allen whipped her with a belt, leaving marks and bruises; Jones testified that Kienna was punished in this manner at least four or five times. 22 RR 95-96. According to Jones, Allen had a specific belt that he used for whipping the children; she asked Allen not to hit the children in this manner but he refused to stop. 22 RR 96-97, 100. A few days before her death, Allen struck Kienna because she had urinated on herself; he then forced her to sit on the toilet for one to two hours until she urinated again. 22 RR 97-99. Jones explained that Allen hit Kienna "real hard" with "anger on his face." 22 RR 97. Jones was afraid of Allen and believed he was capable of hurting her; she also believed Kienna was

afraid of him.  22 RR 99-100.

On May 10, 2000, Jones left for work at 8:30 a.m.  22 RR 107.  The children were still asleep in bed at this time, but Allen was awake.  22 RR 107-08.  Some time around noon, Allen called Jones's workplace and told her supervisor that there was an emergency, and Jones needed to come home because something was wrong with one of her children.  21 RR 64-66; 22 RR 109-10.  Jones left work around 12:35 p.m.; when she arrived home, Allen met her in the parking lot and stated, "I didn't do anything to her."  21 RR 64-67; 22 RR 110, 113.  Allen told Jones that he had spanked Kienna after she wet herself and that he then placed her on the toilet but she fell off and hit her head.  22 RR 113.  Jones ran inside the apartment where she found Kienna lying in the children's bedroom wearing only a wet pair of boy's underpants; Jones noted it was very unusual for Kienna to wear boy's underpants.  22 RR 114-16.  Kienna did not move or respond, foam was coming out of her mouth and nose, and Jones detected no heartbeat.  22 RR 115.  Jones noticed a jar of Vaseline near Kienna's motionless body, which led Jones to suspect Allen had molested Kienna.  22 RR 114-15; 23 RR 89-90.  Jones asked Allen what he had done but he again denied any wrongdoing.  22 RR 116.  Jones removed the boy's underpants from Kienna's body and replaced them with girl's underpants.  22 RR 116-17.

Despite her concern, Jones did not immediately call 911 out of fear—Allen

repeatedly told her not to do so.  22 RR 118-20.  Instead, Allen insisted they go to a neighbor's apartment to borrow a dollar for bus fare so that he could "get away."  22 RR 120-23.  Neither told the neighbor that anything was wrong with Kienna or attempted to call 911 from the neighbor's house; Allen attempted to call his father but could not reach him.  22 RR 122-24.  They left the neighbor's house and went to a payphone were Jones did finally call 911, despite Allen's warnings not to.  22 RR 125-26.  Allen continued to deny doing anything to Kienna.  22 RR 126.  They returned to the apartment where Allen instructed Jones not to tell the police that he was in the apartment.  22 RR 127.  Allen then locked himself in the master bedroom with Jones's other three children.  22 RR 127-30.

Leonard Cherry of the Houston Fire Department arrived at the apartment within three minutes of dispatch, around 1:15 p.m., and performed CPR on Kienna.  21 RR 71-75, 81; 22 RR 130.  Jones told the fireman that Allen was not there.  22 RR 130-31.  When asked about the locked door, Jones stated she did not have a key to the room.  22 RR 132.  Not until police officers arrived and threatened to take Jones to jail did she admit that Allen was hiding in the room and that her other children were in there too.  21 RR 84, 86-88, 91; 22 RR 132-33.  The police eventually kicked the door down to find that Allen had fled through a window; the remaining children were found hiding in the closet.  21

6

RR 91-94; 22 RR 133-34.

A police officer processing the crime scene found an open jar of petroleum jelly near Kienna's body in the children's bedroom, while the jar's lid was found in the master bedroom. 23 RR 150, 154, 161-62; 24 RR 137. In the children's bedroom, police officers also recovered a bottle of hand lotion, a pink child's outfit, two pairs of panties, a towel, and a piece of carpet and padding. 23 RR 154. Another pair of child's underwear was found in the bathroom where they had been washed. 24 RR 136-37. Two Bibles were found lying on the couch; both were opened to a passage about a miracle in which Jesus brought a dead girl back to life by placing his hand on her. 24 RR 136-38.

At the scene, Sergeant James Binford of the Houston Police Department (HPD) spoke with Jones, whom he considered to be of below average intelligence. 24 RR 131-33. After Binford took Jones to the hospital to see her daughter, he took her to the HPD Homicide Office where Jones gave a lengthy statement. 24 RR 138-42. According to Jones, Allen told her that he spanked Kienna and seated her on the toilet after she urinated on herself. 24 RR 144-46. Allen left the room, then heard Kienna fall from the toilet and hit her head. 24 RR 144-46. Jones told Binford that Allen maintained that the death was an accident. 24 RR 144-45. After taking her statement, Sgt. Binford drove Jones home where she showed him a black belt. 24 RR 135-36, 147-48.

7

Paramedics transported Kienna's lifeless body to the hospital where she was pronounced dead at 2:08 p.m.  21 RR 99, 106, 120.  Registered nurse, Kimberly McCreary, attended to Kienna's body when she arrived at the emergency room; McCreary noted that her body was covered with scratches and bruises.  21 RR 111-16.  The injuries appeared to be both old and new.  21 RR 115-17.  McCreary also noticed that Kienna was suffering from a prolapsed bowel—her anal opening was gaping and her bowel was visible.  21 RR 121-124. McCreary stated that she had only seen this condition in victims of sexual assault and had never seen it in a pediatric patient.  21 RR 121-22.  McCreary also noticed a "clear pink-tintish fluid around the anal area."  21 RR 125. Considering these circumstances, a doctor collected a swab specimen from Kienna's anus and vagina.  21 RR 125, 131-32.

Christi Kim of HPD Crime Lab testified that semen was indicated on the two anal swabs collected during the examination, from the blue pad used to wrap Kienna's body after she was declared dead, and from two pairs of children's underwear.  24 RR 86-93, 116-17.  However, the lab was unable to identify the donor of the semen.  24 RR 108-12, 113-15.  No semen was found on the vaginal swab.  24 RR 92.

Dr. Lee Ann Krishnan, an assistant medical examiner, performed an autopsy on Kienna's body.  21 RR 141, 144.  Dr. Krishnan described Kienna's

body as bearing an unusually large number of scars, which constituted evidence of old injuries. 21 RR 152-84. The doctor opined that, while some of these scars could be consistent with normal childhood injury, this was "an exorbitant number of scars, especially for a child so young." 21 RR 183. Dr. Krishnan also said the body bore a number of healing wounds, which were inflicted within days of Kienna's death. 21 RR 191-202. Dr. Krishnan also determined that Kienna was malnourished. 21 RR 204.

Dr. Krishnan concluded that the cause of Kienna's death was blunt force injuries to her chest and abdomen. 22 RR 41. Specifically, Kienna's lungs were bruised, and the soft tissue between her chest plate and heart had hemorrhaged, the result of a strong impact to the front of the chest. 21 RR 212-18. Dr. Krishnan also observed that Kienna's liver was fractured almost in half. 22 RR 20-23. This injury was likely caused by multiple blows, delivered with a great amount of force, to Kienna's abdomen. 22 RR 22-24. According to Dr. Krishnan, this type of liver injury is consistent with the sort of fatal injuries sustained in car accidents. 22 RR 22-23. The doctor opined that, given the small amount of blood in her abdominal cavity, Kienna likely did not live very long after her liver was fractured. 22 RR 24-25. Kienna's kidney was also lacerated as a result of blunt force trauma to her abdomen. 22 RR 25-27. Additionally, the evidence indicated that Kienna had been struck multiple times in the head. 21 RR 211.

9

The lung and liver injuries were both independently sufficient to cause Kienna's death. 22 RR 28-29.  Kienna likely died within one hour of the infliction of these injuries.  22 RR 29.  Dr. Krishnan concluded that Kienna's injuries were consistent with someone hitting her repeatedly on her chest and abdomen with his hand.  22 RR 32-33.  Dr. Krishnan testified that these injuries were consistent with having been inflicted by an adult and were not consistent with Kienna falling off the toilet, hitting head, and losing consciousness.  22 RR 31.

Dr. Krishnan detected evidence of sexual abuse: She found petechial hemorrhages around Kienna's vagina, indicating trauma to that area.  21 RR 186. The trauma was consistent with an attempted penetration of Kienna's vagina. 21 RR 189.  Dr. Krishnan opined that this trauma occurred on the day of Kienna's death. 21 RR 186-87.  Dr. Krishnan noted that Kienna's hymenal ring was open, meaning she was either born with this condition or something had penetrated her hymenal ring.  21 RR 187-88.  Dr. Krishnan also noted evidence of anal penetration.  Dr. Krishnan observed a "skin tag" near Kienna's anus indicating past penetrating trauma to Kienna's anus. 21 RR 189-90.  She found hemorrhages in Kienna's anus.  22 RR 35-36.  The anal injury was consistent with an adult penis penetrating deep into her rectum and causing severe injuries.  22 RR 38, 44-45.  Dr. Krishnan opined that the rectal injury occurred "[a]nywhere from 48 hours close to the time of death."  22 RR 43.  She

also testified that the blood loss associated with Kienna's anal injury may have contributed to her death.  25 RR 47.

Dr. Joan Shook, the director of the Texas Children's Hospital's Emergency Department, reviewed Kienna's records and concluded that Kienna was beaten death.  24 RR 4, 7, 9.  Dr. Shook's findings were consistent with and closely mirrored Dr. Krishnan's:  Dr. Shook determined Kienna's liver was separated, her kidney was lacerated, and her lungs were bruised, 24 RR 16-17, 22, 27; these injuries were caused by repeated blows to Kienna's chest and abdomen, 24 RR 18, 20, 26-27, 31; Kienna was beaten for more than an hour and ultimately beaten to death, 24 RR 43; and, during the beating, Kienna was anally raped which contributed to her death, 24 RR 43.  Regarding the sexual assault, Dr. Shook testified that Kienna suffered significant rectal injuries—her rectal tissue was protruding from her anus, a condition that was "extraordinarily unusual." 24 RR 33, 35.  This condition was consistent with anal penetration by a penis "with considerable force."  24 RR 36-40.  Dr. Shook determined that the anal injuries occurred within hours of Kienna's death.  24 RR 36-37.  Dr. Shook also detected injury to Kienna's vagina which, in her opinion, indicated that she had been chronically sexually abused.  24 RR 41-42.  Further, Dr. Shook noted petechial hemorrhaging indicating a recent injury to Kienna's vagina occurring "within a short period of time before her death."  24 RR 41-42.  According to Dr.

Shook, Kienna's injuries were inconsistent with her falling off a toilet and striking a bathtub. 24 RR 13-14, 24. Rather, the injuries to Kienna's liver, kidneys, and lungs would be consistent with the kind of injuries sustained in a car crash, falling from a second- or third-story window, or from being kicked by a horse. 24 RR 31-32. Dr. Shook testified that injuries to Kienna's head and face were likely caused by someone pulling Kienna's head up by her hair and slamming her face down more than once. 24 RR 13. Bruising along her side was likely caused by someone striking or holding Kienna down while rectally penetrating her. 24 RR 20-22. The lacerations to Kienna's liver were consistent with an adult kicking the child with as much force as possible. 24 RR 29.

Two days after Kienna's death, Allen attempted to turn himself in to the Harris County Jail; a crying Allen told a sheriff's deputy that there had been an accident and Kienna had been killed. 23 RR 178-80. The deputy called HPD and spoke with Sgt. Binford who indicated that he wanted to speak with Allen. 23 RR 180-84. Sgt. Binford arrived at the jail fifteen minutes later and told Allen that he was a suspect in Kienna's death. 23 RR 188; 24 RR 165. Allen hung his head and said, "I know." 24 RR 165. Allen agreed to accompany Sgt. Binford to the homicide office. 24 RR 165. As they approached Sgt. Binford's car, Allen stated, "I should have never done it. My temper gets control." 24 RR 166. Once they arrived at the homicide office, Allen told Sgt. Binford that he had

12

anger management problems and asked if the police department had classes for this problem.  24 RR 173.  Allen also said that he would have fled town but he did not have any means by which to do so.  24 RR 172.  Sgt. Binford testified that Allen was the power in the relationship with Jones and was intelligent and manipulative.  24 RR 173-75.

## II.   Evidence Related to Punishment

### A.   State's evidence

At the punishment phase of trial, the State played for the jury Allen's videotaped interview conducted by Sgt. Binford.  27 RR 8; SX 224.  Sgt. Binford testified that, on the tape, Allen came across as a victim; however, Binford found him to be a methodical and sharp thinker who functions in a "survival mode." 27 RR 13.

Officer Jose Torres from the HPD Juvenile Division testified that he transported Jones's remaining three children from the apartment complex to the hospital.  26 RR 206-07.  Officer Torres testified that the oldest child, Denzel, appeared skinny and listless.  26 RR 209.  Both boys, Denzel and Tristen, had visible bruising and scars.  26 RR 209, 215-20.  Torres took them to Texas Children's Hospital and stayed with them while they were treated by doctors. 26 RR 210.  Denzel never spoke to Officer Torres and never made a sound while his blood was drawn.  26 RR 213, 220.  Denzel had to be admitted to the hospital.

13

26 RR 220.  He was four-years old and weighed just twenty-six pounds.  26 RR 225.  Three year-old Champagne Jones did not have any visible injuries and her overall physical condition was good compared to the other children, but she was hungry.  26 RR 213.  Tristen, the youngest child, had bruises on his bottom and thigh areas and appeared malnourished and dehydrated.  26 RR 215.

The State presented evidence of Allen's criminal record.  On October 22, 1986, Allen pled guilty to two counts of felony sexual assault, committed in Harris County, Texas, and was placed on deferred adjudication probation.  26 RR 4.  The indictment in this matter alleged Allen penetrated the anus of Keenan and Kevin Clay, on or about January 2, 1986.  SX 171.  Allen violated the terms of his probation by failing to report for four months in 1988, by failing to participate in a sex offender program, and by failing to pay supervisory fees and fines.  26 RR 10.  In May 1989, Allen was adjudicated and sentenced to two years' imprisonment for this offense.  26 RR 59-60; SX 174.  Allen received credit for time spent in the county jail awaiting parole revocation proceedings from March until May, and was released on mandatory supervision on or about September 17, 1989.  26 RR 61-62. However, within three months of his release Allen violated the terms of his parole by failing to report for parole and by failing to report a change of residence.  26 RR 63, 65-66. On December 11, 1989, a pre-revocation warrant was issued but was not executed until September 29, 1998,

14

by the Acadia Parish Sheriff's Office in Louisiana. 26 RR 63. Allen was not supposed to leave Harris County, Texas, and should not have been in Louisiana, and was thus considered a parole absconder during those nine years. 26 RR 64-65. In January 1999, Allen's parole was revoked. 26 RR 63, 66. In March 1999, the parole board denied Allen parole and voted that he serve his sentence in its entirety. 26 RR 67. In July 1999, Allen was again released on mandatory supervision, but was required to register as a sex offender. 26 RR 67-71. Allen was discharged of his parole obligation on March 15, 2000—approximately two months prior to the murder of Kienna. 26 RR 68. Records indicate that one of the conditions of his mandatory supervision required that he stay away from children, and being around children under the age of five—i.e., living with Jones's children—would have been a violation that parole. 26 RR 70-71.

HPD Police Officer Dalia Hester testified that she knew Allen from her duties with the HPD Sex Offender Registration Program—Allen was one of the registered sex offenders assigned to her. 26 RR 72-74. According to Officer Hester, sex offenders released from prison or jail must register within seven days of release; Allen did not register for almost a month. 26 RR 74-75. As a multiple offender, Allen was required to report to her office every ninety days, and verify his address once a year, for the rest of his life. 26 RR 78-79. If he moved, Allen was required to notify the program seven days before a move. 26

15

RR 80.  Allen never reported a change of address in connection with his move into the apartment with Kimberly Jones and her children. 26 RR 89-91.  Had Officer Hester discovered he was living somewhere other than his registered address, he would have been charged with a third degree felony, exposing him to two to ten years in TDCJ and up to a ten-thousand dollar fine.  26 RR 91-93.

The State also presented evidence that on May 11, 1990, Allen pled guilty to misdemeanor assault in Harris County, Texas, for attacking his second wife, Carla Jones (see below).  He was sentenced to seventy-five days' confinement in the Harris County Jail.  26 RR 4-10; SX 176.

Allen's first wife, Sonji Allen, testified that she met Allen when she was seventeen and he was twenty-three but her parents would not allow them to date. 26 RR 115.  The two dated secretly and married in August 1983, when she turned eighteen.  26 RR 112-15.  When they married, Allen falsely represented that he was employed.  26 RR 116.  However, Sonji soon learned that Allen did not have a job, a car, or a home; they lived in a hotel and then with a friend of Allen's.  26 RR 116-17.  Sonji got a job at a hospital and supported them during their marriage.  26 RR 117-18.  Their first child was born November 1, 1984. 26 RR 118. While the couple was living in St. Louis, Allen did not work for longer than two weeks.  26 RR 117.  In December 1984, Allen told Sonji he wanted to move the family to Texas so he could look for work, but Sonji did not want to go;

16

they argued about the move at which time Allen choked Sonji until she was almost unconscious.  26 RR 119-21.  Sonji eventually consented to move to Houston where they lived first with a dentist and then with an elderly man.  26 RR 121-22.  Sonji was pregnant with their second child when their son Devin died of natural causes.  26 RR 122.

On two separate occasions Allen and Sonji lived with Vanessa Griffin, whom they met through church.  26 RR 132-36.  Griffin allowed them to live with her and her two sons off and on until Sonji moved back to St. Louis with her family.  26 RR 132-36.[4]  Sonji testified that she and Allen used to babysit for Vanessa's children who, at first, appeared to like Allen.  The children later became withdrawn and avoided him when he was around.  26 RR 137-38.  After Sonji returned to St. Louis, she learned of the sexual assault allegations regarding Allen and Griffin's children.  26 RR 136.  Sonji testified that she remained married to Allen but never saw him again.  26 RR 138.  Allen has not met their daughter, who was born in October 1985, nor does he support the child.  26 RR 124, 138.  Sonji also testified that Allen has a twenty year-old son by another woman in St. Louis, a son who also does not have a relationship with his father.  26 RR 139-40.  On cross-examination, Sonji testified that Allen told

---

[4]    These two children were the victims of the aggravated sexual assault to which Allen pled guilty.  *See* 26 RR 133-34; and 26 RR 4-10; SX 170-76.

17

her an uncle had molested him when he was a child.  26 RR 150.  Sonji also recounted Allen's several attempts at suicide, 26 RR 151-55, but testified on redirect that she thought Allen did this to gain pity.  26 RR 163.

Liza Turner testified that she first met Allen, sixteen years prior to the trial, when she was eleven or twelve years old and he was a youth minister at her church.  26 RR 168.  Turner testified that she had a special relationship with Allen—he would teach her songs and she was flattered by the attention.  26 RR 170.  Turner's parents would not allow them to meet anywhere away from the church so they used to meet up in a secluded hallway of the church.  26 RR 170-71.  According to Turner, they talked and Allen used to hug her in that hallway.  26 RR 171.  The hugging gradually turned more intimate—Allen began caressing her and eventually kissed her.  26 RR 171-73.  Allen told Turner that he wanted to be with her and did not want to be with his wife, Sonji, anymore.  26 RR 173.  She and Allen would communicate with each other through letters they exchanged at the church.  26 RR 174.  In one letter, Allen told Turner he loved her and talked about wanting to go away with her; Turner showed the letters to her friend who then showed them to her mother, who in turn gave them to Turner's parents.  26 RR 175-81; SX 183-88.  Allen was not allowed back in the church after that, and Turner never saw him again.  26 RR 176.

18

Vanessa Griffin Henry testified that she is the mother of Allen's sexual-assault victims. 26 RR 185-86. Henry met Allen through church about fifteen years prior; her children were four and eight at the time. 26 RR 186-870. Henry testified that she let Allen and Sonji move in with them for almost a year after the pastor told her they did not have a place to live. 26 RR 188-89. Allen did not have a job during the time he lived with her. 26 RR 189, 191. At one point, Henry left her boys in the care of Sonji and Allen, and, at first, Allen interacted well with the boys. 26 RR 190- 91. After having a conversation with her pastor, Henry approached her boys and asked them if anyone had ever touched them in an inappropriate way; both boys indicated that Allen had touched them inappropriately and had threatened them if they ever told anyone. 26 RR 192-95. When Henry confronted Allen with the boys' accusations, he told her he did it because he was in love with her. 26 RR 197. Henry called the police, but eventually agreed to probation for Allen so that her children would not have to testify against him. 26 RR 195-96.

The State called Carla Jones who testified that she met Allen when she was twenty-three years old and they both lived in the same boarding house in Houston. 26 RR 13-14. According to Carla, when they first met, Allen told her he would protect her from the single men living in the boarding house and once commented that he thought she was much younger than her true age. 26 RR 12,

14-15.   The two began dating a few months later and then moved into an apartment together.  26 RR 15.  Allen worked odd jobs, contributing to the phone bill and groceries, while Jones worked for an attorney and paid the rent.  26 RR 16-17.   The two got married in April 1990, after Carla found out she was pregnant.  26 RR 17, 21. While they were together, Allen told Carla that he had been incarcerated for assault, but never told her that the offense was for sexual assault of children, that he had an open arrest for parole violations, that he was required to attend sex offender classes, or that he was married to Sonji Allen, despite the fact that Carla specifically asked if he was married.  26 RR 19-20.

Once they were married, Allen wanted to take control of everything:  When Carla became pregnant, Allen tried to get her to stop working; Allen once forced her to change clothing and wear his shirt to her office because he considered the shirt she was wearing too provocative; on another occasion, he stopped the car on the side of the highway and attempted to push her out of the car because they disagreed over her prenatal care.  26 RR 17-18, 22-25.  Allen was also jealous of the attorney Carla worked for and did not like her working at the office alone with him.  26 RR 18.  Allen would get angry if she came home late and accused her of having an affair with her boss.  26 RR 18.

In May of 1990, while Carla was three months pregnant, she stayed late visiting her mother; when she got home Allen accused her of being with her boss.

20

26 RR 26.  The two argued and Allen tried to physically force her to get re-dressed in the clothing she had been wearing that day, and then began beating her with a hanger on her behind and her legs.  26 RR 28-29.  Carla said his whole personality changed during this incident.  26 RR 30.  Allen dragged her out of the apartment kicking and screaming and tried to force her into the car, but neighbors intervened.  26 RR 30-32.  The police were called and Carla made an official report, but Allen ran away before they arrived.  26 RR 32.  Allen was eventually caught and convicted of assault.  26 RR 33.  Carla did not continue to live with Allen after that, and lost the baby approximately three weeks after the attack.  26 RR 33.  During the attack, Carla feared that if she got into the car with Allen, she would never return; Carla opined that he made her re-dress in the clothing she had been wearing so that he could say she never made it home that evening.  26 RR 53-54.

Carla did not see Allen again until she contacted him in 1999 to obtain a divorce; Allen did not tell her that he had been in jail, but told her that he had been ordained as a bishop and that he was trying to turn his life around and look for a job.  26 RR 33-40.  Allen and Carla spent three days together, during which time he told her he wanted to get back together, but Carla refused because Allen ignored her six year old son from another relationship, refusing to look at or speak to him.  26 RR 40-42.  Allen became angry when she told him she still

wanted a divorce, and he left.  26 RR 43-44.  She did not see him again until she saw this case on the news and contacted the police.  26 RR 44-45.

### B.    Defense's evidence

Clinical psychologist, Dr. Gilda Kessner, evaluated Allen to determine his risk of committing future acts of violence.  27 RR 18-19.  Dr. Kessner opined that Allen would fall into a range of 2 to 7.3 percent probability of committing future acts of violence constituting a threat.  27 RR 19, 52.  Dr. Kessner stated that the staff, security, and structure of prison modified Allen's risk level.  27 RR 55.

The defense called the pastor of Allen's childhood church in St. Louis, Missouri, James Jefferson, who has known Allen since he was seven or eight years old.  27 RR 84-85.  According to Jefferson, Allen was part of the church youth group, was a likeable person, and never any trouble.  27 RR 86.  Allen left the church when he was about fifteen, but Jefferson would see him every few years at gatherings, and Allen would stop by to say hello.  27 RR 87.  Jefferson testified that Allen exhibited slightly feminine mannerisms and seemed rather timid and soft.  27 RR 88.

Another childhood pastor, Freddie Thompson, testified that he met Allen when he was fourteen years old, in a fellowship service for young people.  27 RR 98-99.  Allen was active in the group and loved to speak to the group from the Bible.  27 RR 98.  When Allen was about thirty years old, he made a public

confession in front of the entire church congregation that he was a homosexual. 27 RR 99-100, 108-10. Thompson tried to counsel him after the service because the church considered homosexuality a sin. 27 RR 100-01. Thompson had not seen Allen for nearly ten years at the time of trial. 27 RR 101. Thompson testified that Allen's criminal past did not correspond to the person he knew from fellowship. 27 RR 102-03. Thompson saw Allen as a bright young man who was very interested in a spiritual life. 27 RR 103.

Bobby Austin testified that she met Allen in church in Missouri in 1979. 27 RR 113. Allen was a preacher when she met him, and he came to live with her on several occasions. 27 RR 114-15. Allen came to live with her because he was not welcome in his own home. 27 RR 116. Austin had eight children, all younger than Allen, who were in the house when Allen lived with them. 27 RR 114-15. Austin testified that she trusted Allen with her children, he never harmed them in any way, and the children treated him as an uncle and spiritual brother. 27 RR 115. Allen was godfather to Austin's daughter. 27 RR 117. Allen told Austin about his conviction in Texas for assaulting two boys. 27 RR 117. Austin testified there is no comparison between the person who committed these crimes and the person she knew; the Allen she knew was a preacher who used to play with her children and never harmed them. 27 RR 118-19. Austin testified that she loved Allen, that he never had anyone to love him, and that she

23

considered him just like a son. 27 RR 119.

One of Austin's sons, Jerry Pankee, testified that he met Allen through church when Pankee was twelve years old. 27 RR 132. Pankee considered Allen like a brother to him. 27 RR 132-33. Allen was someone he would turn to when he needed to talk or had a problem. 27 RR 133. Allen lived with them when Pankee was about sixteen years old. 27 RR 133. Pankee still considered him a brother, even though he has not seen him in a long time and even knowing what he has done. 27 RR 134.

Licensed master social worker with advanced clinical practitioner status, Bettina Wright, testified that Allen was a survivor of chronic sexual abuse during his childhood. 28 RR 3-6. Her opinion was based upon her interviews with Allen, as well as her review of records gathered by the defense's mitigation experts, records that included interviews with Allen's family. 28 RR 5-6. Wright opined that the abuse started at an early age and continued intermittently through childhood and into adulthood. 28 RR 7. Wright believed Allen was abused by a his brother, his uncle, a boyfriend of his mother, the brother of a boyfriend of his mother, and strangers. 28 RR 9. Wright opined that Allen felt unwanted by his family early in his life, and the sexual abuse made him feel unsafe; therefore he believed he was not of value to his family. 28 RR 12. Allen learned that his biological father raped his mother; thus he and his twin sister

were born of rape.  28 RR 12.  His mother separated from his stepfather—the man he thought was his father—when he was four, and he grew up without a father figure.  28 RR 12.  Wright stated that when a child is sexually assaulted, that child can grow up not being able to trust the world, feel unvalued, and feel unable to protect himself, thereby creating a sense of helplessness and powerlessness.  28 RR 13.  When Allen told his mother that his brother was molesting him, she got angry and did not believe him thereby reinforcing his feeling that he was not valued in the family.  28 RR 15.  Wright opined that someone who perpetrates the kind of abuse against a child that Allen has been convicted of committing likely has poor coping mechanisms, low self esteem, and poor life skills, and is more likely to act out in a stressful situation.  28 RR 16.  Wright opined that being in an impoverished household, caring for someone else's four young children, after having suffered sexual abuse himself, was a stressful situation for Allen.  28 RR 17.

Finally, Corita Hawkins testified that she has known Allen for fifteen to twenty years, after meeting him through church.  28 RR 61-63.  Hawkins allowed Allen to live in her Houston home for a time, and he lived with her after he was paroled from TDCJ.  28 RR 64-66.  Hawkins testified that Allen tried to find work while he was staying with her, but no one would hire him because of his record.  28 RR 66-67.  Allen helped out at her house, cleaning, cooking, and

25

doing yard work.  28 RR 67.  Hawkins testified that Allen took Kimberly Jones's children to church and told Hawkins he was just trying to help Jones get settled even though he knew that he should not live with her.  28 RR 71-72.  Allen called Hawkins after Kienna's death but before he was arrested; Hawkins encouraged him to turn himself in.  28 RR 68-69.  Hawkins told the jury Allen had good qualities and pleaded for the jury to spare his life.  28 RR 69-70.

## ANSWER

Allen, confined pursuant to a state-court judgment, is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); 28 U.S.C. §2254(d).  The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that

contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state-court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,*

537 U.S. 19, 27 (2002) (federal habeas relief is merited only where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion").  Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664.  This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which, when analyzed in conjunction with §2254(d), creates a difficult-to-surmount, "doubly" deferential assumption in favor of the state court denial.  *Richter*, 131 S. Ct. at 786.

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning.  *Neal v. Puckett*, 286 F.3d

28

230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th

Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493  (5th Cir.  2002) (". .

. we review only the state court's decision, not its reasoning or written opinion

. . . ."). Indeed, state courts are presumed to know and follow the law.  *Visciotti*,

537 U.S. at 24.   And, even where the state court fails to cite to applicable

Supreme Court precedent or is unaware of such precedent, AEDPA's deferential

standard of review nevertheless applies "so long as neither the reasoning nor the

result of the state-court decision contradicts [Supreme Court precedent]." *Early

v. Packer*, 537 U.S. 3, 8 (2002); *see also Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish

[a] . . . constitutional principle, the lower federal courts cannot themselves

establish such a principle with clarity sufficient to satisfy the AEDPA bar" under

either the contrary-to or unreasonable-application standard. *Williams*, 529 U.S.

at 381.  Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a
> state prisoner must show that the state court's ruling on the claim
> being presented in federal court was so lacking in justification that
> there *was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. at 786-87 (emphasis added).  And a federal court must be

wary of circumstances in which it must "extend a [legal] rationale" of the

Supreme Court "before it can apply to the facts at hand" because such a process

suggests the proposed rule is not clearly established. *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).  A reviewing court accords deference to determinations of credibility made by the factfinder; this deference also extends to findings based on "physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state-court fact finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state-court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2).  "It would be contrary to that purpose to allow

a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo. . . .  It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Pinholster*, 131 S. Ct. at 1399.

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000).  But even if the petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

31

I.   **The State Is Required To Prove All Aggravating Factors Beyond A Reasonable Doubt; Therefore The Texas Capital Sentencing Scheme Is Constitutional Under *Apprendi*[5] And *Ring*.[6] (Issue 1)**

Allen complains that the Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments by not requiring the State to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.  Petition at 21.  Allen argues that the CCA's rejection of this claim is not entitled to deference because it is "fundamentally opposed" to *Ring* and incorrectly holds that *Apprendi* did not address who bore the burden of proof.  Petition at 22.  Allen's arguments are unconvincing.

A.   **State court findings.**

Allen raised this issue on direct appeal.  The CCA overruled this claim, finding Allen's reliance on *Apprendi* misplaced.  The state court held that *Apprendi* applies only to facts that increase the penalty beyond the "prescribed statutory maximum" whereas under Texas Penal Code sections 12.31 and 19.03, the "prescribed statutory maximum" for capital murder is death.  Therefore, "[n]othing the jury or judge decided during the punishment phase could have enhanced [Allen's] sentence beyond the prescribed range[,]" and *Apprendi*

---

[5]   *Apprendi v. New Jersey,* 530 U.S. 466 (2000)

[6]   *Ring v. Arizona,* 536 U.S. 584 (2002)

32

focused only on who should be the factfinder for sentence enhancement, not who bears the burden of proof. *Allen,* 108 S.W.3d at 285.

Allen raised this claim again on state habeas review, where the state court denied relief concluding the claim had been raised and rejected on direct appeal. 3 SHCR 909, #60; 921-22, #25.

### B.   Allen fails to show a constitutional violation.

Allen argues that, because the CCA holds that aggravating factors may be considered as part of the mitigation special issue, the jury should have been instructed that any aggravating factors considered by the jury when answering the mitigation special issue must be proven by the State beyond a reasonable doubt. Petition at 26 (citing *Jackson v. State,* 992 S.W.2d 469, 478 (Tex. Crim. App. 1998)). Allen complains that, during closing arguments, the State urged the jury to consider aggravating circumstances which had not been proven beyond a reasonable doubt and which were only relevant to the mitigation special issue. Petition at 26-28. Specifically, Allen's use of the church to impose evil, 29 RR 38, 40, 51; rape allegations, 29 RR 41-42, 51, 56; and his inability to be rehabilitated, 29 RR 47, 50, 52, 53, 55.

First, as to Allen's argument that, because the mitigation special issue encompasses both aggravating and mitigating circumstances, the jury must be instructed to find those aggravating circumstances beyond a reasonable doubt,

Petition at 22-23, the jury instructions, as given, more than sufficiently required the State to prove the existence of any extraneous offense or bad act that may be considered in aggravation, beyond a reasonable doubt. Regarding the future dangerousness special issue, the jury was twice instructed that the State bore the burden of proving the issue "beyond a reasonable doubt[.]" 2 CR 568. The jury was also given general instructions regarding extraneous crimes and bad acts for which the defendant has not been charged. *See* 2 CR 571. These instructions applied to the jury's determination in general and not to a particular special issue. The jury was repeatedly instructed that it "may consider such evidence only if the extraneous crime or bad act has been shown by the State beyond a reasonable doubt to have been committed by the defendant." 2 CR 571. The jury was instructed that Allen need not prove his innocence of any extraneous offense or act of misconduct and that "[t]he presumption of innocence alone is sufficient for you to find that the defendant did not engage in the extraneous offense or act of misconduct that has been placed in evidence unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt or responsibility therefor after careful and impartial consideration of all the evidence in the case." 2 CR 571. Additionally, "if you find and believe beyond a reasonable doubt that the defendant committed an extraneous crime or bad act, then you may consider such evidence in answering

34

the special issues. However, if you have a reasonable doubt that the defendant committed an extraneous crime or bad act then you may not consider such evidence in answering the special issues." 2 CR 571. Thus, if aggravating evidence was applicable to only the mitigation special issue (which the Director disputes), then the jury was sufficiently instructed that the evidence must be found beyond a reasonable doubt before it may be considered.

Furthermore, contrary to Allen's argument, the aggravating evidence referred to by the prosecutor during closing arguments, and cited by Allen in support of this claim, was relevant to both the future dangerousness and mitigation special issues. The fact that Allen used his religious background to influence past victims is certainly applicable to his future dangerousness in prison as he could continue to use religion to manipulate guards or other prisoners. *See* Petition at 26. Regarding the rape contentions, the argument that Allen will not stop preying on vulnerable victims and will find a way to satisfy his needs is applicable to a determination of his future propensity for violence in prison. And the suggestion that he lied about being raped as a child to gain favor is also relevant to his future dangerousness because it demonstrates his ability to manipulate those around him. *See* Petition at 27. The State's argument discounting Allen's apparent remorse for his actions is also relevant to Allen's ability to manipulate and thus to his future behavior.

35

Petition at 27.  Finally, any argument by the prosecution that Allen was given an opportunity at rehabilitation but failed is certainly an aggravating factor to be considered in answering the future danger special issue.  *See* Petition at 27-28.  In no way could these cited arguments "only impinge on the mitigation special issue." Petition at 26.  Because this evidence was applicable to the future dangerousness special issue, the instruction addressing the State's burden of proof on that issue applies to this evidence.  And the additional instructions on extraneous crimes or bad acts suffice to cover all other aggravating evidence that conceivably fell outside the future dangerousness special issue.

Regarding the application of *Apprendi* and *Ring*, the state court reasonably concluded that these cases afford Allen no relief.  Allen complains that the state court's conclusion that "reliance on *Apprendi* is misplaced" is contrary to the clearly established federal law contained in *Apprendi* and *Ring*. Petition at 21.  Allen's argument focuses on the state court's finding that "*Apprendi* did not address who bears the burden of proof but focused on who should be the factfinder for sentence enhancement."  *Id.* (citing *Allen,* 108 S.W.3d at 285).  Allen complains that "the finding that mitigating evidence does not call for a sentence of life is the equivalent of an element of a greater offense, especially where the jury is permitted to consider aggravating factors in deciding on the mitigation special issue." Petition at 25.  Thus, it must be proved beyond

a reasonable doubt.  Petition at 25-26.

However, the Fifth Circuit has "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances." *Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir. 2007); *see also Ortiz v. Quarterman,* 504 F.3d 492, 504-05 (5th Cir. 2007); *Granados v. Quarterman,* 455 F.3d 529, 536 (5th Cir. 2007); *Rowell v. Dretke,* 398 F.3d 370, 379 (5th Cir. 2005).  In *Granados* the Fifth Circuit addressed a similar argument that the absence of mitigating evidence is an aggravating circumstance whose presence increases the maximum punishment from life to death.  455 F.3d at 536.  The Court rejected this contention.  It found no constitutional violation because "[a]ll the elements of capital murder were put to the jury with instruction that the evidence had to persuade them beyond a reasonable doubt"; the trial judge made no finding that exposed the petitioner to the death penalty; the jury was instructed that it could affirmatively answer the first two special issues only if they found so beyond a reasonable doubt; and there was no contention that the mitigating evidence could not find expression in the jury's answers.  *Id.* at 536.  The court concluded that "the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing Granados to the maximum penalty of death."  *Id.*  The court was "not persuaded that Texas

37

violated any principle of *Apprendi* or *Ring* . . . by not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt in addition to questions it required the jury to answer." *Id.* at 536-37. "Put another way, a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Id.* at 537.

*Apprendi* and *Ring* do not apply to mitigating circumstances. *Apprendi* squarely addressed the right to jury trial for facts in *aggravation* of punishment, whereas mitigating evidence and manipulation of the burden of proof were explicitly *not* at issue. 530 U.S. at 475, 477 & 490 n. 16. *Ring* was even more confined in its analysis, examining the application of the right to trial by jury but again expressly excluding mitigating circumstances. 536 U.S. at 588 & 597. These cases simply do not support the proposition that the State must prove the absence of mitigating circumstances beyond a reasonable doubt.

Allen's argument that, in answering the mitigation special issue, the jury must consider aggravating factors that should be proven beyond a reasonable doubt, *see* Petition at 23, does not contradict the Fifth Circuit's judgment. The Fifth Circuit has confirmed that the Texas capital juries make the death-eligibility determination at the guilt-innocence phase. *Turner v. Quarterman,* 481 F.3d 292, 299-300 (5th Cir. 2007) (citing *Johnson v. Texas,* 509 U.S. 350, 362 (1993)). The jury then determines whether the sentence should be imposed at

the sentencing phase, and "*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase." *Id.* The Texas special issues do not "increase[] the penalty for [capital murder] beyond the prescribed statutory maximum" in violation of the United States Constitution. *See Apprendi,* 530 U.S. at 490. In this case, the elements of capital murder were indicted, submitted to the jury, and proven beyond a reasonable doubt as a prerequisite to reaching the punishment phase of Allen's trial.[7] And, once Allen's trial proceeded to the punishment phase, the special issues were submitted to the *jury* according to Texas law. Tex. Code Crim. Proc. art. 37.071, § 2(b) and (e). 2 CR 574-75. Thus, Texas law did not improperly attempt to bypass the Sixth and Fourteenth Amendment rationale of *Apprendi* and *Ring* in determining Allen's guilt and his "death eligibility."

Although a Texas capital-sentencing jury must specifically answer the mitigation special issue in the negative to render a death sentence, the actual function of that special issue is plainly meant to inure to the defendant's benefit by allowing the jury an avenue to give effect to mitigating evidence. Thus, mitigation special issue is a vehicle through which the jury is given the opportunity to make an individualized determination of the offender's moral

---

[7] Specifically, the State proved that Allen killed a child under six years of age. 1 CR 11; *See* Tex. Penal Code § 19.03(a)(8). The prescribed maximum penalty for capital murder is death. Tex. Penal Code §§ 12.31(a) & 19.03(b).

culpability, as required by the Supreme Court. *Penry v. Johnson,* 532 U.S. 782, 797 (2001) ("*Penry II*"); *Eddings v. Oklahoma*, 455 U.S. 104, 111-12 (1982); *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). In making the decision, the jury is instructed to consider all the evidence, including the circumstances of the offense, the defendant's character and background, and general moral culpability of the defendant. Tex. Code Crim. Proc. art. 37.071, § 2 (e) & (f). The jury is not required to agree on what evidence supports an affirmative answer. *Id.* The mitigation issue in fact confers upon the jury a broad ability to show leniency and *reduce* the defendant's sentence to life imprisonment. Thus, it is untenable that this special issue is functionally equivalent to an aggravating factor. An affirmative finding of *aggravation* is different than a finding of mitigation, which reduces the sentence from the statutory maximum. *See Granados,* 455 F.3d at 537.

Moreover, both *Apprendi* and *Ring* acknowledge this distinction between aggravating factors and mitigating circumstances. In *Ring*, the Supreme Court emphasized that the defendant's claim was "tightly delineated" to the issue of whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him and made no assertions with respect to mitigating circumstances. *Ring*, 536 U.S. at 597 n. 4. The Court's ultimate conclusion was limited accordingly. *Id* at 609 (holding that *Walton v. Arizona*,

497 U.S. 639 (1990), was overruled to extent it "allows a sentencing judge, sitting without a jury to find an *aggravating* circumstance necessary for the imposition of the death penalty," and that "[b]ecause Arizona's enumerated *aggravating factors* operate as the functional equivalent of an element of a greater offense, the Sixth Amendment required that they be found by a jury")(internal citations and quotations omitted)).

Likewise, the *Apprendi* decision explicitly noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n. 16.  There, the Court noted that where a judge finds a fact which allows a defendant to "escape the statutory maximum" attached to a jury verdict, that finding "neither expos[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor . . . impos[es] upon the defendant a greater stigma than that accompanying the verdict alone." *Id.*  Similarly, in a concurring opinion joined by Justice Scalia, Justice Thomas pointed out that potentially mitigating facts are not an element of a crime that might increase a sentencing decision.  *Id.* at 501(Thomas, J. concurring, joined by Scalia, J.)  Neither *Ring* nor *Apprendi* contemplate extending the Sixth Amendment's reasonable-doubt requirement to a capital jury's finding regarding mitigating evidence.

Finally, because no constitutional authority required the assignment of a

burden of proof with regard to the Texas mitigation special issue at the time

Allen's conviction became final, his claim is *Teague*-barred.  *Teague*, 489 U.S. at

310.

The state court reasonably concluded that *Apprendi* afforded Allen no

relief, and that determination is entitled to deference.  Relief should be denied.

## II.   Requiring Individual Counties To Pay For Death Penalty Prosecution Does Not Result In The Arbitrary Imposition Of The Death Penalty. (Issue 2)

Allen argues that the State of Texas, by requiring individual counties to

fund the prosecution of capital cases, injects arbitrariness into the selection of

which cases will be tried as capital cases, in violation of the Eighth and

Fourteenth Constitutional Amendments.  Petition at 28.   Allen does not argue

that the death penalty scheme is unconstitutional simply because prosecutors

have discretion to decide who is death-worthy; rather, his argument focuses on

the fact that the Texas death penalty scheme injects factors unrelated to the

crime itself—budgetary concerns—into the prosecutor's decision-making process.

Petition at 35-36.

Allen raised this issue on direct appeal.  The CCA first noted that, while

Allen presented information regarding the number of offenders sentenced to

death and executed from each county, he failed to provide budgetary data for

each of the counties.  *Allen,* 108 S.W.3d at 286.  Also, while a larger county may

be in a better financial position to seek the death penalty than a smaller county, the Texas Attorney General's Office will provide assistance to smaller counties in prosecuting capital cases. *Id.* at 286 n.3 (citing *Bell v. State,* 938 S.W.2d 35, 55 n.31 (Tex. Crim. App. 1996)).[8]   And finally, one of the articles cited by Allen stated that an ample budget was only one of several factors that contributed to the higher number of convictions in Harris County. *Id.* at 286. The CCA found, the fact that Harris County is a bigger county with a bigger budget that sentences more offenders to death than any other county, does not establish disparate treatment among similarly situated defendants. *Id.*   The court concluded that Allen "made no threshold showing of disparate treatment between himself and other similarly situated defendants." *Id.* at 287.  Allen also raised the issue again on state habeas review, where the state court denied relief as the claim had been raised and rejected on direct appeal.  3 SHCR 909-10, #62-63; 922, #27.  The CCA's conclusions were not unreasonable.

The Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the

---

[8]     The CCA incorrectly notes that the "Capital Litigation Section" provides this service when actually the Criminal Prosecutions Division is the designated provider.  *See* https://intranet.oag.state.tx.us/criminal/cle/index.shtml

decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see Neal v. State,* 150 S.W.3d 159, 173 (Tex. Crim. App. 2004). This discretion is tempered by certain constitutional restraints. For example, the Equal Protection Clause requires that the decision to seek the death penalty cannot be based on an arbitrary classification, such as race or religion. *Id.*; *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Oyler v. Boles,* 368 U.S. 448, 456 (1962). Allen makes no allegation that the prosecution sought the death penalty against him because of his race or ethnicity, nor does he claim that a county's funding leads prosecutors to discriminate on the basis of any suspect class. Indeed, the Supreme Court has never held that capital murderers constitute a suspect class and has even indicated otherwise. *See Gregg v. Georgia*, 428 U.S. 153, 187-88 (1976)(decision to authorize capital punishment for some classes of crimes was one best left to legislature unless "clearly wrong"). Since suspect classification is not implicated, the Texas death-penalty statute "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Given that prosecutorial discretion is essential to the criminal justice process, *see McCleskey v. Kemp*, 481 U.S. 292, 297 (1987), Allen cannot satisfy

this standard.

Allen recognizes and does not dispute that the prosecutor has discretion to seek or not seek the death penalty in a given case. Petition at 34. Allen argues instead that the issue he raises "is whether or not the [Constitution] allows defendants to be treated differently based solely upon the location where the offense was committed." Petition at 35. However, Allen committed an act for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. The fact that Allen chose to commit this heinous capital murder in a wealthy county versus a poor county was an act of his own choosing. But the fact that the prosecutor could afford to seek the punishment that his crime so clearly called for does not render the procedure under which he was convicted and sentenced unconstitutional.

Nevertheless, in support of his claim, Allen cites to a chart from 2003 listing the number of offenders currently on death row from each Texas county; a chart from the TDCJ website indicating the number of executed offenders from each county; a press release from the office of State Senator Eddie Lucio, Jr., regarding the life-without-parole bill, stating that a Texas death penalty case costs taxpayers an average of $2.3 million dollars and suggesting that "[r]ural counties cannot always afford to try a death penalty case"; and two Houston Chronicle stories discussing Harris County's pursuit of the death penalty. *See*

45

Petition at 29-30; Appendix A. However, as the state court noted, none of the cited sources provides the empirical data necessary to support Allen's claim. *See Allen,* 108 S.W.3d at 286 (citing *Bell v. State,* 938 S.W.2d 35,55 (Tex. Crim. App. 1996),and *King v. State,* 953 S.W.2d 266, 274 (Tex. Crim. App. 1997)).

Apart from the failure of the cited evidence to supply empirical data supporting the allegations, the stories demonstrate that budgetary concerns—or lack thereof—over the cost of the death penalty are but one factor contributing to Harris County's ability to try more cases than any other county and do not establish unconstitutionally disparate treatment of capital defendants from one county to the next. The Tolson article makes clear that budgetary matters are but one of many factors that result in higher numbers of death penalty convictions in Harris County. *See* Petitioner's Appendix A (Mike Tolson, *A Deadly Distinction*, Houston Chronicle, Feb. 5, 2001). For example, the article suggests that philosophical differences among district attorneys in their pursuit of the death penalty could lead to higher totals from Harris County. The article primarily attributes Harris County's number of death sentences to the philosophy and character of former Harris County District Attorney John B. Holmes, Jr., and his staff. Holmes states that "rules . . . ought to be enforced" and "[i]f the death penalty substantively fits a given crime and I have enough stuff so that jury will give it," to not prosecute would "promote disrespect for the

46

law[.]"  *See* Petitioner's Appendix A (Mike Tolson, *A Deadly Distinction*, Houston Chronicle, Feb. 5, 2001, at 2); *see id.* at 5 ("The law made no mention of special cases.").  This same philosophy was followed by Holmes's successor, Chuck Rosenthal.  *Id.* at 3.  Harris County's "hardnosed philosophy translates into five or 10 more death trials than are seen in any other Texas jurisdiction."  *Id.* at 7.

The article also attributes the increased numbers of death sentences in Harris County to circumstances unique to Texas and Harris County. Specifically, the willingness of the State and Harris County to follow through with executions, a capital murder statute which "leans towards the imposition of death," a system that allows trial judges to set execution dates rather than the governor or top appellate court, a streamlined state appellate process with tight deadlines, conservative appellate courts that rarely reverse convictions; and in Harris County specifically, a history of ample budgets providing sufficient staff and resources, adequate number of felony courts, judges friendly to capital sentencing,  and, until recently, an underfunded and sometimes underqualified defense bar.  *Id.* at 7-8; *see also Allen,* 108 S.W.3d at 286 n.4.  Finally, the article notes that, "[b]ehind it all, pushing the execution totals even higher, is an immense tide of regional culture, religion and history," which set the stage for the arrival of a prosecutor such as Holmes "with a literalist vision of law and order."  *Id.* at 8.  In short:  "The people of Harris County believe in the death

penalty.  And those same people employ the district attorney and his staff." *Id.* at 11.

Finally, as noted by the Tolson article, even Harris County cannot always afford to try a death penalty case.  *Id.* at 17.  "Despite abundant resources, [Harris County prosecutors] could not pursue the death penalty in all capital cases even if they wanted to.  Trying 30 or more death cases a year would turn the courts into quagmire.  At best, they can do about 15." *Id.*  Thus, even Harris County must "pick and choose." *Id.*[9]  For this reason, a poorer county's inability to always pursue a death penalty when it so desires does not necessarily distinguish it from larger and wealthier counties and does not establish that Allen's death sentence was arbitrarily imposed.  Additionally, Allen's reliance on the monetary angle is weakened by the fact that the Texas Attorney General's Office provides assistance to those counties without the resources to litigate such costly, complicated trials.  *See Allen,* 108 S.W.3d at 286, n.3.  The Criminal Prosecutions Division "provide[s] investigative and prosecutorial assistance to local law enforcement entities and county and/or district attorneys across the

---

[9]    According to the article, the decision to seek the death penalty "is influenced by myriad details" including the facts of the crime, the heinousness of the crime, the danger the defendant presents; the defendant's demeanor, appearance, and sense of remorse; the wishes of the victim's family; and the likelihood that a jury would return a death verdict.  *Id.* at 6.  "Each capital case is examined in detail.  In most, the death penalty is not sought[.]" *Id.* at 5.

state of Texas when the county *does not have the resources to investigate and prosecute complex cases* or where a conflict of interest prohibits them from taking part in the prosecution."[10] Thus, the budgetary disparity between smaller and larger counties is not so great a concern, given the availability of assistance from the State.

In *Jurek v. Texas,* the Supreme Court rejected an argument alleging "that arbitrariness still pervades the entire criminal justice system of Texas from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences" finding that "[t]his contention fundamentally misinterprets the *Furman*[11] decision, and we reject it for the reasons set out in our opinion today in *Gregg v. Georgia*, 428 U.S., at 199[.]" 428 U.S. 262, 273 (1976).  In *Gregg*, the Supreme Court noted:

---

[10]    *See* https://intranet.oag.state.tx.us/criminal/cle/index.shtml  (emphasis added).

[11]    *Furman v. Georgia*, 408 U.S. 238 (1972).  The *Furman* Court held that several state capital-sentencing schemes violated the Eighth and Fourteenth Amendments by allowing the death penalty to be "wantonly and . . . freakishly imposed" by permitting unbridled discretion in sentencing. *Nelson v. Quarterman,* 472 F.3d 287, 293 (5th Cir. 2006) (citing *Furman,* 408 U.S. at 310).  In response, Texas rewrote its death penalty statute to include the special-issues-capital-sentencing scheme, which was designed to guide jurors' consideration of mitigating evidence offered in the sentencing phase of capital cases. *Id.*  The *Jurek* court later upheld the facial constitutionality of Texas capital-sentencing scheme. *Id.* at 293-94.

49

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

428 U.S. at 199.  While similarly situated capital murderers in smaller counties may ultimately escape the death penalty because a prosecutor determines the case would be too costly to try, *see* Petition at 35, this act of mercy is not a violation of Allen's constitutional rights. *See Lawton v. State,* 913 S.W.2d 542, 559 (Tex. Crim. App. 1995)("The constitutional proscriptions against the arbitrary and erratic imposition of the death sentence do not apply to decisions against the imposition of the death sentence[.]"), *overruled on other grounds by*, *Mosely v. State,* 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998).

The Supreme Court went on to say that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg,* 428 U.S. at 199.  In a footnote, the court explained that,

> [i]n order to repair the alleged defects pointed to by [Gregg], it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital

50

> murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited.

*Id.* at 199 n.50.  The Court rejected such a system as it "would have the vices of the mandatory death penalty statutes we hold unconstitutional today in *Woodson v. North Carolina*, [428 U.S. 280 (1976)], and *Roberts v. Louisiana*, [428 U.S. 325 (1976)]." *Id.*  No authority requires a set procedure for the prosecutor's determination of what eligible cases should be tried as a death penalty crime or what factors should be considered when making that determination.

In *Gregg,* the Supreme Court wrote that "when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime.  It is an extreme sanction, suitable to the most extreme of crimes."  428 U.S. at 187 (opinion of Stewart, Powell, Stevens, JJ.). The Court acknowledged the concerns of *Furman* that the imposition of the death penalty not be "arbitrary or capricious" and said that "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance" will alleviate such.  *Id.* at 195.  And as a general proposition, the *Furman* concerns were "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its

51

use of the information." *Id.*  Allen received a trial that comported with these requirements. The fact that Harris County determined that, of the fifteen or so death penalty cases it could afford to prosecute that year, *see* Petitioner's Appendix A (Mike Tolson, *A Deadly Distinction*, Houston Chronicle, Feb. 5, 2001, at 17), Allen's case was one truly warranting a death penalty prosecution does not demonstrate that his death sentence was arbitrarily inflicted.

## III.   The Texas "12-10" Rule Is Not Unconstitutional.  (Issue 3)

Allen argues that the Texas "12-10" Rule and the law prohibiting jurors from being informed of the effect of their failure to agree on the issues violate the Eighth and Fourteenth Amendments as construed by *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990).  Petition at 38.

Allen raised this claim on state habeas review.   The trial court recommended denying relief on grounds that Article 37.071, § 2(a)(1), prohibits the trial court from informing jurors of the effect of their failure to agree on the special issues, and the CCA has previously rejected similar challenges to this statute. 3 SHCR 910-11, #64-67.[12] The court concluded that Allen failed to show the unconstitutionality of the prohibition against informing jurors of the effects

---

[12]        *See Smith v. State,* 919 S.W.2d 96 (Tex. Crim. App. 1996)*; Eldridge v. State,* 940 S.W.2d 646 (Tex. Crim. App. 1996)

of a single "no" vote, failed to give the court a reason to reconsider its established caselaw on this point, and failed to show that the punishment instruction injected confusion and arbitrariness into the trial court proceeding or created an unreliable sentencing determination. 3 SHCR 923, #28-30. The trial court also found that it had previously rejected similar challenges to the "12-10" Rule, 3 SHCR 911-12, #68-72,[13] and concluded that Allen failed to show the "12-10" Rule was unconstitutional or that the CCA should overrule established caselaw on this issue, 3 SHCR 924, #31-32.

Allen argues that state court's rejection of this claim was unreasonable because the CCA precedent, upon which the state court relied, too narrowly construes *Mills* and *McKoy* by limiting the holdings to cases where jury instructions require juror unanimity on the same mitigating evidence before they could give it effect, when *Mills* also required that each juror be permitted to consider and give effect to mitigating evidence. Allen urges that the failure to tell jurors that one hold-out juror will result in a life sentence misleads the jurors and prevents them from giving effect to all evidence. *See* Petition at 44-48. However, the CCA's precedent has been upheld by the Fifth Circuit and is consistent with Supreme Court authority. Therefore, the state court's

---

[13]     *See Resindez v. State,* 112 S.W.3d 541, 548-49 (Tex. Crim. App. 2003); *Williams v. State,* 937 S.W.2d 479, 490 (Tex. Crim. App. 1996); *Lawton v. State,* 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995).

determination was reasonable and entitled to deference.

Allen supports his claim with decisions from the Sixth and Seventh Circuit, while ignoring the binding authority of this circuit. *See* Petition at 42-44.[14]   The Fifth Circuit has consistently rejected different variations of challenges to the "12-10" Rule raised by other Texas habeas petitioners, based both on the substantive merits of the claim and on the court's conclusion that to extend *Mills* to grant relief in a Texas case would require the court to announce and apply a new rule of constitutional law, a practice prohibited on federal habeas review by the nonretroactivity principle of *Teague v. Lane*. *See Druery v. Thaler,* 647 F.3d 535, 542-44 (5th Cir. 2011), *cert. denied,* 132 S. Ct. 1550

---

[14]   Allen relies on *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989), and *Davis v. Mitchell,* 318 F.3d 682 (6th Cir. 2003), in support of his claim.  Petition at 42-43.  However, the Fifth Circuit has specifically held that *Kubat* "does not supersede intervening Fifth Circuit precedent regarding challenges to Texas' 12-10 rule." *Druery v. Thaler,* 647 F.3d 535, 543 (5th Cir. 2011).  This holding applies with equal force to the Sixth Circuit decision.

Moreover, both *Kubat* and *Davis* involved sentencing schemes different from Texas, and both dealt with the submission of a jury instruction that incorrectly required unanimous agreement on the decision not to impose death. *See Davis,* 318 F.3d at 689-91(jury instructions incorrectly informed jurors that they must first unanimously reject the death penalty before considering sentencing options, and jury was never told that individual jurors may consider mitigating circumstances in the weighing process regardless of lack of agreement over mitigating factor); *Kubat,* 867 F.2d at 370-71 (instructions clearly mis-stated state law by calling for unanimous agreement on decision not to impose the death penalty).  Those courts concluded that the erroneous instructions conceivably precluded individual jurors from giving effect to mitigating evidence.  *Davis,* 318 F.3d at 689; *Kubat,* 867 F.2d at 372-73.  In Allen's case the jurors were properly instructed in accord with 37.071, § (2), that they need not agree on what particular evidence supports their decision.  Thus, the individual jurors were not precluded from considering mitigating evidence.

(2012) (denied COA relying on circuit precedent holding that *Mills* not applicable to Texas, and extension of *Mills* is *Teague*-barred); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005) (relief denied based on *Teague*); *Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir. 2000) (relief denied based on *Teague*); *Miller v. Johnson,* 200 F.3d 274, 288-89 (5th Cir. 2000) (holding *Mills* inapplicable to Texas capital sentencing proceeding); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (relief denied based both on *Teague* and on the merits); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) (relief denied on the merits); *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993) (relief denied based on *Teague*). Therefore, circuit precedent compels rejection of this claim as a matter of law.

In any event, Allen's reliance on *Mills v. Maryland* is misplaced. The Court in *Mills* found Eighth Amendment error because jury unanimity instructions created a "substantial probability that individual jurors . . . may well have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384. However, the holding in *Mills* has no application to states such as Texas that do not require the jury to make threshold factual determinations that limit the mitigating evidence available to be weighed by the jury on the ultimate sentencing issues. Maryland is a "weighing" state with a two-step sentencing process: The jury was required to first make preliminary

55

factual determinations that aggravating or mitigating circumstances had or had not been proved and, next, to weigh the proven aggravating and mitigating facts to actually decide the sentence in a particular case. *See* Md. Ann. Code art. 27, § 413, *repealed by* Acts 2002, c. 26, § 1, eff. Oct. 1, 2002. The Supreme Court's concern was that a single juror's belief that a mitigating circumstance had not been proven would prevent the entire jury from weighing that factor when deciding the ultimate sentencing issues. *Mills*, 486 U.S. at 373-74; *McKoy*, 494 U.S. at 438. The constitutional infirmity was contained in the first part of this two-step process, which has no counterpart under the Texas statute. Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable.

Further, nothing in *Mills* or its progeny holds that a state may not require unanimity or some lesser degree of juror agreement on the ultimate sentencing issues in a capital case. To the contrary, as Justice Blackmun explained:

> Juries are typically called upon to render unanimous verdicts on the ultimate issues in a given case. But it is understood that different jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

*McKoy*, 494 U.S. at 449-50 (concurring opinion) (footnote omitted). Allen essentially claims entitlement to an instruction authorizing a jury deadlock, but

56

the Constitution does not require this.  The Supreme Court has rejected, in an analogous case, the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States,* 527 U.S. 373, 381 (1999). The Fifth Circuit has also recognized that there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Turner v. Quarterman,* 481 F.3d 292, 300 (5th Cir. 2007) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander,* 211 F.3d at 897 n.5 (holding the same). Both the state and the defendant have legitimate interests in achieving a verdict, and the Constitution does not guarantee any defendant the right to a deadlocked jury. *See Jones,* 527 U.S. at 382 (government has strong interest in having jury reach a verdict and put forth the community conscience on the ultimate question of life or death); *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (defendant has a "valued right to have his trial completed by a particular tribunal"); *Illinois v. Somerville*, 410 U.S. 458, 463 (1973) (public's interest in seeing its criminal prosecutions proceed to verdict " need not be forsaken by the formulation of rigid rules that necessarily preclude the vindication of that interest"). As a result, Allen's claim is entirely without

57

merit.

Finally, despite Allen's arguments to the contrary, Petition at 49-54, there is no indication in the record that the jury was ever deadlocked on the special issues or had trouble returning a verdict. The fact that the jury asked for clarification of a witness's testimony, during the normal course of deliberation, does not necessarily indicate deadlock. Rather, the jurors' note stated that they disagreed over "the expense and content of the information provided Bettina Wright prior to her interviewing [Allen]." *See* 29 RR 64-71. This note provides no insight into what stage the jury's deliberations had reached or whether the jurors were deadlocked over an issue. Furthermore, the jury's initial inquiry regarding the "12-10" Rule prior to deliberation, Petition at 50-53 (citing 28 RR 77), also does not demonstrate the jury was later deadlocked. Before deliberations began, a juror indicated confusion "from the instructions [they] heard originally." *Id.* The judge admonished that, "It will all be in the Court's charge," to which the juror replied, "That's all we need know." *Id.* The record does not indicate further inquiry regarding this instruction. *See* 29 RR 6. At no time did the jurors indicate they were having trouble reaching an agreement. And after the verdict was read, the jurors were individually polled, but no juror denied the verdict. 29 RR 72-74. No evidence supports a presumption that the jury was ever deadlocked.

This claim is *Teague*-barred and wholly without merit. As the state court's finding was objectively reasonable and in accordance with federal law, it is to be accorded deference and the claim dismissed.

## IV.   Because Veniremember Berg Did Not Sit On Allen's Jury, And Because Allen Failed To Identify Another Objectionable Juror Who Did, No Constitutional Violation Arose From The Trial Court's Refusal To Excuse Berg For Cause. (Issue 4)

In his fourth claim for relief, Allen argues that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause against veniremember Gordon Berg. Petition at 54. And because the trial court refused to excuse Berg, Allen had to exercise a peremptory strike against him and was prevented from using a peremptory strike against another veniremember, Linda Smith Schultz, who actually sat on his jury. Petition at 66-68. However, Allen failed to preserve error on this claim in the trial court because he failed to identify Schultz to that court as an objectionable juror. And because Allen exercised a peremptory challenge against Berg and he did not sit on this jury, no constitutional error arises from the trial court's refusal to dismiss him. Therefore, relief on this claim must be denied.

After individual voir dire, Allen sought to remove veniremember Berg for cause, but the trial court denied his request. 5 RR 82-83. Once voir dire was finished, but prior to the exercise of a single peremptory strike, Allen sought four additional strikes from the trial court, arguing that he believed four

veniremembers disqualified themselves from the jury pool with their answers, and because he would have to exercise peremptory strikes to remove them he should be allotted four additional strikes to replace those. The court said he would rule on the request when they got to that point—presumably when Allen had used all his strikes. 21 RR 3-6. Allen again requested an extra strike after exercising his first strike against Berg, but his request was denied. 21 RR 27. Allen moved again for more strikes after exercising one against veniremember #250, Beverly Girgis. However, at that time he had only used eight strikes and thus still had seven left; the request was again denied. 21 RR 29. Juror Linda Smith Schultz was the final juror to be accepted. When her name was called, the State replied, "The whole thing rests on this decision. State accepts," to which Allen replied, "Defense accepts but we don't have any more strikes." 21 RR 31-32. Allen did not renew his request for additional strikes—at this or any time after Beverly Girgis was struck—nor did he complain about Schultz's presence on the jury. 21 RR 32-34. Allen did not object when the jury was seated or sworn. 21 RR 33-34, 40.

On direct appeal, the CCA held that Allen failed to properly preserve error on this claim because he failed to identify, to the trial court, juror Linda Smith Schultz as objectionable. *Allen,* 108 S.W.3d at 282-83. Therefore, Allen "waived his right to complain on appeal that the trial judge erroneously overruled his

challenge for cause." *Id.* at 283.  Allen raised the claim again on state habeas review.  3 SHCR 904-06, #46-50.  Noting the CCA's decision on direct appeal, the trial court[15] concluded that Allen failed to properly preserve this ground for review and this claim was thus procedurally barred.  3 SHCR 905-06, #49, #; 191-20, #19.  Alternatively, the state court concluded that the trial court did not abuse its discretion in denying Allen's challenge for cause against veniremember Berg.  3 SHCR 920, #20.  These findings are not unreasonable and are entitled to deference under AEDPA.

A trial court's failure to remove a juror for cause is constitutional error, requiring reversal of a death sentence, if that juror sat on the jury that sentenced a defendant to death, and if the defendant properly preserved his right to challenge the trial court's failure to remove the juror for cause. *Morgan v. Illinois,* 504 U.S. 719, 728-29 (1992); *Ross v. Oklahoma,* 487 U.S. 81, 85 (1988). In Texas, in order to properly preserve a claim that the trial court's refusal to remove a juror for cause deprived a defendant of a fair trial, the defendant must "(1) assert a clear and specific challenge for cause; (2) use a peremptory strike on the complained-of veniremember; (3) exhaust his peremptory strikes; (4) request additional peremptory strikes; (5) identify an objectionable juror; and (6) claim that he would have struck the objectionable juror with a peremptory strike

---

[15]    Judge Mark Ellis presided over both trial and state habeas proceedings.

if he had one to use." *Allen,* 108 S.W.3d at 282 (citing *Nelson v. State,* 848 S.W.2d 126, 134 (Tex.Crim.App.1992)); *see also Ross,* 487 U.S. at 89.  While the trial court's refusal to remove the challenged juror could result in constitutional error, this error "is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." *Ross,* 487 U.S. at 89; *See also United States v. Webster,* 162 F.3d 308, 342 n.36 ( 5th Cir. 1998); *Nethery v. Collins,* 993 F.2d 1154, 1160 (5th Cir. 1993)(refusing to find harm from trial court's refusal to strike veniremembers for cause where defendant exercised peremptory challenges to remove objectionable veniremembers but did not exhaust peremptory challenges); *Felder v. State,* 758 S.W.2d 760, 766-67 (Tex.Crim.App. 1988).

Allen's argument incorrectly focuses on the alleged unsuitability of veniremember Berg and the unreasonableness of the state court's findings with respect to him.  However, Berg did not sit on Allen's jury.  The Supreme Court has held that a Sixth Amendment impartial jury violation does not arise from a trial court's refusal to remove a biased veniremember for cause where the defendant exercised a peremptory strike against the challenged veniremember. *Ross,* 487 U.S. at 88; *Soria v. Johnson,* 207 F.3d 232, 241 (5th Cir. 2000).  "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth

Amendment was violated." *Ross,* 487 U.S. at 88.  Because Berg did not sit on this jury, the trial court's refusal to exclude him did not violate Allen's Sixth Amendment rights. *Soria,* 207 F.3d at 241-42.  Furthermore, the Supreme Court has also held that forcing a defendant to exercise a peremptory challenge to excuse an objectionable juror does not violate his right to due process. *Ross,* 487 U.S. at 88-89.  "Because peremptory challenges are a creature of statute and are not required by the Constitution . . .  it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Ross,* 487 U.S. at 89 (internal citations omitted).  Therefore, a defendant's "right" to peremptory challenges is impaired only if the defendant does not receive that which state law provides. *Id.* Allen received his allotted peremptory challenges and exercised them accordingly.  And Berg did not sit on his jury.  Thus no constitutional violation arose from the trial court's refusal to dismiss him for cause.

The focus of Allen's argument should be on the allegedly improper juror who actually sat on his jury. However, Allen identified no such juror to the trial court.  While Allen now identifies a juror who he claims improperly sat on his jury—Linda Smith Schultz, who expressed bias against "black people," Petition at 66-68—the state court correctly noted that Allen did not preserve error with respect to this claim.

The CCA concluded that Allen failed to preserve error by failing to meet two of the six requirements for preservation before the trial court: He failed to identify an objectionable juror, and he failed to claim that he would have struck the objectionable juror with a peremptory strike if he had one to use. *See Allen,* 108 S.W.3d at 282-83. Because he did not identify Schultz as objectionable to the trial court, Allen "waived his right to complain on appeal that the trial judge erroneously overruled his challenge for cause." *Id.* at 283. The state court's findings were reasonable.

Allen did not identify Schlutz as an objectionable juror to the trial court. In fact, Allen did not even attempt to strike Schlutz for cause or object to her inclusion in the jury pool after the completion of her voir dire. *See* 19 RR 228. Schultz was the last juror selected after the parties began exercising strikes. When Schultz's name was called, the State accepted her and Allen stated, "Defense accepts but we don't have any more strikes." 21 RR 32. Allen did not request any additional strikes at this time, nor did he state that Schultz was an objectionable juror. And he did not object to the jury as a whole. 21 RR 33-34.

While Allen stated he did not have any more strikes, this should not be considered an assertion that he *would* have struck her. Indeed, Allen did not oppose Schultz after individual voir dire and did not ask the court to grant him more strikes when her name came up—as he had on three prior occasions when

64

he still had strikes available to him.  *See* 21 RR 3-6, 27, 29.  When Allen initially requested four additional strikes, prior to any juror being struck, the court said he would rule on the request when they got to that point—presumably when Allen had used all his strikes.  21 RR 3-6.  However, when Juror Schultz's name was called, Allen made no further request for additional strikes.  21 RR 31-32.  Clearly, Allen recognized the magnitude of the decision, but he did not request any additional strikes[16] or complain about Schultz's presence on the jury.  21 RR 32-34.

Therefore, as found by both the CCA and the trial court, he failed to properly preserve his claim for review, and this claim is thus procedurally barred from federal habeas review as a consequence of Allen's failure to comply with state procedural rules for preserving error.  *See Riles v. McCotter,* 799 F.2d 947, 950 n.4 (5th Cir. 1986); *see also* Tex. R. App. P. 33.1; *see also Granviel v. State*, 552 S.W.2d 107, 118 (Tex. Crim. App. 1976) (preservation of error for review on appeal requires a defendant to object in a timely and specific manner).  This "contemporaneous objection rule" is strictly and regularly applied to similar claims in Texas and is therefore an adequate and independent state ground sufficient to bar review in federal court.  *See Rowell v. Dretke,* 398 F.3d 370, 375-

---

[16]    Thus, although he previously requested additional strikes, it could also be argued that he did not meet requirement number four: Request additional peremptory strikes.  He did not ask for the strikes in a timely manner.

75 (5th Cir. 2005) (holding defendant's failure to timely object to alleged errors in jury charge determined by Texas appellate court to be violation of contemporaneous objection rule barred federal habeas relief of alleged erroneous jury charge under procedural default doctrine); *Graves v. Cockrell,* 351 F.3d 143, 152 (5th Cir. 2003) (Fifth Circuit holds Texas contemporaneous objection rule constitutes adequate and independent state ground, and failure to comply procedurally bars federal habeas review).

For the reasons discussed, the state court's procedural ruling is supported by the record.  Therefore, Allen failed to meet the State's requirements for preserving error on this claim, and he cannot now complain of constitutional error from the seating of this juror.  Federal habeas corpus review is thus foreclosed unless Allen demonstrates either cause for the default and actual prejudice resulting therefrom or that failure to consider the claim would result in a "fundamental miscarriage of justice."  *Coleman,* 501 U.S. at 749-50; *Jones v. Johnson,* 171 F.3d 270, 277 (5th Cir. 1999) (citing *Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992)). Allen makes no such showing.  Because no exception applies, this claim should be dismissed as procedurally barred.

Regardless, the presence of Juror Schultz did not violate Allen's right to an impartial jury, and the trial court's refusal to excuse veniremember Berg was not erroneous.  Allen fails to demonstrate a violation of his constitutional rights

66

from the trial court's determinations on either juror.  Therefore, apart from his failure to preserve the claim, relief on the merits of this claim must denied.

Regarding juror Schultz, Allen argues that the trial court's refusal to accept his challenge for cause forced him to exercise a peremptory strike leaving him unable to later strike juror Schultz who was biased against "black people." Petition at 67-68; 19 RR 211-12.[17]  Allen also argues that Schultz is "strongly in favor of the death penalty," citing to her response that, on a scale of one to ten, with ten being the person who would give the death penalty in every circumstance, Schlutz said she would fall "between about a five and a seven." Petition at 67; 19 RR 217.

The Sixth and Fourteenth Amendments guarantee Allen an impartial jury. *Ross,* 487 U.S. at 85.  "'[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.'" *Id.* at 86 (citing *Lockhart v. McCree,* 476 U.S. 162, 184 (1986)).  The record indicates—despite Schultz's opinion, based upon observations from the news, that African-Americans commit more violent crimes than other racial groups—that she was able to carry out her sworn duty to apply

---

[17]     Allen is African-American.

the law to the facts of this case.

The juror questionnaire asked, "Do you feel that one group of people is more dangerous than other groups, i.e., age group, ethnic group, racial group, sexual orientation groups, or other specific groups?"  19 RR 211.  According to the voir dire transcript, Schlutz answered "yes" and wrote in "racial," and, upon examination, specified, "Blacks."  *Id.*  When to explain why she thought "Blacks" were more dangerous than others and how she reached that conclusion, Schultz explained, "Probably from the news.  It seems like to me that the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks."  19 RR 211-12.  Schultz was asked no further questions on this subject.  Schultz also indicated that she could wait until she had heard all the fact before deciding what punishment would be appropriate and that she could consider all available ranges of punishment.  19 RR 189-94.  She stated that her "mind [was] open" to hearing all evidence on the future dangerousness special issue, that she could listen to the evidence, weigh it in her mind, and hold the State to its burden of proof, beyond a reasonable doubt.  19 RR 200-02.  Schultz also stated that she was open to re-examining all the evidence to determine whether there was any mitigating circumstance that would result in a life sentence.  19 RR 204, 223-24.  Finally, Schultz stated that the facts of this crime—the murder of a child under the age of six—would not prevent her from

68

being able to take her oath as a juror to render a true verdict based upon the law and evidence.  19 RR 208.  The fact that Allen did not oppose her inclusion in the jury pool following voir dire or state at any time (before now) that she was an objectionable juror supports a conclusion that she was a suitable juror for his panel.

And Schultz's response that she falls between five and seven on a scale of one to ten does not indicate that she is "strongly in favor of the death penalty." On a scale with one being the lowest and ten being the highest, a five would put her squarely in the middle or neutral range.  A range of five to seven would indicate moderate support.   Her answers during voir dire support this proposition: When asked her opinion of the death penalty, Schultz indicated she "believe[d] in the death penalty."  19 RR 187.  When asked what kind of cases she thought the death penalty should be available for, she identified serial murders, "school murders," and "where somebody has killed someone else in a horrible type way."  19 RR 188.  She in no way suggested she was "strongly in favor" of it or that she thought it was always appropriate.  Neither Schultz's belief that the death penalty is appropriate for the killing of someone "in a horrible type way," nor her neutral to moderate support for the death penalty indicates that her views on capital punishment "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her]

instructions and [her] oath." *Adams v. Texas,* 448 U.S. 38, 45 (1980); *see also Wainwright v. Witt,* 469 U.S. 412, 424 (1985). Allen fails to demonstrate that Schultz's inclusion on the jury violated his right to a fair and impartial jury.

Regarding Berg, Allen argues that Berg strongly favored the death penalty and stated that there were certain cases in which he did not think there were any possible mitigating circumstances that would prohibit the use of the death penalty. Notably, Berg expressed reluctance to find mitigating circumstances in the murder of a child under the age of six. Petition at 54-60; 5 RR 43-44, 49, 67-72, 80-81. Allen interpreted Berg's answer to indicate that he would always vote in a manner requiring death in the event the defendant was found guilty of murdering a child, unless the killing was a mercy killing. Petition at 60.

However, a state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness. *Miniel v. Cockrell,* 339 F.3d 331, 338-39 (5th Cir. 2003); *Soria,* 207 F.3d at 242. Allen must rebut this finding with clear and convincing evidence. *See Soria,* 207 F.3d at 242. At the time the challenge was made, the trial court did not articulate its reasons for rejecting Allen's challenge for cause against Berg. However, the same judge presided over the state habeas proceeding and held that, while Berg initially stated there were no mitigating circumstances prohibiting the use of the death penalty and that he would have trouble considering mitigating evidence for the

70

capital murder of a child under the age of six, Berg retreated from that position when the prosecutor explained the nature of mitigating evidence and a juror's duty to consider it.  3 SHCR 904-05, #47.  In response to additional questioning, Berg stated that he was open to listening to and considering mitigating evidence, that he would give fair consideration to mitigating evidence, that he was unbiased and committed to listening to the evidence, and that he had no bias against the mitigation special issue.  *Id.*; 5 RR 43-44, 50, 57-58, 62, 65-72, 80-81. The trial court thus found that, "although venireperson Berg stated he would not likely grant a great deal of weight to certain types of mitigation evidence, Berg stated that he would be able to consider evidence offered in mitigation of punishment."  3 SHCR 905, #48; 5 RR 67-72, 80-81.  Finally, the court found that Allen failed to demonstrate that Berg's views concerning mitigating evidence would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.  3 SHCR 906, #50.

A prospective juror may not be challenged for cause because of his or her views on capital punishment "unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Adams,* 448 U.S. at 45; *Witt*, 469 U.S. at 424.  Allen complains that the state court unreasonably applied this standard to his case. Petition at 63-66.  While a capital defendant may challenge for cause a

71

prospective juror who would automatically vote for the death penalty in every case and would fail to consider in good faith the aggravating and mitigating evidence as required by his instructions, *see Morgan v. Illinois,* 504 U.S. 719, 729 (1992); *see also Buchanan v. Angelone,* 522 U.S. 269, 276 (1998) ("the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence"), a juror is not required to consider any particular circumstance as mitigating.  Nor must a court necessarily excuse a prospective capital juror for cause who might view evidence offered in mitigation as aggravating. *See Soria,* 207 F.3d at 244.

The trial court is assigned the difficult task of distinguishing between prospective jurors whose opinions on capital punishment will not allow them to apply the law or view the facts impartially, and those jurors who, despite their opinions, will nevertheless conscientiously apply the law to the facts adduced at trial.  *Witt*, 469 U.S. at 421.  The trial court's finding regarding a prospective juror's bias "involves credibility findings whose basis cannot be easily discerned from an appellate record."  *Id.* at 429.  As the Supreme Court has recognized: "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen [by the trial court] below, but cannot always be spread upon the record."  *Id.* at 428 n.9 (citation omitted).  Accordingly, in cases of juror bias, a trial judge must make a factual

determination regarding not only whether the prospective juror claimed that she could be impartial, but also, *whether she should be believed. Id.* at 423-24 (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In these situations, "deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 426; *Yount,* 467 U.S. at 1040.

Since it is the trial judge "who is best situated to determine competency to serve impartially," *Yount,* 467 U.S. at 1039, the reviewing court should determine, not whether it disagrees with the trial court's findings, "but whether those findings are fairly supported by the record." *Witt,* 469 U.S. at 434; *Marshall v. Lonberger,* 459 U.S. 422, 432 (1983). The trial court's findings are so supported. Without question, Berg expressed concerns about the level of mitigating evidence he would deem worthy of a life sentence for someone who committed the murder of a child under six. 5 RR 50, 60-62, 67-72, 80-81. However, Berg stated he would be open minded, would listen to the evidence before rendering a decision, and that he could take an oath to render a true verdict based upon the law and the evidence. 5 RR 56, 59, 60-62, 65-66, 71-72, 80-81. The fact that Berg had "reservations" did not exclude him. The Supreme Court has held that a party cannot "exclude jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected [by their views on capital punishment]."

73

*Adams,* 448 U.S. at 50-51.  "[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty."  *Adams,* 448 U.S. at 50.

While Berg did not sit on this jury and impose judgment on Allen, a presumption of correctness is owed to the trial court's findings that he should not have been excluded for cause.   *Yount,* 467 U.S. at 1040; *Soria,* 207 F.3d at 242. No constitutional error arose from the trial court's determinations, and relief on this claim must be denied.

## V.   Allen's Claim Of Ineffective Assistance Of Trial Counsel Is Unexhausted. He Cannot Demonstrate Cause To Overcome The Procedural Default Of This Claim.  Regardless, The Claim Lacks Merit.  (Issue 5)

Allen argues that trial counsel were ineffective for failing to subpoena witnesses to provide mitigation testimony.  Petition at 69-77. According to Allen, witnesses were available who could have testified to the physical and sexual abuse Allen suffered as a child.  Petition at 74.  Trial counsel had intended to call these witnesses but, as the time for trial neared, the witnesses refused to come to Houston and testify on Allen's behalf. Petition at 75.  Allen argues that trial counsel were thus ineffective for failing to subpoena these witnesses and force them to attend trial.  Petition at 75.

74

Allen admits that this claim is unexhausted.  He asks this Court to allow him to stay and abate federal habeas proceedings, pursuant to *Rhines v. Webber,* 544 U.S. 269, 273 (2005), and allow him to return to state court to exhaust this claim.  Pursuant to *Rhines,* this Court may stay and abate a federal habeas proceeding upon a showing 1) of good cause for his failure to exhaust his claims in the state court, 2) that the unexhausted claims are potentially meritorious, and 3) that there is no indication that the petitioner has engaged in potentially dilatory tactics.  544 U.S. at 278.  The Supreme Court notes that a stay "frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings," while also "undermin[ing] AEDPA's goal of streamlining federal habeas proceedings[.]" *Rhines,* 544 U.S. at 277.  Therefore, stay and abeyance should be available in only the above-cited limited circumstances.  *Id.*  As support for a stay, Allen asserts the deficient performance of state habeas counsel as cause for his failure to exhaust this claim on state habeas review.  *See* Petition at 69-71.  While acknowledging that, historically, the negligence of state habeas counsel is not cause to excuse procedural default, Allen argues that a recent Supreme Court decision, *Maples v. Thomas,* 132 S. Ct. 912 (2012), has changed this previously established precedent.  Petition at 71.

Allen is incorrect.  As will be discussed below, neither *Maples* nor the

subsequent Supreme Court decision, *Martinez v. Ryan* 132 S. Ct. 1309 (2012)*,* applies to Allen's case.  Under the law as it now stands, the ineffectiveness of state habeas counsel does not demonstrate good cause for Allen's failure to exhaust his claim in state court.  *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citing *Murray v. Giarratano*, 492 U.S. 1 (1989), *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *Wainwright v. Torno*, 455 U.S. 586 (1982)) ("There is no constitutional right to an attorney in state postconviction proceedings. . . . Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."); *Martinez v. Johnson,* 255 F.3d 229, 241 (5th Cir.2001) (stating that "that ineffective assistance of habeas counsel cannot provide cause for a procedural default").  Therefore, Allen cannot demonstrate cause to excuse the procedural default of this claim.  He also cannot present a meritorious claim for relief.  Therefore, this Court should decline to stay federal habeas proceedings and should dismiss his claim as unexhausted and procedurally barred.

**A.   *Maples* does not provide Allen cause to excuse the procedural default of his claim.**

Allen claims that state habeas counsel's failure to properly investigate his state writ of habeas corpus was "so serious that counsel was not functioning" as counsel, and he thus "effectively abandoned" Allen on the state habeas level. Petition at 71. Relying on *Maples*, Allen argues that he may now assert the

ineffectiveness of state habeas counsel as cause to excuse the procedural default of his *Strickland* claim.  Petition at 71-74.  Allen is mistaken.

In *Maples,* the Supreme Court considered "whether, on the extraordinary facts of Maples' case, there is 'cause' to excuse the default" of his state court petition, for his failure to timely appeal the trial court's order denying him postconviction relief.  132 S. Ct. at 917, 922.  Those "extraordinary facts" are as follows.  Maples was represented on postconviction state habeas review by two pro bono attorneys associated with a large New York-based law firm, who filed a petition for relief on Maples's behalf alleging several instances of ineffective assistance of trial counsel.  *Id.* at 916, 918-19.  While his petition was pending, both attorneys left the law firm for other employment and were disabled from continuing their representation of Maples.  *Id.* at 916, 919.  However, neither attorney informed Maples of his departure, nor did the attorneys seek leave to withdraw from the Alabama trial court as required by Alabama law, and no one moved for substitution of counsel on Maples's behalf.  *Id.* at 916-17, 919.  The Alabama trial court subsequently denied Maples's petition, sending notice to former counsel at the New York-based law firm; the notices were returned to the clerk unopened.  *Id.* at 917, 919-20.  The court clerk did not attempt to contact any attorney by other means and took no further action.  *Id.* at 920.  Consequently, no one filed an appeal on Maples's behalf and time ran out.  *Id.*

at 917, 920.  A month later, an Alabama Assistant Attorney General notified Maples of his missed state-court deadline and that he had four weeks to file his federal petition.  *Id.* at 920.  Maples's mother contacted the New York law firm who submitted a motion asking the state court to restart the appellate period; the motion was denied.  *Id.* at 920-21.  When Maples petitioned the federal district court for habeas relief, both the district court and the Eleventh Circuit rejected his petition on grounds that he had procedurally defaulted his appeal in the state court and had failed to demonstrate cause to excuse that default.  *Id.* at 917, 921.  It was uncontested that Maples was blameless in the default.  *Id.* at 917.

The Supreme Court held that Maples was abandoned by counsel and left unrepresented at a critical time for his state postconviction petition and lacked any clue of the need to protect himself pro se.  *Id.* at 917.  In these circumstances, the Court concluded that "cause" has been shown to avoid the procedural default.  *Id.*  While negligence on the part of postconviction counsel normally does not qualify as "cause" to excuse the procedural default in federal court, *see Coleman*, 501 U.S. at 753, "[a] markedly different situation is presented . . . when an attorney abandons his client without notice, and thereby occasions the default."  *Maples,* 132 S. Ct. at 922.  "Having severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's

representative. . . . [Thus] [h]is acts or omissions . . . 'cannot fairly be attributed to [the client].'" *Id.* at 922-23 (citing 1 Restatement (Third) of Law Governing Lawyers § 31, Comment *f* (1998), and *Coleman,* 501 U.S. at 753). Relying on *Holland v. Florida*, 130 S. Ct. 2549 (2010), for support, the Supreme Court held that, "under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him. Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record . . . are not representing him." *Maples,* 132 S. Ct. at 923-24. Because he was abandoned by counsel and lacked assistance at the time his appeal should have been filed and because he had no reason to suspect that he had been reduced to pro se status, "Maples was disarmed by the extraordinary circumstances quite beyond his control." *Id.* at 927. Thus he has shown "ample cause" to excuse the procedural default of his state proceedings. *Id.* at 927.

The Supreme Court repeatedly confined its decision to the limited question before that Court: whether, on the facts presented, Maples had shown cause to excuse the missed notice of appeal deadline. *See id.* at 917 (Court considered "whether, on the extraordinary facts of Maples' case, there is 'cause' to excuse the default" of his state court petition"); 922 (certiorari granted to decide whether "uncommon facts presented here establish cause"); 927 ("In the unusual circumstances of this case . . . ."). The Court specifically noted that the *Maples*

decision did not disturb the general rule of *Coleman*—that negligence on the part of a petitioner's postconviction counsel does not qualify as "cause" to excuse the procedural default of a claim and that a petitioner is bound by the acts of his attorney and cannot rely on the acts of postconviction counsel to establish cause. *Id.* at 922 (citing *Coleman,* 501 U.S. at 753-54).

The circumstances at issue in *Maples* do not exist in Allen's case. First, Allen was not abandoned by counsel, nor was he left unrepresented at a critical time for his state postconviction petition. *Maples,* 132 S. Ct. at 917. State habeas counsel filed a state habeas application raising thirty-seven claims for relief, including claims of ineffective assistance of trial and appellate counsel. *See* 1 SCHR 2-488, State Application for Post-Conviction Writ of Habeas Corpus, Claims 1, 2, 4, 5, 6, 8, 10, 12, 14, 16, 34, 35, 36; *Ex parte Allen,* No. 73-586-01, 2010 WL 1709947 (Tex. Crim. App. April 28, 2010). Although Allen's state habeas counsel did not present the now-proposed *Strickland* claim, Allen was not "abandoned" by counsel. Rather, counsel may have had good reason for not advancing the claim—for example, it may have been meritless. This is the very difference between a *Strickland* claim and a claim under *United States v. Cronic*, 66 U.S. 648 (1984)—i.e., error by omission as opposed to a total denial of counsel. *See, e.g., Penson v. Ohio,* 488 U.S. 75, 88 (1988) (failure of counsel to press particular argument or argue it effectively is different from denial of counsel

altogether).  Appellate counsel's effectiveness is measured by the same standard applied to trial counsel:  whether the performance was objectively reasonable and whether any deficient performance prejudiced the proceeding.  Appellate counsel is not ineffective for failing to raise every possible point on appeal. *Smith v. Robbins,* 528 U.S. 259, 288 (2000).  Rather, appellate counsel is obliged to raise and brief only those issues that he believes have the best chance of success.  *Id.* at 285; *see Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").  Furthermore, prejudice cannot be shown in the absence of a reasonable probability that, but for counsel's omitting a particular ground of error, the case would have been reversed on appeal. *Smith*, 528 U.S. at 285.

In this case, state habeas counsel did not fail to file or otherwise abandon his client.  Instead, state habeas counsel simply did not develop the claim Allen now contends (in hindsight) should have been developed.  *But see Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way.").  Appellate counsel is not necessarily ineffective for failing to raise every possible point on appeal. *Smith,* 528 U.S. at 288.  Unlike Maples, Allen was represented by counsel and received state habeas

review of thirty-seven claims.   Thus, there was no default of Allen's state postconviction proceeding.   Further, as will be discussed in Section V(C)(1), *infra,* Allen cannot demonstrate a meritorious claim.   Therefore, he was not prejudiced by any alleged deficiency of state habeas counsel.

Despite the fact that Allen received state habeas review of his case, Allen nevertheless argues that he was "effectively abandoned" by counsel because state habeas counsel did not personally meet with his client, review documents in possession of the trial attorneys, or meet with the trial investigator; he did not investigate claims outside the record; and he repeated in the state writ fourteen claims previously raised on direct appeal.  Petition at 72-73.[18]  However, Allen cannot demonstrate complete abandonment by counsel as occurred in *Maples.* As the Fifth Circuit has found in a similar case, this distinction is fatal to Allen's reliance on *Maples. See Gates v. Thaler,* No. 11-70023, 2012 WL 2305855, at *6 (5th Cir. June 19, 2012) (rejecting argument that after *Maples* and *Martinez* ineffectiveness of state habeas lawyer should excuse procedural default and distinguishing *Maples* on ground that Gates did not argue he was abandoned, only that state habeas counsel was ineffective) (unpublished).  And the Fifth Circuit has rejected a similar allegation against state habeas counsel as insufficient cause to excuse the procedural default of state habeas claims, prior

---

[18]     The Director does not concede the truth of the allegations.

to *Maples. See Martinez*, 255 F.3d at 240-41 (petitioner accused state habeas counsel of deficient performance for defaulting claims without ever communicating with his client, researching the law, investigating, or developing extra-record argument).

Furthermore, because Allen was repeatedly in contact with the state habeas court and his counsel, complaining that the petition filed by state habeas counsel did not contain certain issues he wished to have filed,[19] 2 SHCR 569-70; asking for a writ of mandamus from the trial court for its failure to timely file findings of fact and conclusions of law in this case, 2 SHCR 572-73; filing a petition for recusal of the trial court judge, on which a hearing was held with Allen in attendance, 2 SHCR 578-613; sending a letter to counsel regarding his desire to oppose the trial court's findings of fact and conclusions of law, 3 SHCR 849; sending a letter to the trial court asking to drop his appeal and set a date for execution, 3 SHCR 851; and sending a letter to the trial court notifying it that his newly appointed counsel has not been in contact with him yet,[20] 3 SHR

---

[19]     These issues involved crime scene photographs, the fact that he was tried for sexual assault even thought his indictment did not allege such, the fact that he was tried by an all-white jury, photographic evidence of his hands was taken but not presented at trial, and the police collected fingernail scrapings from him but such evidence was not presented at trial.  He did not mention the now-proposed claim.  State habeas counsel sent Allen a letter explaining his reasons for not addressing some of these allegations in the state writ.  *See* 2 SHCR 592-993

[20]     It became necessary for state habeas counsel to withdraw from the case after he accepted a position with the Harris County District Attorney's Office.  *See* 3

890, Allen cannot argue that he lacked any clue of the need to protect himself pro se. *See Maples,* 132 S. Ct. at 917. For this reason, his case is not on par with *Maples.*

And finally, unlike *Maples*, the State did not contribute to the default of Allen's claim. 132 S. Ct. at 919-20. Allen makes no such allegation. Thus, Allen cannot blame the court because he did not receive the postconviction review he hoped for.

The issue before the Supreme Court in *Maples* is very narrowly construed: Where the petitioner was abandoned by counsel and left unrepresented at a critical time for his state postconviction petition, and where the petitioner also lacked knowledge of the need to protect himself pro se, the deficient representation of state postconviction counsel may amount to cause to excuse the procedural default of state habeas proceedings. *Maples,* 132 S. Ct. at 917. Allen does not meet these contingencies. Therefore, the Supreme Court's decision in *Maples* does not afford relief to Allen.

---

SHCR 852-53. New counsel was appointed for Allen, and a district attorney pro tem was appointed for the State. 3 SHCR 854, 891. This event occurred after briefing had concluded and findings of fact had been submitted by the parties. The State's proposed findings were rescinded and resubmitted by the district attorney pro tem. 3 SHCR 887, 892-927.

84

### B.  *Martinez* does not apply to Texas or to Allen's claim.

Although Allen does not cite to *Martinez*, this recent Supreme Court case—which was decided after he filed his amended petition—reaffirms that the ineffectiveness of state habeas counsel may not serve as cause to excuse the procedural default of a federal habeas claim.

First, as the Fifth Circuit has recently concluded, *Martinez* does not apply to Texas. *See Ibarra v. Thaler,* No. 11-70031, 2012 WL 2620520, at *4 (5th Cir. June 28, 2012) (Petitioner not entitled to benefit of *Martinez*); *see also Ayestas v. Thaler,* No. 11-70004, 2012 WL 2849487, at *1 (5th Cir. July 11, 2012) (citing *Ibarra,* Court denied motion to vacate and remand in light of *Martinez*); *Gates,* 2012 WL 2305855, at *6 (because a Texas capital defendant can raise an ineffective assistance of trial counsel claim on direct review, *Martinez* does not alter cause and prejudice analysis).  In *Martinez*, the Supreme Court found—for the first time—an exception to the unqualified statement previously asserted in *Coleman* that an error by an attorney in a postconviction proceeding does not qualify as cause to excuse a procedural default.  132 S. Ct. at 1315 (citing *Coleman,* 501 U.S. at 753-54).  While repeatedly stating that its holding is limited and that "the rule of *Coleman* governs in all but the limited circumstances recognized here," the Court qualified *Coleman* by recognizing a narrow exception to the rule barring attorney negligence as "cause." *Id.* at 1320;

85

*see also Ibarra,* 2012 WL 2620520, at *2 (*Martinez,* by its own terms, establishes specific and narrow exception to the *Coleman* doctrine).  Specifically, the Court found that "[w]here, under State law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.*  Thus, when a State requires a petitioner to raise an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding,[21] the petitioner may establish cause to excuse a default of that claim if either (1) no counsel was appointed; or (2) counsel in that proceeding was ineffective under the standards of *Strickland.* *Id.* at 1318, 1320; *Ibarra,* 2012 WL 2620520, at *2.

But the *Martinez* court carefully limited its ruling *only* to cases where the initial collateral proceeding is the only forum where ineffective-assistance-of-trial-counsel claims may be raised.  *Id.* at 1318-20.  However, in Texas, the limited exception to *Coleman* carved out by the Supreme Court does not apply because the State does not require a defendant to raise an ineffective assistance of trial counsel claim in an initial-review collateral proceeding.  *See Lopez v.*

---

[21]     The Court defined "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez,* 132 S. Ct. at 1315.

*Texas*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011) (holding that a claim of ineffective assistance of counsel may be considered on direct appeal). The *Martinez* court repeatedly noted that the exception it created was limited to jurisdictions (such as Arizona) that deliberately choose to bar a defendant from raising *Strickland* claims on direct appeal. 132 S. Ct. at 1318 ("By *deliberately* choosing to move trial-ineffectiveness claims outside the direct appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims."), 1320 ("Our holding here addresses only the constitutional claims presented in this case, where the State *barred* the defendant from raising the claims on direct appeal."), 1320 ("Where, under *state law*, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding. . .") (italics added).

However, in Texas, this limited exception to *Coleman* does not apply because the State allows a defendant to first raise an ineffective assistance of trial counsel claim in a motion for new trial or on direct appeal. *See* Tex. R. App. Proc. 21.3, 21.4; *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993)(holding ineffective assistance of counsel may be raised in a motion for new trial); *Lopez*, 343 S.W.3d at 143 (holding that a claim of ineffective assistance of counsel may be considered on direct appeal); *see also Ibarra,* 2012 WL 2620520, at *4 (acknowledging that Texas defendants may raise ineffective assistance of

87

counsel claims in a motion for new trial or on direct appeal).  Defendants may use the motion for new trial to develop non-record facts to support a claim on direct appeal.  Tex. R. App. Proc. 21.2.  Moreover, a trial court is authorized to hold a live hearing on the issue and abuses its discretion for failing to do so if a defendant presents a motion that raises matters that may not be determined from the record.  Tex. R. App. Proc. 21.7; *Holden v. State*, 201 S.W.3d 761 (Tex. Crim. App. 2006).  Because Texas defendants such as Allen have two outlets in state court to develop and raise *Strickland* claims, the narrow exception created in *Martinez* is clearly inapplicable.

The Fifth Circuit has recently agreed, concluding that, since Texas, unlike Arizona, has not deliberately opted to bar defendants from raising *Strickland* claims on direct appeal, *Martinez* is not applicable and *Coleman* still applies. *See Ibarra,* 2012 WL 2620520, *4 (Petitioner not entitled to benefit of *Martinez* because "Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings, and they do not by law deprive Texas defendants of counsel- and court-driven guidance in pursuing ineffectiveness claims."); *Gates,* 2012 WL 2305855, *6 (because a Texas capital defendant can raise an ineffective assistance of trial counsel claim on direct review, *Martinez* does not alter cause and prejudice analysis); *see also Adams v. Thaler,* 679 F.3d 312, 317 n.4 (5th Cir. 2012) (While not addressing the impact of *Martinez* on

88

Texas, the Fifth Circuit noted that "Texas does not require a defendant to raise an ineffective assistance of trial counsel claim only in state habeas proceedings, . . . and that ineffective assistance claims (particularly those, like Adams's claim, involving trial counsel's failure to object to jury instructions) are often brought on direct appeal, with mixed success.") (citing *Lopez,* 343 S.W.3d at 143).

Because *Martinez* "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial," 132 S. Ct. at 1320, it does not apply to Texas and does not provide Allen with cause to excuse the default of his claim.

### C. Allen cannot demonstrate cause and prejudice to avoid the procedural default his claim.

Apart from the fact that neither *Maples* nor *Martinez* provides Allen with an avenue to allege "cause" to excuse the procedural default of his claim, to overcome any procedural default, Allen must establish not only "cause"—the deficient performance of state habeas counsel—but also "prejudice" by demonstrating the merits of his underlying claims. *See Martinez,* 132 S. Ct. at 1318-19. The *Martinez* Court specifically noted that "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* (citing *Miller-El v. Cockrell,* 537 U.S. 322 (2003)). This Allen cannot do.

89

### 1.  Allen fails to prove prejudice because he cannot demonstrate a potentially meritorious claim for relief.

Allen cannot demonstrate "prejudice" to overcome default because he fails to demonstrate a potentially meritorious claim for relief.  Allen's failure to demonstrate a "substantial claim" for relief forecloses his attempt to excuse the procedural default of his *Strickland* claim by state habeas counsel because he fails to prove "prejudice."  *See Martinez,* 132 S. Ct. at 1318-19.

To demonstrate deficient performance, as required under *Strickland,* the petitioner must show that counsel's conduct fell beyond the bounds of prevailing, objective professional standards.  *Strickland*, 466 U.S. at 688.  However, there is a presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.  "[T]he standard for judging counsel's representation is a most deferential one."  *Richter*, 131 S. Ct. at 788.  "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"  *Id.* at 788 (citing *Strickland,* 466 U.S. at 689).  The question for the reviewing court to ask is whether counsel's performance "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Id.* (citing *Strickland,* 466 U.S. at 690).  The standard for review under *Strickland* and AEDPA is "doubly" deferential.  *Id.*  "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

90

standard." *Id.*

Additionally, Allen must affirmatively prove prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (citing *Strickland*, 466 U.S. at 694). Regarding counsel's failure to investigate and present mitigating evidence at the punishment phase of trial, the reviewing court must "reweigh the evidence in aggravation against the totality of available mitigating evidence[,]" including that adduced at trial, as well as the habeas proceeding. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. Allen fails to meet either prong of the *Strickland* standard.

The affidavit of Gerald Bierbaum indicates that trial counsel hired both Bierbaum and Lisa Milstein to investigate this case. Petitioner's Exhibit B, #2. These investigators uncovered evidence that Allen suffered from physical and sexual abuse and neglect as a child. *Id.* at #4-5. The investigators interviewed Allen's "family, friends, and ex paramours," from St. Louis, as well as local witnesses, and learned that some of these witnesses could support the allegations of abuse. *Id.* at #6-7. Trial counsel also hired expert licensed master social worker Bettina Wright to discuss the impact of this mitigating evidence

91

on Allen's development.  *Id.* at #8.  However, as trial approached, some of the witnesses refused to travel to Houston to testify on Allen's behalf "after learning about the mitigating evidence to be presented." *Id.* at #9.  Bierbaum stated that he did not believe there was enough to time to pursue out of state subpoenas when they found out the witnesses would not willingly appear.  *Id.*  The defense nevertheless pursued this mitigation strategy without these witnesses through the testimony of Bettina Wright, who testified that, based upon her interviews with Allen and her review of the mitigation team records, which included interviews with Allen's family members, she had concluded that Allen was the survivor of chronic sexual abuse, starting during early childhood and continuing into adulthood. 28 RR 3-7, 18-19.  Trial counsel confirmed evidence of this abuse through cross-examination of Allen's ex-wife, Sonji Allen, who testified that Allen once told her that he had been abused as a child.  26 RR 150.     Allen nevertheless alleges that trial counsel were ineffective for failing to subpoena the other witnesses in a timely manner.  Had they been properly subpoenaed, Allen suggests the witnesses would have supported his claims of abuse as a child.  Allen alleges that, if he could have corroborated his claims of childhood abuse, there is a great probability that the result of the proceeding would have been different.  Petition at 75-77.

As an initial matter, Allen does not even identify by name these witnesses

whom Bierbaum and Milstein allegedly discovered prior to trial, nor does he provide affidavits attesting to what they would have said.   As it stands, Bierbaum's affidavit is hearsay.   Furthermore, even if trial counsel had subpoenaed these unnamed witnesses, the witnesses' mere presence in Houston would not have assured that they would have testified on his behalf or that they would have testified in a manner that would have benefitted Allen.   The Fifth Circuit has held that "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified to are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).   To prevail on a claim alleging deficient performance of counsel for failure to call a witness, Allen must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009).   Allen meets none of these requirements: He does not name any witness, he does not demonstrate availability at the time of his trial, nor does he set forth the content of the witnesses' proposed testimony—favorable or otherwise.   And even if trial counsel had subpoenaed these witnesses, there is no guarantee that they would have testified as Allen now alleges.   Indeed, the witnesses' refusal to testify at Allen's trial upon learning the defensive strategy

indicates they were unwilling to provide the testimony that would have helped his cause.  This claim of ineffective assistance amounts to nothing more than rank speculation and cannot form the basis of federal habeas relief.  *See Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir. 1994).

Furthermore, trial counsel could have reasonably concluded that subpoenas were not necessary to compel these witnesses to appear at Allen's trial.  Because the witnesses initially cooperated and discussed the alleged evidence with the investigators, and because the witnesses were people close to Allen—"family, friends, and ex paramours,"—trial counsel could reasonably have concluded that they were willing to help him by testifying on his behalf and subpoenas were thus unnecessary.  Moreover, Bierbaum's affidavit indicates that the witnesses refused to come to Houston only after learning about the intended mitigation defense.  Petitioner's Exhibit B, #9.  At this point, trial counsel could have reasonably concluded that subpoenas would not help because, even if the witnesses were forced to come to Houston, they did not want to cooperate and would not have been good witnesses.  Trial counsel cannot force witnesses to testify favorably.  Thus, the decision not to subpoena witnesses was strategically reasonable and not deficient.

Trial counsel nevertheless presented an impressive mitigation defense, in spite of the lack of cooperation from these unnamed witnesses.  "[I]t is difficult

to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter,* 131 S. Ct. at 791.  As noted, trial counsel did their best to preserve the childhood-abuse-mitigation-defense through the testimony of Bettina Wright.  Wright's opinion that Allen was the survivor of chronic sexual abuse, starting during early childhood and continuing into adulthood, was based on information supplied by Allen, and by her review of the mitigation team records which included interviews with Allen's family members. 28 RR 3-7, 18-19.  Wright testified that she believed Allen was abused by his brother, his uncle, a boyfriend of his mother, the brother of a boyfriend of his mother, and strangers.  28 RR 9.  Wright opined that the sexual abuse made Allen feel unwanted by his family, unsafe, and that he was not of value to his family.  28 RR 11-12.  Wright explained that when a child is sexually assaulted, the child may grow up not being able to trust the world, feel unvalued, and feel as if he is not able to protect himself; thus the child develops a sense of helplessness and powerlessness.  28 RR 13-14.  Wright also testified that she believed Allen was rejected and emotionally neglected by his mother.  28 RR 14. When Allen told his mother that his brother was molesting him, she got angry and did not believe him thereby reinforcing his feeling that he was not valued in the family.  28 RR 15.  Wright opined that a perpetrator of abuse against a child—like the kind Allen was accused of in this case—likely has poor coping

mechanisms, low self esteem, poor life skills, and is thus more likely to act out in a stressful situation.  28 RR 16.  Wright opined that Allen was in a very stressful situation when he committed this crime—he was unemployed, living in an impoverished household, caring for someone else's four young children, and had suffered through sexual abuse as a child.  28 RR 17.  Wright testified that when a person who experienced childhood sexual abuse perpetrates abuse on a child as an adult, the perpetration is a way of dealing with that person's own pain.  28 RR 18.

Trial counsel was also able to elicit on cross-examination from Allen's ex-wife, Sonji Allen, that Allen once told her that an uncle had molested him when he was a child.  26 RR 150.  This testimony corroborated Bettina Wright's testimony.  Additional evidence of this kind would have been cumulative.  Furthermore, while Allen suggests that the unnamed witnesses could have provided the jury with "firsthand knowledge" of the sexual abuse, Petition at 76-77, unless one of these unnamed witnesses actually saw Allen being abused or abused Allen themself, any testimony they could have provided would be hearsay based upon what Allen told them, and would be no more probative than the hearsay provided by Wright and Sonji.

Finally, trial counsel emphasized the evidence of abuse during closing arguments, noting that Allen came from a highly dysfunctional family—he was

the product of rape, he ran away from home at six-year old, and he told his mother he was being sexually abused, but she did not believe him.  29 RR 29-30. Counsel also noted that, although the State suggested Allen was lying about the abuse, Wright—an expert with experience interviewing more than two-hundred victims of sexual abuse—believed he was telling the truth.  29 RR 31.

Trial counsel also presented testimony from clinical psychologist, Dr. Gilda Kessner, who opined that, if incarcerated, Allen presented a 2 to 7.3 percent likelihood of committing future acts of violence in prison.  27 RR 18-19, 52.  The defense called several witnesses, including two church pastors, who knew Allen when he lived in St. Louis.  These witnesses indicated that Allen was active in various churches; liked to speak to groups from the Bible; was likeable, polite, and never a problem; and was a bright young man who was interested in spiritual work.  27 RR 86, 98, 103.  Another witness, Bobby Jean Austin, testified that she met Allen in 1979 in church where Allen was a preacher; Allen lived with Austin on several occasions and she trusted him with her eight children; Allen never did anything to harm them.  27 RR 113-15, 118-19.  Also, Allen's friend Corita Hawkins testified that she had known Allen for fifteen to twenty years and that he had lived with her in her Houston home on two occasions.  28 RR 63.  Allen sang in the church choir and preached.  28 RR 63-64. According to Hawkins, Allen tried to find employment after he was paroled but

lost his jobs when employers checked his record.  28 RR 66.  However, Allen
helped around her house with cooking and yard work.  28 RR 67.  According to
Hawkins, Allen took Jones's children to church, and told Hawkins that he was
just trying to help Jones get settled even though he knew he should not live with
her.  28 RR 71-72.

While the defense made a valiant attempt to portray Allen as someone who
was victimized as a child by severe abuse, but was otherwise a likeable, spiritual
young man who was very involved in the church, and not likely to be a future
danger to society if incarcerated for life in prison, the State's contrary evidence
was overwhelming.  Apart from the truly horrific facts of the crime, the jury
heard evidence that all of Kimberly Jones's children showed signs of abuse and
malnutrition.  *See* 26 RR 207-09, 213-21, 225.

The evidence also showed Allen was on parole for a prior sexual offense
against children and was a registered sex offender prior to moving in with Jones.
Specifically, in 1986, he pled guilt plea to two counts of felony sexual assault
involving two minor children, resulting in placement on deferred adjudication.
26 RR 4; SX 171. The victims' mother, Vanessa Henry, testified that she had
allowed Allen and his wife to stay with her after her pastor told her they did not
have anywhere to live.  26 RR 185-89.  Allen did not have a job so he and his wife
cared for Henry's two boys. 26 RR 189-91.  It was during this time that Allen

assaulted both boys, then threatened to hurt them if they told anyone.  26 RR

192-95.  Henry agreed to probation for Allen so that her children would not have

to testify against him.  26 RR 195-96.  However, due to parole violations, this

crime was eventually adjudicated in May 1989, and Allen was sentenced to two

years imprisonment.  SX 174.  Allen was released to mandatory supervision in

September 1989, but his parole was revoked in January 1999, because he failed

to report and changed his residence without permission.  26 RR 61, 66.  In July

1999, he was again released on mandatory supervision and was required to

register as a sex offender.  26 RR 70-71, 79, 91.  Allen then violated the

conditions of his parole by living with Jones's children; Allen also failed to report

that he moved into the apartment with Jones.  26 RR 70-71, 91.

In addition, the jury heard testimony from Allen's ex-wife Sonji, who

described how Allen choked her into unconsciousness because she did not want

to move to Texas. 26 RR 118-21.  Also, Liza Turner described the inappropriate

relationship she had with Allen when she was a minor and he was a youth

minister at her church.  26 RR 168-81.  Allen pled guilty in May 1990, to

misdemeanor assault and was sentenced to seventy-five days in jail for

assaulting his then-pregnant second wife, Carla Jones.  SX 176; 26 RR 26-33, 53-

54.  Jones feared for her life during the attack and subsequently lost her baby.

26 RR 33, 53-54.  Finally, the jury heard the videotaped interview Allen gave to

Sgt. James Binford after he turned himself in to the police.  Sgt. Binford testified that Allen tried to come across as a victim in the interview, but he found him to be a methodical, sharp thinker who functioned in "survival mode."  27 RR 8-13.

The jury heard evidence that Allen had been sexually abused as a child and found it unconvincing in the face of the overwhelming aggravating evidence offered by the State.  Therefore, there is no reasonable probability that, after reweighing the entirety of the available mitigating evidence against this aggravating evidence, the result of the proceeding would have been any different.  The "likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792.  Allen cannot meet this standard.

### 2. Allen cannot establish "cause" because state habeas counsel was not ineffective.

Finally, as discussed, Allen fails to establish "cause" because the performance of state habeas counsel was not deficient.  Allen relies on records obtained from the Harris County Auditor's Office—comprising habeas counsel's motions for payment, expense work sheets and worksheet summaries, investigator invoices, and various receipts—to support his claim that state habeas counsel performed deficiently.  Petition at 72-73; Petitioner's Exhibit C. However, this exhibit demonstrates that state habeas counsel hired an investigator to help with claims and spent more than 228 hours reading the record and researching and writing a brief.  State habeas counsel ultimately filed

100

a brief, raising thirty-seven claims for relief. Allen now identifies only one claim that he suggests should have also been raised in that state writ.  However, as discussed, that claim is meritless.  And even if it was arguably meritorious, appellate counsel is not necessarily deficient for failing to raise it.  *See United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999); *Green v. Johnson,* 160 F.3d 1029,1043 (5th Cir. 1998) (counsel does not need to raise every non-frivolous issue on appeal).  "Even the best criminal defense attorneys would not defend a particular client in the same way."  *Strickland*, 466 U.S. at 689.

While Allen alleges that state habeas counsel did not personally meet with his client, he was in contact through letters.  *See* 2 SHCR 592-93; 3 SHCR 850 (counsel suggested letter-writing would be far more expedient way to get information than waiting for a visit to ask questions).  Furthermore, according to Petitioner's Exhibit C, an investigator met with Allen at TDCJ.  And contrary to Allen's assertions, Petition at 72, these records do not indicate what the investigator discussed with Allen. The records state only that the investigator "[t]raveled to TDC, Livingston, Texas, Interviewed Kerry Allen."  Petitioner's Exhibit C, Lone star Investigations, Invoice Summary, page 2.  This exhibit also indicates that the investigators located and contacted juror members, but this could have been a separate investigation.  The exhibit does not suggest that a "jury claim" was the only subject of the investigator's conversation with Allen at

101

TDCJ or that it was even discussed at all.  Allen also presumes that state habeas counsel's expense works sheets indicating only "Research & writing" and "Reading record" as an Explanation of Services Performed prove that he did not review any documents in possession of the trial attorneys or investigate claims outside the record.  However, these vague descriptions of services should not be construed so narrowly.  And while state habeas counsel repeated twelve claims raised on direct appeal, he also raised twenty-five other claims.  In short, the exhibit fails to prove a lack of investigation by state habeas counsel.  Under these circumstances, state habeas counsel's performance was objectively reasonable.  *Smith,* 528 U.S. at 285; *Moreno,* 450 F.3d at 168.

For all these reasons, Allen cannot demonstrate that appellate counsel was deficient or that he was prejudiced by their performance.

## VI.   Allen Is Not Entitled To Discovery Or An Evidentiary Hearing.

Allen makes a cursory request for discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases, seeking permission to use discovery "to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondent's Answer."  Petition at 77.  He also seeks leave to further amend his petition "to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery" and leave to expand the

102

record, pursuant to Rule 7 of the Rules Governing § 2254 Cases with this information.  Petition at 77-78.  Finally, Allen requests an "evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition."  Petition at 78.

However, under AEDPA, federal habeas review of a state court decision "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 131 S. Ct. at 1398.  The "backward-looking language" of § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and "review is limited to the record in existence at the same time *i.e.*, the record before the state court."  *Id.* at 1398.  "[E]vidence introduced in federal court has no bearing on a § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court."  *Id.* at 1400;[22] *see also Rabe v. Thaler,* 649 F.3d 305, 308-09 (5th Cir. 2011) (quoting *Pinholster*); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011) (same).  In such instance, a federal habeas court is prohibited from considering

_____

[22]     It would be contrary to § 2254(b)'s purpose—that state courts have primary responsibility to review federal-law challenges to a state custodial judgment and provide any necessary relief—if petitioners were allowed "to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo."  *Pinholster*, 131 S. Ct. at 1398-99 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997), and *Woodford v. Viscotti*, 537 U.S. 19, 27 (2002) (per curiam)).

new evidence or granting an evidentiary hearing. *See Pape*, 645 F.3d at 288 (District court erred in conducting evidentiary hearing and relying on evidence from that hearing to conclude state habeas court unreasonably rejected *Strickland* claim; claim must be adjudicated on record before the state court.); *Higgins v. Cain,* No. 10-30,285, 2011 WL 3209843 (5th Cir. July 28, 2011) (unpublished) (Pursuant to *Pinholster,* district court would have erred in granting federal evidentiary hearing on *Strickland* claims adjudicated on the merits in state court proceedings.).

Because his first four claims were adjudicated on the merits in state court proceedings, this Court is prohibited from granting discovery or an evidentiary hearing unless Allen can demonstrate that he meets an exception to § 2254(d). For the reasons already given in this answer, Allen fails to make this threshold showing and is not entitled to relief under AEDPA. Therefore, this Court is limited to the record before the state court, and further development or expansion of the record is prohibited. *Pinholster*, 131 S. Ct. at 1398.

Assuming, however, that *Pinholster* does not bar factual development in this case, consideration of new evidence in federal court is still subject to the restrictions in 28 U.S.C. § 2254(e)(2). *See Pinholster*, 131 S. Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."). Consequently, new evidence cannot be considered if the

petitioner "failed to develop the factual basis of a claim in State court proceedings." §2254(e)(2).   Applying *Pinholster,* and for the reasons discussed below, AEDPA forecloses discovery or an evidentiary hearing on all of Allen's claims, including the procedurally defaulted *Strickland* claim.   Therefore, this Court should deny his requests for discovery, an evidentiary hearing, and expansion of the record.

### A.    Allen is not entitled to an evidentiary hearing.

This Court's discretion to consider new evidence is further restricted by §2254(e)(2).   *Pinholster*, 131 S. Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief.").   AEDPA places strict limitations on a court's ability to grant an evidentiary hearing:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> > (A) the claim relies on-
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;  and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Thus, for Allen to be entitled to a federal evidentiary hearing—in addition to showing that he surpasses the threshold of § 2254(d)—he must show that he did not fail to develop the factual basis of his claim in state court, or that his claim satisfies a § 2254(e)(2)(A) exception *and* that an evidentiary hearing could enable him to prove the petition's factual allegations, which, if true, would entitle him to federal habeas relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Allen cannot meet these requirements.

Regarding Issues I through IV, Allen cannot demonstrate that he did not fail to develop the claims in state court. "Failure" is established by showing a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. Allen makes no argument regarding the sufficiency of his attempts to further develop the claims on his own. The record indicates that Allen made only a cursory requests for discovery of "information necessary to prove the facts as alleged in his petition" and an evidentiary hearing "at which he may be allowed to present evidence on these claims." 1 SHCR 354-55. Allen's generic appeals for an evidentiary hearing and

non-specific discovery requests were not diligent attempts to develop the state court record. Indeed, "seek[ing] an evidentiary hearing in state court" is simply the "minimum" showing for diligence under § 2254(e)(2). *Michael Williams*, 529 U.S. at 437. And "[m]ere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim." *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000). As he does now, Allen simply requested an evidentiary hearing but presented no compelling reason why additional factfinding was warranted. Furthermore, he did not identify any documents or evidence he wished to discover through further factual development, or how this evidence could affect his claims His generic request falls short of proving the necessary diligence in the development of his claims in state court.

Furthermore, he cannot meet an exception to § 2254 (e)(2) because no claim relies on a new rule of constitutional law, nor does he allege that the factual predicate to his claims could not have discovered through the exercise of due diligence. Indeed, Allen does not even describe what evidence he seeks to develop through discovery or an evidentiary hearing. And, as described throughout this answer, Allen fails to allege any factual dispute that, if true, would entitle him to relief. *Landrigan,* 550 U.S. at 474. He certainly does not explain how evidence obtained through discovery or an evidentiary hearing

would help to prove his case.  Therefore, Allen cannot prove that further evidentiary development would establish, by clear and convincing evidence, that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense.

Regarding Issue V, Allen cannot show diligence in his attempts to develop this claim in state court.  "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts." *Schriro,* 550 U.S. at 473 n.1. "[A] failure to develop the factual basis of a claim" exists where there is "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 431.  Allen admits the claim should have been raised in state court, but blames the ineffective assistance of appellate counsel as cause for this default.  However, the ineffectiveness of state habeas counsel does not excuse a procedural default in this case.  *See Coleman*, 501 U.S. at 752. Therefore, by his own admission, he cannot satisfy the opening clause of § 2254 (e)(2).  Furthermore, he meets no exception.  He cites no new rule of constitutional law[23] and admits that the factual predicate for his claim was

---

[23]    *Martinez* is not a new rule of constitutional law.  132 S. Ct. at 1315 (Court did not resolve whether exception to *Coleman* exists as a constitutional matter); *id.* at 1319-20 (distinguishing between a constitutional ruling and "the equitable ruling of this case").

available. § 2254(e)(2)(A). And, for the reasons discussed, his *Strickland* claim fails to allege any factual dispute that, if true, would entitle him to relief. *Landrigan,* 550 U.S. at 474. Therefore, Allen cannot prove that further evidentiary development would establish, by clear and convincing evidence, that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. § 2254(e)(2)(B). Thus, Allen meets no exception allowing for further factual development.

Finally, even if he could prove that he was not barred by AEDPA from obtaining a hearing, this Court has discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000). With regard to any of Allen's claims, he does not put forth factual allegations that, if true, would entitle him to relief. *See Landrigan,* 550 U.S. at 474. Furthermore, he fails to make any argument as to how a hearing will aid in the development of his claims. *See Clark,* 227 F.3d at 284 (petitioner failed to show how his claim would be advanced by a hearing). This Court has sufficient evidence and argument currently before it to resolve Allen's claims. Therefore, even if a federal evidentiary hearing was allowed, it is unwarranted and this Court should deny Allen's request.

### B.  Allen is not entitled to discovery.

For the same reasons an evidentiary hearing is not allowed, discovery is also not allowed. Consideration of new evidence in federal court is subject to the restrictions in § 2254(e)(2). *See Holland v. Jackson*, 542 U.S. 649, 653 (2004) ("Those same restrictions [in § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing."); *Shelton v. Quarterman*, No. 06-10448, 2008 WL 4411487, at *8 (5th Cir. Sept. 28, 2008) ("Section 2254(e)(2) . . . also governs when a district court may consider evidence not presented to the state courts."). Consequently, new evidence cannot be considered if the petitioner "failed to develop the factual basis of a claim in State court proceedings." § 2254(e)(2). As argued, Allen cannot show diligence in the development of all claims in the state court. Furthermore, he cannot demonstrate that he meets an exception to § 2254 (e)(2)(A), or that the further factual development could enable him to prove the petition's factual allegations and thus entitle him to federal habeas relief. Additional factual development through discovery will not help Allen's claims.

Parties to a federal habeas action under 28 U.S.C. § 2254, generally are not entitled to discovery under the Federal Rules of Civil Procedure. Rather, under Habeas Rule 6, a party may invoke the discovery process only if and to the extent that the court grants leave "for good cause shown." Although the Habeas

Rules do not define "good cause," the Advisory Committee Note to Habeas Rule 6 explains that the rule is consistent with the Supreme Court's decision in *Harris v. Nelson,* 394 U.S. 286 (1969). Under that decision, a court must grant discovery only "where specific allegations before the Court show reason to believe that the applicant may, if the facts are fully developed, be able to demonstrate that he is . . . *entitled to relief* . . . ." *Harris v. Nelson*, 394 U.S. at 300; *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("A habeas petitioner, unlike the usual litigant in federal court, is not entitled to discovery as a matter of ordinary course"); *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994) ("Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence.") (citing *Aubet v. Maine,* 431 F.2d 688, 689 (1st Cir. 1970)). In *Harris,* the court reasoned that habeas actions are particularly unsuited for literal application of the civil discovery rules and concluded that

> in appropriate circumstances, a district court, confronted by a petition for habeas corpus *which establishes a prima facie claim for relief,* may use or authorize the use of suitable discovery procedures . . . reasonably fashioned to elicit facts necessary to help the court to "dispose of the matter as the law and justice require."

394 U.S. at 290 (emphasis added; citation omitted). Thus, Allen may not utilize postconviction discovery as a means to meet his initial burden of establishing a *prima facie* claim. Rather, he must assert facts constituting a *prima facie* claim

111

*before* a federal habeas court may properly grant discovery.   Moreover, Allen's factual allegations must be specific, rather than conclusory or speculative, in order to warrant discovery under Habeas Rule 6. *West v. Johnson,* 92 F.3d 1385, 1399-1400 (5th Cir. 1996) (citing *Ward,* 21 F.3d at 1367); *Montoya v. Scott,* 65 F.3d 405, 417 (5th Cir. 1995); *East v. Scott,* 55 F.3d 996, 1005 (5th Cir. 1995). For the reasons discussed in this answer, Allen fails to present a *prima facie* claim for relief.

Furthermore, Allen's generic request to use discovery "to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondent's Answer," Petition at 77, as well as his request for leave to further amend his petition "to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery," Petition at 77-78, is simply an impermissible fishing expedition.   Rule 6 permits the district court to order discovery on good cause shown, but does not authorize "fishing expeditions." *Ward,* 21 F.3d at 1367; *Lave*, 416 F.3d at 380 ("A habeas petitioner may 'invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.'") (citing *Rector v. Johnson,* 120 F.3d 551, 562 (5th Cir. 1997)); *East,* 55 F.3d at 1005 (holding petitioner's

112

conclusory allegations that discovery might uncover evidence supporting claim insufficient to obtain discovery). Allen identifies no specific evidence he wishes to discover or how it will affect his various claims. He seeks only the opportunity to "explore [his] case in search of its existence." *Ward,* 21 F.3d at 1367. Therefore, discovery should not be permitted.

Finally, discovery on the Issue V is impermissible for another reason—Allen has procedurally defaulted the claim. Discovery is allowed only when there is a showing of "good cause." Rule 6(a). Even if the facts were fully developed, he would still not be entitled to relief from this Court because he cannot overcome the procedural default of this claim. For this reason, Allen cannot show good cause for discovery. *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009) ("As Rucker's federal claim is procedurally barred because it was not raised in the state courts, he cannot satisfy [good cause]."). Discovery should therefore not be granted.

### C.    This Court should deny Allen's request to expand the record.

The Director opposes any expansion of the record in these federal habeas corpus proceedings. As argued in the previous sections, for the claims adjudicated on the merits by a state court, a federal habeas petition must overcome the limitation of §2254(d)(1) on the record that was before the state court." 131 S. Ct. at 1400. Because four of these claims were adjudicated on the

merits by the state habeas court, this Court is foreclosed from considering new evidence when reviewing the state court's rejection of his claims. And because Allen cannot meet an exception to § 2254(d), this Court may not grant an evidentiary hearing, discovery, or receive new evidence. By this logic, the Court is also foreclosed from expanding the record. Similarly, because he procedurally defaulted Issue V, and cannot show cause of the default, this Court should not permit expansion of the record with any related evidence.

While Rule 7 grants this Court the discretion to expand the record, AEDPA places strict limitations on a court's ability to do so. This Court's discretion to grant an evidentiary hearing or expand the record, as allowed under the Rules Governing § 2254 Cases, is still constricted by § 2254(d)(1) and (e)(2), and Allen must first clear the AEDPA "hurdle" before this Court can exercise its discretion. As stated by the Fifth Circuit regarding evidentiary hearings:

> Consistent with AEDPA's goal of streamlining the habeas process, § 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required. Thus, if a petitioner seeking a hearing clears this initial hurdle, he must still persuade the district court. *This subsequent determination is committed to the district court's discretion pursuant to Rule 8 of the Rules Governing § 2254 Cases.*

*McDonald v. Johnson*, 139 F.3d 1056, 1059-60 (5th Cir. 1998) (emphasis added). The Supreme Court holds that the same restrictions of § 2254(e)(2) apply when

114

a petitioner seeks to expand the record without an evidentiary hearing. *Holland,* 542 U.S. at 652-53; *see also Thompson v. Quarterman,* 629 F. Supp. 2d 665, 672-73 (S.D. Tex. 2007) (district court denied motion to expand the record because petitioner failed to demonstrate specific factual dispute that would entitle him to relief). Therefore, even if claims were *not* adjudicated on the merits in state court, *see* § 2254(d), a federal court's discretion to consider new evidence is still restricted by § 2254(e)(2). *See Pinholster*, 131 S. Ct. at 1401.

Because four of Allen's five claims were adjudicated on the merits in the state court, any expansion of this record is foreclosed by his failure to overcome § 2254(d). And, Allen also fails to demonstrate that he meets the requirements of § 2254(e)(2), thereby allowing this Court to exercise its discretion in deciding whether to grant a hearing. Therefore, expansion of the record is foreclosed by AEDPA, and the Supreme Court's decision in *Pinholster.*

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Allen's federal petition for writ of habeas corpus be denied with prejudice on the merits; that the Court deny his requests for discovery, an evidentiary hearing and to expand the record; and that no certificate of appealability issue with regard to any of the claims raised therein.

Respectfully submitted,


GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

s/ Tomee M. Heining

*TOMEE M. HEINING

*Attorney in charge      Assistant Attorney General
Texas Bar No. 24007052
Southern District Admission No. 25024
Office of the Attorney General
Postconviction Litigation Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone: (512) 936-1600
Telecopier: (512) 320-8132

ATTORNEYS FOR RESPONDENT

116

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2012, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who has consented in writing to accept this Notice as service of this document by electronic means: Seth Kretzer and Jonathan Landers.

s/ Tomee M. Heining
_____
TOMEE M. HEINING
Postconviction Litigation Division

117