UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KERRY DIMART ALLEN,      §
       Petitioner,      §
                  §
VS.                     §     CIVIL ACTION NO. H-11-1676
                  §
WILLIAM STEPHENS,      §
Director, Texas Department of    §
Criminal Justice, Correctional    §
Institutions Division,       §
       Respondent.      §

**MEMORANDUM AND ORDER**

Kerry Dimart Allen, an inmate incarcerated on Texas' death row, has filed a federal petition for a writ of habeas corpus. The issue before the Court is whether Allen has shown an entitlement to relief under federal law. Having considered the record, the pleadings, and the law, the Court denies Allen's federal habeas petition. The Court will not certify any issue for appellate review.

## I.    Background

The State of Texas charged Allen with capital murder for intentionally and knowingly causing the death of two-year-old Kienna Lashay Baker. Clerk's Record at 2. The State's trial evidence showed that forty-year-old Allen had lived with twenty-three-year-old Kimberly Renee Jones and her four children, including the victim, for six months prior to the murder. Allen, who told Ms. Jones that he was an evangelist preacher, was unemployed. Allen watched Ms. Jones' children while she worked. Ms. Jones did not know that Allen had an extensive history of sexual and violent offenses.

Allen harshly disciplined Ms. Jones' children. The victim did not like being around Allen and would "shrivel up" whenever she saw him. Tr. Vol. 22 at 99. The children soon became

malnourished, sullen, and afraid.

On May 10, 2000, Allen called Ms. Jones' workplace and told her to come home because of an emergency. Allen met her in the parking lot of their apartment, saying: "I didn't do anything to her." Allen said that the victim fell from the toilet after he spanked her for wetting herself. Ms. Jones rushed to the apartment. The victim lay in a bedroom wearing only a pair of boy's underwear. Foam oozed from her mouth and nose. Her heart was not beating. An open jar of Vaseline nearby the toddler made Ms. Jones suspect that Allen had committed a sexual assault.

Ms. Jones wanted to get medical assistance for her daughter. Allen repeatedly ordered her not to call 9-1-1, insisting that he needed to "get away." Ms. Jones finally called for help. When emergency personnel arrived, Allen was hiding behind a locked bedroom door. He fled through a window before the police kicked down the door. The police found two Bibles lying on the couch, both open to a passage about Jesus raising a girl from the dead.

Efforts to revive the victim were unsuccessful. An autopsy revealed that she had died from blunt force trauma to her chest and abdomen. Multiple blows – the force of which was similar to that seen in automobile accidents – had bruised her lungs, injured her kidneys, and fractured her liver. The autopsy suggested that she had been anally raped after being beaten, a factor that contributed to her death. The medical examiner concluded that the final injuries were only the last in a long series of assaults. Fifty-six scars, in various degrees of healing, covered the victim's body.

Two days after the murder Allen turned himself into the police. Allen claimed that the victim's death was an accident, but also said: "I should never have done it. My temper gets control." Tr. Vol. 24 at 166.

Allen's trial attorneys (R.P. "Skip" Cornelius and Alvin Nunnery) did not call any witnesses

2

in the guilt/innocence phase of trial.  In closing arguments, the defense disputed that Allen had sexually assaulted the victim and argued that the evidence insufficiently pointed to him as the killer. The jury found Allen guilty of capital murder.

The jury decided Allen's fate by answering two special issue questions in a separate punishment hearing: (1) would Allen be a future danger and (2) did sufficient evidence mitigate against a death sentence?  Clerk's Record at 575.  The State presented evidence and argument to show that Allen deserved a death sentence.  According to trial testimony, years earlier Allen pleaded guilty to two counts of felony sexual assault in Harris County.  A court revoked his probated sentence for that crime when he failed to report to officers, did not participate in a sex offender program, and failed to pay fines.  Within three months of his release from that incarceration he violated the terms of his parole.  Allen then absconded to Louisiana.  Nine years later, Allen was again arrested and required to serve the remainder of his Texas sentence.  Allen was subsequently negligent in updating his sex-offender status.  The terms of his release required him to avoid children, a condition he violated.

Allen's first wife – who he had secretly dated while she was still a minor – testified that Allen was a liar, did not work, and was abusive.  Allen had been convicted for a misdemeanor assault against her.  Allen's first wife suspected that he had sexually abused the children of a family with whom they had lived.  While married, Allen had an intimate relationship with a pre-teen girl at the church where he had served as a youth minister.  Allen's second wife testified that he was controlling, jealous, and angry.  Allen violently abused her and was convicted of assaulting her. Another woman testified that Allen had sexually abused her two children.  Police officers also gave detailed testimony about the neglected and abused condition of Ms. Jones' children.  The State also

emphasized that the murder resulted from Allen's cruel assault on a defenseless child.

Trial counsel presented significant evidence to humanize Allen. Taken as a whole, the evidence showed that Allen claimed to have been the victim of child sexual abuse at the hands of several men, many of whom were relatives. As a result, Allen had poor coping mechanisms, low self esteem, and poor life skills, which especially came to the surface when he found himself in a stressful situation. He attempted suicide several times. Individuals who knew Allen testified that he was likeable, bright, trustworthy, and interested in religion. A clinical psychologist testified that Allen would present a low risk of committing future acts of violence.

The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence on May 5, 2001.

Appellate counsel Allen C. Isbell raised thirteen claims on the direct appeal from Allen's conviction and sentence. On June 11, 2003, the Texas Court of Criminal Appeals affirmed. *Allen v. State*, 108 S.W.3d 281 (Tex. Crim. App. 2003). The United States Supreme Court denied Allen's petition for a writ of certiorari. *Allen v. Texas*, 540 U.S. 1185 (2004).

During the pendency of direct review, Allen filed a state application for a writ of habeas corpus through appointed counsel, Steve Morris. In 2003, state habeas counsel submitted a 356-page long application raising thirty-seven grounds for relief. The state habeas court signed an initial set of habeas conclusions and findings. State Habeas Record at 887. When Mr. Morris accepted a position with the Harris County District Attorney's Office, Danny Easterling replaced him as counsel of record. The state habeas court then rescinded its earlier findings and avoided a conflict of interest by allowing the Texas Attorney General's Office to litigate against Allen *pro tem*.

On February 17, 2010, the state habeas court entered a new recommendation that the Court

4

of Criminal Appeals deny Allen's state habeas application.  State Habeas Record at 894-929.  On

April 28, 2010, the Court of Criminal Appeals adopted the recommendation and denied habeas relief.

*Ex parte Allen*, 2010 WL 1709947 (Tex. Crim. App. 2010) (unpublished).

Federal review followed.  This Court appointed counsel to represent Allen throughout the

federal habeas process.  Allen filed a federal petition for a writ of habeas corpus and later amended

his petition. (Docket Entry Nos. 1, 15).  Allen's amended petition raises the following grounds for

habeas relief:

1.   The Texas capital sentencing statute's failure to assign the prosecution a
     beyond-a-reasonable-doubt burden on the second special issue violates the
     Constitution.

2.   The disparate results of prosecutorial discretion across counties of differing
     resources unconstitutionally inserts arbitrariness into the death-penalty
     process.

3.   The Texas statute governing jury voting during the punishment phase violates
     the Eighth and Fourteenth Amendments.

4.   The state trial court violated Allen's right to an impartial jury and to due
     process by denying his challenge for cause against a prospective juror.

5.   Trial counsel provided ineffective assistance by failing to subpoena additional
     witnesses in the punishment phase.

Respondent has filed an answer arguing that procedural requirements and substantive law

preclude federal habeas relief. (Docket Entry No. 17).  Allen has filed a reply. (Docket Entry No.

23).  This case is ripe for adjudication.

## II.   Legal Standards

Federal habeas corpus review provides an important, but limited, examination of state

criminal judgments.  Because "state courts are the principal forum for asserting constitutional

5

challenges to state convictions," concerns for comity, federalism, and finality define the contours of federal habeas review. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 787 (2011); *see also Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Through the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") and traditional post-conviction jurisprudence, federal law limits both the scope and nature of federal habeas review.

Federal law sets procedural precursors to the adjudication of habeas claims. To avoid the "'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," the AEDPA requires inmates to raise their claims in the highest state court before federal relief becomes available. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (relying on 28 U.S.C. 2254(b)(1)). Even when an inmate exhausts state remedies, *how* he has exhausted them determines the availability of federal review. The procedural-default doctrine, which functions as a "[a] corollary to the habeas statute's exhaustion requirement," *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004), precludes federal habeas review when "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012); *see also Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, the AEDPA affords great deference to the state court judgment. The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, ___ U.S. at ___, 131 S. Ct. at 784. Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's

adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002). Similarly, federal courts afford significant deference to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2).

Traditional habeas law complements the AEDPA standards. Under *Teague v. Lane*, 489 U.S. 288 (1989), federal habeas courts cannot create new constitutional law. *See Horn v. Banks*, 536 U.S. 266, 272 (2002). Also, any trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson v. Cain*, 324 F.3d 297, 304 (5th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)).

With those standards in mind, the Court turns to Allen's federal claims.

## III.   Analysis

### A.   Constitutionality of Texas' Capital Sentencing Statute (claim one)

Allen's first federal claim argues that Texas' capital sentencing statute violates the Sixth, Eighth, and Fourteenth Amendments as understood by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

*Id.* at 490; *see also Ring v. Arizona*, 536 U.S. 584 (2002) (extending the *Apprendi* holding to capital cases).  Capital inmates have relied on *Apprendi* to make repeated challenges to Texas' capital sentencing statute (TEX. CODE CRIM. PRO. art. 37.071).  To date, the federal courts have rejected each argument.

Allen raises a novel attack on Texas law.  Before turning to Allen's specific complaints, however, the Court will briefly review the structure of Texas' capital sentencing procedure.  Under Supreme Court jurisprudence, a capital sentencing process must contain two elements: "the eligibility decision and the selection decision."  *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).  "To render a defendant eligible for the death penalty in a homicide case, [the Supreme Court has] indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."  *Id.* at 971-72.  In Texas, jurors make the eligibility decision in the guilt/innocence phase by finding that the defendant killed under one of several specifically defined circumstances.  *See* TEXAS PENAL CODE § 19.03; *Lowenfield v. Phelps*, 484 U.S. 231, 246-47 (1988); *Jurek v. Texas*, 428 U.S. 262, 270-71 (1976); *Adams v. Thaler*, 421 F. App'x 322, 337 (5th Cir. 2011).  Here, the jury instructions required the prosecution to prove Allen's guilt of a capital offense beyond a reasonable doubt.  Clerk's Record at 553.  Once the jury found Allen guilty, he was eligible for a death sentence.

The jury's consideration of special issue questions in the punishment phase fulfilled the constitutionally required selection decision.  *See Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007).  In this case, the special issues required the jury to find (1) "beyond a reasonable doubt" whether Allen "would commit criminal acts of violence that would constitute a continuing threat to society" and (2) whether "a sufficient mitigating circumstance or circumstances . . . warrant that a

8

sentence of life imprisonment without parole rather than a death sentence be imposed." Clerk's Record at 575; *see* TEX. CODE CRIM. PRO. art. 37.071, § 2(b)(1).

Inmates have repeatedly challenged both special issues under *Apprendi*, arguing that the State should prove any factor authorizing a death sentence beyond a reasonable doubt. However, *Apprendi* only imposed a reasonable-doubt requirement on the eligibility decision, which in Texas is the guilt/innocence phase. *See Turner*, 481 F.3d at 330 (finding *Apprendi* jurisprudence "inapposite to any discussion of the constitutional requirements of the selection phase"). Thus, the Fifth Circuit has held that the Constitution does not impose a beyond-a-reasonable-doubt standard on Texas' selection phase use of the special issue questions. *See id.*

In particular, the Fifth Circuit has repeatedly rejected the argument that the prosecution bears a burden to disprove the existence of mitigating factors beyond a reasonable doubt. *See Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011); *Druery v. Thaler*, 647 F.3d 535, 546-47 (5th Cir. 2011); *Adams*, 421 F. App'x at 334; *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370, 376-78 (5th Cir. 2005). Because "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof," *Rowell*, 398 F.3d at 378, granting relief on a capital petitioner's *Apprendi* claim would require the creation of new constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989).

Allen's first habeas claim, however, presents a novel approach to the *Apprendi* challenges to Texas' mitigation special issue. Rather than seeking to impose a burden on the prosecution to disprove mitigating circumstances, Allen focuses on the fact that the mitigation special issue's expansive review allows jurors to review all trial evidence, "not just evidence a juror might consider to be mitigating." *Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004); *see also*

9

*Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1989) (recognizing that "aggravating circumstances can be considered in connection with the mitigation special issue"). According to Allen, Texas should "requir[e] the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death." (Docket Entry No. 15 at 21).

Allen's *Apprendi* claim suffers from the same fundamental defects as those previously denied by the Fifth Circuit. Regardless of whether the second special issue allows consideration of aggravating factors along with the mitigating ones, the jury only reviews that question as part of its selection decision. The jury's answer to the mitigation special issue does not increase an inmate's authorized punishment, it only actualizes or prevents the imposition of that punishment. *See Granados*, 455 F.3d at 537. By the time the jurors considered the mitigation special issue, the State already "was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death." *Granados*, 455 F.3d at 536; *see also Adams*, 421 F. App'x at 334-35; *Rowell*, 398 F.3d at 378. Thus, the Court of Criminal Appeals correctly concluded that "the 'prescribed statutory maximum' for capital murder is fixed at death. Nothing the jury or judge decided during the punishment phase could have enhanced [Allen's] sentence beyond the prescribed range." *Allen*, 108 S.W.3d at 285.

Allens first claim fails because "*Apprendi* has no application to Texas's scheme of leaving open who has the burden of proof for the mitigation special issue." *Oliver v. Quarterman*, 254 F. App'x 381, 386 (5th Cir. 2007). The state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

**B.      Equal Protection in Capital Prosecutions in Texas (claim two)**

Allen's second claim argues that a lack of uniformity in prosecutorial discretion violates the Equal Protection Clause. Under Texas law, each county pays the court costs, attorney fees, and investigative fees for indigent defendants facing a capital-murder charge. *See* TEX. CODE CRIM. PRO. art. 26.052. A county district attorney's office also commits itself to significant expenses when charging a capital crime. Allen cites studies estimating that, all told, each capital-murder case costs taxpayers around $2.3 million. (Docket Entry No. 15 at 29). Given this heavy expense, Allen postulates that an individual county factors its available resources into the calculus of prosecutorial discretion.

According to Allen, in capital prosecutions "[g]eography means everything. In smaller counties death penalty cases can ruin the county budget and exhaust personnel. Therefore, they are not prosecuted as death cases." (Docket Entry No. 15 at 29). "Unfortunately for [Allen], he was indicted for the offense of capital murder in Harris County, Texas." (Docket Entry No. 15 at 30). With its larger budget, Allen argues that Harris County will charge crimes as capital offenses when smaller counties would not. Allen reasons that "[f]inancial constraints mean that similar capital murders committed by similarly situated defendants will be treated differently, solely because they were committed in different counties." (Docket Entry No. 15 at 29). Allen argues that Texas' administration of the death penalty is arbitrary and capricious under the Eighth and Fourteenth Amendment because financial considerations inform prosecutorial discretion.

Allen first raised this claim on direct appeal. Before then, the Court of Criminal Appeals had denied similar claims because inmates generally had not bolstered their arguments with "empirical data, case law, or other factual basis" to show inequity in prosecutorial discretion between counties. *Bell v. State*, 938 S.W.2d 35, 55 (Tex. Crim. App. 1996); *see also King v. State*, 953 S.W.2d 266,

11

274 (Tex. Crim. App. 1997).  To comply with the Court of Criminal Appeals' expectations, Allen relied on: (1) statistics from the Texas Department of Criminal Justice's website showing the number of offenders sentenced to death and executed from each county; (2) a press release from a Texas state senator stating that capital prosecutions cost taxpayers an average of $2.3 million and that "[r]ural counties cannot always afford to try a death penalty case"; and (3) two newspaper articles describing the financial constraints a capital murder case causes smaller counties. *Allen*, 108 S.W.3d at 286 (quotation omitted).

The Court of Criminal Appeals found that Allen had still provided insufficient information to prove selective prosecution, notably because he did not provide "budgetary data for each" Texas county. *Id.*  Financial concerns aside, the Court of Criminal Appeals rejected Allen's equal protection claim because "[t]he fact that Harris County, a large county with a large budget, sentences more offenders to death than any other county in Texas, does not in and of itself establish disparate treatment among similarly situated defendants." *Id.*  In fact, one of the newspaper articles that Allen relied on noted that "the 'history of ample budgets' is only one of several factors that contribute to the higher number of death penalty convictions in Harris County." *Id.* (citations omitted).  With "no threshold showing of disparate treatment between himself and other similarly situated defendants," the Court of Criminal Appeals denied Allen's claim. *Id.* at 287.  Allen must show that the state court's rejection was contrary to, or an unreasonable application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

Constitutional law, particularly in the jurisprudence flowing from *Gregg v. Georgia*, 428 U.S. 153 (1976) and *Furman v. Georgia*, 408 U.S. 238 (1972), emphasizes "eliminating total arbitrariness and capriciousness in" imposing the death penalty. *Proffitt v. Florida*, 428 U.S. 242, 258 (1976).

12

The Constitution, however, does not mandate complete uniformity throughout the entire death penalty process. Discretion permeates capital punishment at various stages: "the prosecutor's decision whether to charge a capital offense in the first place, his decision whether to accept a plea to a lesser offense, the jury's consideration of lesser included offenses, and, after conviction and unsuccessful appeal, the Executive's decision whether to commute a death sentence." *Id.* at 254. With regard to the prosecutor's initiation of the capital process, the existence of discretion alone does not "render[] the capital sentences imposed arbitrary and capricious." *McCleskey v. Kemp*, 481 U.S. 279, 307 (1987) (quoting *Gregg*, 428 U.S. at 199); *see also Spinkellink v. Wainwright*, 578 F.2d 582, 608 (5th Cir. 1978); *Proffitt*, 428 U.S. at 254. The Constitution only limits prosecutorial discretion in charging capital crimes when "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[.]" *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotations omitted); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).

The Supreme Court has not held that financial considerations made by state entities with limited resources trigger equal-protection concerns. Other courts have traditionally included "the amount of resources required to convict a defendant" and "the extent of prosecutorial resources" as "legitimate prosecutorial factors that would justify" the use of discretion. *United States v. Lightly*, 616 F.3d 321, 370 (4th Cir. 2010); *see also Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004) (noting "the optimal deployment of prosecutorial resources" among the permissible "host of variables" in deciding to prosecute). Constitutionally prohibited arbitrariness does not occur merely because "[t]he capability of the responsible law enforcement agency can vary widely." *McCleskey*, 481 U.S. at 307 n.28. As the Fifth Circuit has observed in another context, the Constitution does not prohibit

13

"simply failing to prosecute all known lawbreakers, whether because of ineptitude or (more commonly) because of lack of adequate resources. The resulting pattern of nonenforcement may be random, or an effort may be made to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers, but in either case the result is that people who are equally guilty of crimes or other violations receive unequal treatment, with some being punished and others getting off scot-free. That form of selective prosecution, although it involves dramatically unequal legal treatment, has no standing in equal protection law."

*Parude v. City of Natchez*, 72 F. App'x 102, 105 (5th Cir. 2003) (quoting *Esmail v. Macrane*, 53 F.3d 176, 178-79 (7th Cir. 1995)). Allen has not pointed to any case in which prosecutorial discretion exercised across jurisdictions, and specifically across different counties, violates the Equal Protection Clause.

Moreover, Allen has not shown that financial concerns factored into the State's choice to prosecute his as a capital crime. S*ee Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999) (requiring "a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully."). Allen's crime facially fit the statutory requirements for capital murder. Nothing suggests that the prosecutor in this case considered anything other than the severity of the crime in deciding the severity of the punishment to seek. Allen can only speculate that the availability of resources in Harris County made his a capital prosecution, and that another county would have sought a lesser penalty.

Allen has not shown that the calculus of prosecutorial discretion in counties facing smaller budgets renders his own death sentence unconstitutional. The state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## C.   Texas' "12-10" Rule (claim three)

Allen argues that the trial court's punishment-phase instructions confused the jury and made

14

a death sentence more likely. The trial court's instructions said that any answer to Texas's special issues which could result in Allen receiving a death sentence must be unanimous, but that ten or more jurors would have to agree to any answer supporting a life sentence. Clerk's Record at 568. The trial court fashioned those instructions after TEX. CODE CRIM. PRO. art. 37.071, commonly called either the "12-10" or "10-12" Rule. *See Resendiz v. State*, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003); *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

Here, when jurors expressed some confusion over the 12-10 Rule, the trial judge directed them to the trial court's charge. Tr. Vol. 28 at 77. Allen argues that the trial court should have instead instructed the jury that, should any juror refuse to answer the special issues in unanimity with the others, he would receive a life sentence. At the time of trial, TEX. CODE CRIM. PRO. art. 37.071(g) prohibited the parties and the trial court from providing the jury with that information. Allen claims this confusing sentencing process violates *Mills v. Maryland*, 486 U.S. 367 (1988) by not explaining the effect of a single juror's "no" answer to the mitigation special issue.

In *Mills*, the Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating *factors* not found unanimously." *Beard v. Banks*, 542 U.S. 406, 408 (2004) (emphasis added); *see also Smith v. Spisak*, 558 U.S. 139, 148 (2010); *McKoy v. North Carolina*, 494 U.S. 433, 439-440 (1990); *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011). Because the Constitution mandates that jurors be able to consider mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Mills* prohibits sentencing instructions which preclude jurors "from considering any mitigating evidence unless all 12 jurors agreed on *the existence of a particular such circumstance.*" *Mills*, 486 U.S. at 384 (emphasis added).

Allen reasons that the 12-10 rule in practice "affirmatively mislead[s] jurors into believing

that their independent belief that a life sentence is proper is irrelevant unless nine other jurors agree with them." (Docket Entry No. 15 at 41). In other words, an individual juror may not feel that they can act on "mitigating evidence they believe calls for a life sentence unless they can get nine other jurors to agree with them." (Docket Entry No. 15 at 41). "Thus, there is a substantial possibility that one or more of the petitioner's jurors might have been precluded from granting mercy because of their mistaken belief that sufficient mitigating factors had to be found by ten or more jurors." (Docket Entry No. 15 at 43).

The Fifth Circuit has repeatedly held that Texas' 12-10 Rule does not run afoul of *Mills*. *See Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Parr v. Thaler*, 481 F. App'x 872, 878(5th Cir. 2012); *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011); *Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir. 2010). The Fifth Circuit holds that "the instruction at issue is wholly dissimilar to that involved in *Mills*," *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996), because "all jurors can take into account any mitigating circumstance." *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994); *see also Spisak*, 558 U.S. at 147-48 (distinguishing between instructions requiring unanimity in an ultimate finding of mitigating circumstances from unanimity in finding the existence of a particular circumstance). Unlike in *Mills*, "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously." *Spisak*, 558 U.S. at 148. In fact, the instructions explicitly told jurors that they "need not agree on what particular evidence supports an affirmative finding on Special Issue No. 2." Clerk's Record at 568. Given that *Mills* does not condemn sentencing instructions such as those given in this case, granting habeas relief would require the creation of new constitutional law in violation of the non-retroactivity principle from *Teague v. Lane*. *See Druery*, 647 F.3d at 542–45 (citing numerous Fifth Circuit cases).

16

Allen tries to distinguish the Fifth Circuit law by arguing that prior cases only considered the effect of the 12-10 rule on capital sentences arising before the Texas legislature adopted a new, more-comprehensive mitigation special issue in 1991. (Docket Entry No. 23 at 11-16). The Fifth Circuit, however, has rejected challenges to the 12-10 rule in cases arising well after the 1991 statutory revision. *See Reed*, 739 F.3d at 779; *Parr*, 481 F. App'x at 878; *Blue*, 665 F.3d at 662-63. Accordingly, Allen's 12-10 rule claim is both *Teague*-barred and without merit. The state court's rejection of this claim, therefore, was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### D.    Denial of Challenge for Cause to One Prospective Juror (claim four)

Allen claims that the trial court violated his Sixth and Fourteenth Amendment rights by denying his motion to strike prospective juror Gordon Arthur Berg for cause. Allen argues that, because he had to use a peremptory strike to remove Mr. Berg, he later ran out of challenges. Allen says that if he had additional strikes he would have removed a juror who he considers to have been biased. Allen must show that he did not receive "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

#### 1.    Background

Jury selection in this case proceeded in two stages. Questioning by the parties first qualified a pool of prospective jurors. At that time, the parties could challenge any allegedly biased potential juror for cause. Allen asked the trial court to remove Mr. Berg, the fourth potential juror questioned, because "[h]e could not fairly consider the evidence in the case" and "his feelings toward mitigation [evidence] substantially impair[ed] his ability to carry out his performance as a juror[.]" Tr. Vol. 5 at 82-83. The trial court denied Allen's motion. Tr. Vol. 5 at 82-83.

After the parties had questioned all potential jurors and made for-cause challenges, the trial court held a separate hearing for the parties to use their peremptory strikes. Each side started with fifteen peremptory challenges. Before the parties began exercising their strikes, the defense requested four additional challenges. Trial counsel argued that the defense lacked sufficient strikes because the trial court should have removed three prospective jurors (including Mr. Berg) for cause. Tr. Vol. 21 at 4-5. Because Texas case law authorizes additional peremptory challenges only after the defense expends their original allotment, *see Cooks v. State*, 844 S.W.2d 697, 717 (Tex. Crim. App. 1992), the trial court deferred ruling on that request until they "g[o]t to that point." Tr. Vol. 21 at 6.

As the trial court presented the name of each potential juror to the parties, the State first elected to accept the prospective juror or use a peremptory challenge. If the State accepted, the defense could then use their challenges. When the State accepted Mr. Berg, the defense exercised a peremptory strike "because the court [had] overruled [their] challenge for cause." Tr. Vol. 21 at 27. Allen then immediately requested an extra strike, though the defense still had not exhausted all its peremptory challenges. Tr. Vol. 21 at 27. The trial court stated: "That was denied." Tr. Vol. 21 at 27.

After the defense had expended all its strikes, the State accepted Linda Smith Schultz (also referred to in the record as Linda Smith) as the final juror. Tr. Vol. 21 at 31. Without any additional comment, trial counsel stated: "Defense accepts but we don't have any more strikes." Tr. Vol. 21 at 32. Trial counsel, however, did not request any additional strikes at that point.

### 2. *Waiver of Claims on State Review*

On direct appeal, Allen argued that the trial court violated his right to an impartial jury by

18

not removing Mr. Berg for cause. The State, however, countered that Allen had not preserved the issue for appellate review. The Court of Criminal Appeals found that Allen had waived any claim relating to jury selection:

> To preserve error with respect to a trial court's denial of a challenge for cause, an appellant must: (1) assert a clear and specific challenge for cause; (2) use a peremptory strike on the complained-of veniremember; (3) exhaust his peremptory strikes; (4) request additional peremptory strikes; (5) identify an objectionable juror; and (6) claim that he would have struck the objectionable juror with a peremptory strike if he had one to use. *Nelson v. State*, 848 S.W.2d 126, 134 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 830, 114 S. Ct. 100, 126 L. Ed.2d 66 (1993). The record in this case shows that [Allen] asserted a clear and specific challenge for cause against Berg, that he exercised a peremptory strike against Berg, and that he exhausted his peremptory strikes.
>
> [Allen] failed to meet the fifth and sixth requirements to preserve error. In his appellate brief, appellant identifies Linda Smith Schultz as the objectionable juror that sat on the jury. However, because he failed to identify [Schultz] as objectionable in the trial court, he waived his right to complain on appeal that the trial judge erroneously overruled his challenge for cause. *Ibid.*

*Allen*, 108 S.W.3d at 282-83 (footnote omitted). The state courts reached a similar result when Allen raised this claim on state habeas review. State Habeas Record at 919. The state courts alternatively found that the trial judge did not abuse his discretion in denying the challenge for cause against Mr. Berg. State Habeas Record at 920.

### 3.    *Mr. Berg*

On federal review, Allen renews his argument that the trial court should have removed Mr. Berg for cause. No constitutional violation results from a defendant having to use a peremptory strike to remove objectionable jurors. The Supreme Court in *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988), held that because "peremptory challenges are not of constitutional dimension . . . the fact that the defendant had to use a peremptory challenge to achieve [an impartial jury] does not mean the

19

Sixth Amendment was violated." *Id.*; *see also United States v. Martinez–Salazar*, 528 U.S. 304, 317 (2000). Allen removed Mr. Berg "from the jury as effectively as if the trial court had excused him for cause." *Ross*, 487 U.S. at 86. Under *Ross*, this Court's focus "begins and ends" with a determination of whether those jurors who served possessed "views [that] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotation omitted); *see also Ross*, 487 U.S. at 88; *Martinez–Salazar*, 528 U.S. at 317; *United States v. Snarr*, 704 F.3d 368, 386-87 (5th Cir. 2013); *Jones v. Dretke*, 375 F.3d 352, 356 (5th Cir. 2004). This Court's review, therefore, focuses on whether any "member of the jury as finally composed was removable for cause[.]" *Rivera v. Illinois*, 556 U.S. 148, 158 (2009).

    *4.   Ms. Schultz*

Allen's federal petition identifies only one allegedly objectionable juror, Ms. Schultz, whose "answers during voir dire raised several grave concerns." (Docket Entry No. 15 at 67). On direct appeal, however, Allen conceded that trial counsel "did not articulate why he would have used a peremptory on [Ms. Schultz] and why she was not an acceptable juror." Appellant's Brief on Direct Appeal at 13. Because trial counsel never articulated why Ms. Schultz posed concern for the defense, the Court of Criminal Appeals could not evaluate why Allen considered her to be an objectionable juror. As Respondent observes, because "Allen did not even attempt to strike Schultz for cause or object to her inclusion in the jury pool after the completion of her voir dire," (Docket Entry No. 17 at 62), trial counsel did not develop a record regarding any problematic portions of her questioning.

Respondent now argues that Allen's default of that issue on state review prevents federal

relief. The Court of Criminal Appeals observed that Allen "waived his right to complain on appeal that the trial judge erroneously overruled his challenge for cause" because he did not lodge a specific objection to Ms. Schultz's impartiality in the trial court. *Allen*, 108 S.W.3d at 283. On federal review, Allen has not addressed the question of whether he preserved error with regard to the voir dire of Ms. Schultz. Allen's failure to make a contemporaneous objection to Ms. Schultz's ability to be impartial prevents federal habeas review.

Even if a procedural bar did not prevent federal review, the same failure to develop an adequate record precludes a determination that Ms. Schultz could not be impartial. Even though Allen says that Ms. Schultz as "an objectionable juror," (Docket Entry No. 23 at 19), an inmate must prove that the juror was "partial," that is, "properly subject to strikes for cause." *Nethery v. Collins*, 993 F.2d 1154, 1161 n.20 (5th Cir. 1993); *see also Rivera*, 556 U.S. at 158; *Martinez-Salazar*, 528 U.S. at 317. Texas law allows for the removal of a potential juror after a showing that "the juror has a bias or prejudice in favor of or against the defendant" or "has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely[.]" TEX. CRIM. PRO. art. 35.16(a)(9), (c)(2). Allen never moved to strike Ms. Schultz for cause during her initial questioning. Tr. Vol. 19 at 228. Allen never alerted the trial court to any disqualifying bias or prejudice, hampering subsequent review of the issue.

For the first time on direct appeal, Allen identified two areas in which he considered Ms. Schultz to be objectionable. First, Allen alleged that Ms. Schultz favored the death penalty. When questioned about her support of the death penalty, and asked to rank it on a scale from one to ten, Ms. Schultz responded that she would fall "between about a five and a seven." Tr. Vol. 19 at 217. Ms. Schultz indicated that she "believe[d] in the death penalty and thought it should be available for

21

serial murders," for "school murders," and for "where somebody has killed someone else in a horrible type way." Tr. Vol. 19 at 187-88. The examination of Ms. Schultz did not reveal any bias in favor of the death penalty that would open her to a valid challenge for cause. Ms. Schultz's answers did not show that she would "automatically vote for the death penalty in every case" or "fail in good faith to consider the evidence of aggravating and mitigating circumstances[.]" *Morgan*, 504 U.S. at 729. Ms. Schultz said she could consider the full range of punishment, would not decide Allen's sentence until she heard all the facts, would hold the State to its burden of proof, and could consider whether any mitigating evidence warranted a life sentence. Tr. Vol. 18 at 189-94, 200-02, 204, 223-24. Thus, Ms. Schultz was not a juror who had "already formed an opinion on the merits" and to whom "the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant[.]" *Morgan*, 504 U.S. at 729.

Second, and more troubling, Allen argued that Ms. Schultz held racial views that would subject her to dismissal for cause. The jury questionnaire asked, "Do you feel that one group of people is more dangerous than other groups, i.e., age group, ethnic group, racial group, sexual orientation groups, or other specific groups?" Tr. Vol. 19 at 211. Apparently, Ms. Schultz answered "yes" and wrote in "racial." When trial counsel asked her during her questioning to clarify what she meant, Ms. Schultz replied: "Blacks." Ms. Schultz explained: "[p]robably from the news . . . the group of people that seem to commit the most violent crimes from my point of view and what I hear are blacks." Tr. Vol. 19 at 211-12. Trial counsel, however, did not ask any more questions on that subject or clarify whether she could set aside her views.

Under Texas law, "[b]ias exists as a matter of law when a prospective juror . . . admits or demonstrates prejudice toward a racial or ethnic class of which the defendant is a member."

22

*Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).  The Supreme Court has recognized that "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence." *Turner v. Murray*, 476 U.S. 28, 35 (1986).  A "juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors" *Id.*

The trial questioning of Ms. Schultz, however, was not adequate to determine whether her views would prevent her from being an impartial juror.  Trial counsel did not contemporaneously argue that Ms. Schultz should be removed because of her racial views.  Had trial counsel challenged Ms. Schultz for cause, the State may or may not have rehabilitated her through additional questioning.  Ms. Schultz's answers to other questions, however, indicated that she could have an impartial mind and could consider the full range of punishment.  In particular, she indicated that she would hold the State to a beyond-a-reasonable-doubt burden on the future-dangerousness issue, possibly suggesting a predisposition to set aside any racial preconceptions.  Tr. Vol. 19 at 200-02. Notwithstanding any disconcerting answers Ms. Schultz gave, the trial record leaves only speculation about whether she was biased against Allen.

Trial counsel's failure to preserve an objection prevents judicial consideration of Ms. Schultz's ability to be impartial.  Moreover, Allen never alleged that failure amounts to constitutionally deficient performance.  Accordingly, Allen has not shown any constitutional error in the trial court's refusal to dismiss Mr. Berg.  This claim is denied.

### E.   Trial Counsel's Investigation and Presentation of Mitigating Evidence (claim five)

In his fifth claim, Allen argues that "trial counsel were ineffective for failing to subpoena witnesses who were key to the mitigation special issue." (Docket Entry No. 15 at 69).  According to Allen, trial counsel's investigation uncovered evidence of "the severe abuse suffered by [him] as a child," but "witnesses essential to the presentation of [that] mitigating evidence . . . were not subpoenaed to the trial." (Docket Entry No. 15 at 69).  Because Allen concedes that "[t]his claim was not raised in the state courts," Respondent argues that this Court cannot reach the merits. (Docket Entry No. 15 at 69).  The Court will examine the background of Allen's ineffective-assistance-of-counsel claim, address the procedural impediments to federal review, and then review the merits in the alternative.

#### 1.   Constitutional Obligations and the Defense's Case at Punishment

A capital defense attorney carries a heavy burden in preparing to defend against a death sentence. *See Florida v. Nixon*, 543 U.S. 175, 191 (2004).  Constitutional and professional standards guide trial counsel's search for circumstances that may militate for a life sentence.  Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be," an attorney must still employ "reasonable professional judgment" in defending against a death sentence.  *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003). Defense attorneys must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potential mitigating themes.  *See Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002).  In reviewing a trial attorney's efforts, courts use the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984), that asks whether "a defense

attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012); *Wiggins*, 539 U.S. at 520.

Allen's attorneys put a significant amount of mitigating evidence before the jury through expert and lay witnesses.  As the defense's first witness, trial counsel called Dr. Gilda Kessner, a clinical psychologist, who opined that death-sentenced inmates have low rates of violence in prison. Tr. Vol. 27 at 47.  Dr. Kessner also explained that, according to her actuarial review of the discrete circumstances in this case, Allen only posed a two to seven percent chance of committing criminally violent offenses in prison, a number smaller than that for most capital inmates.  Tr. Vol. 27 at 52, 136-37.  On cross-examination, however, the prosecution accentuated that Dr. Kessner based her opinion on statistical analysis, "not what Kerry Allen has done[.]"  Tr. vol. 27 at 154.

The defense called lay witnesses to humanize Allen in the jury's eyes.  Two of Allen's former pastors testified that Allen was bright, affable, and spiritual when younger.  Tr. Vol. 27 at 86, 103. Two friends testified that Allen was a loving, helpful, and religious person.  Tr. Vol. 27 at 115, 118-19, 134; Tr. Vol. 28 at 67-69.  Cross-examination, however, emphasized that the witnesses' recollection was inconsistent with the brutal crime that Allen had committed.

Trial counsel called Bettina Wright, a social worker, to tell the jury about the abuse Allen had suffered as a child.  The defense prepared Ms. Wright for trial by providing her with background material.  Ms. Wright interviewed Allen and some of his family members.  She also reviewed transcripts of interviews that the defense investigators had conducted with family members.  Tr. Vol. 28 at 23-24.  Based on her investigation, Ms. Wright testified that Allen "was a survivor of chronic sexual abuse during his childhood."  Tr. Vol. 28 at 6.

Ms. Wright's testimony provided the jury with disturbing insight to the abuse Allen suffered. She explained that "the abuse started at an early age and continued into adulthood." Tr. Vol. 28 at 7. "[T]here were numerous abusers. There was his brother, his uncle, a boyfriend, the brother of a boyfriend of his mother's, and strangers as well." Tr. Vol. 28 at 9. Ms. Wright provided specific details about the sexual assaults: "He was forced to masturbate his uncle. He was forced to perform oral sex on his uncle. His brother fondled him and masturbated on him, entered him anally. He was raped by a stranger in the park when he was a teenager. The list was pretty graphic and ongoing." Tr. Vol. 28 at 13. Ms. Wright explained that Allen told other people about the sexual abuse, though not all of them believed him. Tr. Vol. 28 at 55-56. Allen tried to tell his mother "that his brother was molesting him, [but] she didn't believe him and dismissed it and got angry at him and punished him for saying that about his brother." Tr. Vol. 28 at 15. Ms. Wright explained that Allen had also suffered other kinds of abuse: "he was rejected and emotionally neglected by his mother" because he was the product of a rape, "more so even than his twin sister was rejected." Tr. Vol. 28 at 14.

Ms. Wright described how Allen's troubled childhood contributed to his criminal adulthood. The pervasive abuse sent Allen "a message that he was unwanted very early in life[.] . . . That he was not safe. That he was not of value in the family." Tr. Vol. 28 at 12. Ms. Wright testified that childhood abuse left Allen with "very poor coping mechanisms, very low self esteem, very poor life skills in general" which made him "more likely to act out when things are very stressful in [his] life[.]" Tr. Vol. 28 at 16. The circumstances in which Allen found himself at the time of the offense – poor, caring for several children, and a victim of sexual abuse himself – created a stressful situation precipitating the murder. Tr. Vol. 28 at 17. Ms. Wright explained that victims of sexual assault are more likely to sexually assault children themselves. Tr. Vol. 28 at 17-18.

26

On cross-examination, the State put forth that Allen "never told anyone [in prison facilities] that he was sexually abused as a child" until "it became important to him so that he would get out of a death penalty." Tr. Vol. 28 at 55. Ms. Wright conceded that the allegations of abuse all came from Allen himself, which was unsurprising because sexual assaults are "very rarely witnessed." Tr. Vol. 28 at 56. Still, Ms. Wright testified that "[t]here were people who mentioned that he had told them about the abuse." Tr. Vol. 28 at 55. During closing argument, the prosecutor emphasized that the testimony about sexual assault only came from Allen, who had shown himself to be a liar. Tr. Vol. 29 at 49-50.

### 2.    Allen's Federal Habeas Claim

For the first time on federal review, Allen claims that trial counsel did not do enough to put information about childhood abuse before the jury. Allen bases this claim on an affidavit that federal habeas counsel secured from one of his trial investigators, Gerald Bierbaum. According to Mr. Bierbaum, trial counsel employed two investigators, himself and Lisa Milstein. Ms. Milstein "performed field interviews of witnesses while [he] reviewed records, interviewed the client, assisted in local interviews and drafted miscellaneous documents supporting the mitigation presentation." Mr. Bierbaum stated that Allen told him that he had suffered "seriatim sexual abuse as a child at the hands of older male members of the family." Also, "[t]hrough interviews of family members, neighbors and paramours, Ms. Milstein and [Mr. Bierbaum] discovered some testimony that supported the physical and sexual abuse Mr. Allen suffered during prior [sic] to his leaving home as a teenager." (Docket Entry No. 15, Appendix B, Declaration of Gerald Bierbaum.). Trial counsel provided Ms. Wright the information accumulated by the investigators.

Trial counsel did not subpoena any family members to verify that Allen had been abused.

27

Mr. Bierbaum explained:

> As the trial approached, we selected witnesses to testify. I recall that some of the selected witnesses refused to come to the trial in Houston after learning about the mitigating evidence to be presented. I recall this troubled the defense team greatly because their testimony would have verified the abuse that Mr. Allen revealed. I believe the team assumed these witnesses would cooperate because of their interviews. I believe that we did not have enough time to pursue out of state subpoenas when we found out the witnesses would not willingly appear.

(Docket Entry No. 15, Appendix B, Declaration of Gerald Bierbaum.). Allen claims that trial counsel provided deficient performance by not subpoenaing the reluctant family members to testify about the chronic abuse.

### 3.    Procedural Impediments to Federal Review

Allen never presented his *Strickland* claim to the state courts. The AEDPA precludes federal review over unexhausted claims for any purpose other than to deny their merits. *See* 28 U.S.C. § 2254(b)(1), (2). Notwithstanding the unexhaustion of remedies, Allen outlines two paths to adjudication of his *Strickland* claim. First, Allen asks the Court to stay his case pursuant to *Rhines v. Webber*, 544 U.S. 269 (2005) and allow him to file a new state habeas application. Second, Allen argues that recent developments in habeas law will allow him to overcome the procedural impediments to federal review. For the reasons outlined below, the Court finds that full federal review is unavailable on this claim.

### a.    Unavailability of successive state review

In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court adopted a stay-and-abeyance safety valve for the consideration of unexhausted claims, allowing for the development of meritorious claims while preserving the AEDPA's concern for finality and expediency. In his petition, Allen asked this Court to stay his case under *Rhines* to allow the filing of a successive state

habeas application. (Docket Entry No. 15 at 77).  The Texas courts, however, strictly enforce an abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5(a)) and generally prohibit the filing of successive habeas actions.  Allen now concedes that "sending the case back to the state court could prove futile."  (Docket Entry No. 32 at 8).  Because the Court of Criminal Appeals would not allow Allen to file a successive habeas application, staying this case under *Rhines* would only cause pointless delay of these proceedings.

b.      Exceptions to the procedural bar doctrine

The absence of a state habeas avenue of relief technically satisfies the exhaustion requirement for federal review.  *See Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).  Nevertheless, federal courts honor the independence of state procedural law.  The state procedural rule that forecloses state successive habeas actions also bars federal review under these circumstances.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1991); *Coleman*, 501 U.S. at 734 n.1; *Teague*, 489 U.S. at 297-98; *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (stating that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review" ).

An inmate may overcome a procedural bar if he can "demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*."  *Coleman*, 501 U.S. at 750 (emphasis added).  Allen argues that he can show cause and prejudice because his state habeas counsel failed to advance his *Strickland* claim.  In *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012), the Supreme Court recently found that ineffective assistance by a state habeas attorney may amount to cause under some circumstances.  *See also Trevino v. Thaler*, ___ U.S. ___, 133 S.

29

Ct. 1911 (2013) (applying *Martinez* to cases arising from Texas courts). To meet the cause exception under *Martinez*, an inmate must: (1) prove that his habeas attorney's representation fell below the standards established in *Strickland* and (2) show that his underlying ineffective-assistance claim "has some merit[.]" *Martinez*, ___ U.S. ___, 132 S. Ct. at 1318; *see also Crutsinger v. Stephens*, 540 F. App'x 310, 317 (5th Cir. 2013); *In re Sepulvado*, 707 F.3d 550, 556 n.12 (5th Cir. 2013).

Allen alleges that state habeas counsel was ineffective because he "spent no time investigating claims outside of the record." (Docket Entry No. 32 at 6). Allen points to records he has obtained showing that habeas counsel billed Harris County for only 228 hours in preparing and litigating Allen's state habeas application. Allen says that habeas counsel never met with him personally, did not review the trial attorneys' files, and never spoke with the trial investigators. Allen alleges that the lengthy state habeas application contained "little substance" and mostly "appears to have been copied and pasted from the state direct appeal[.]" (Docket Entry No. 32 at 6).

Notwithstanding his allegations against habeas counsel, federal review only becomes available after Allen makes a threshold showing that his underlying claim "has some merit[.]" *Martinez*, ___ U.S. ___, 132 S. Ct. at 1318. Allen has only made a passing effort to show that trial counsel erred in not subpoenaing out-of-state witnesses. Allen states that "[s]imply put, the mitigation investigation in this case was next to non-existent. This is incredibly alarming because . . . the trial counsels . . . had information showing that Mr. Allen was severely mentally and sexually abused by family members and strangers alike while growing up." (Docket Entry No. 32 at 3). Allen obviously understates trial counsel's investigation into mitigating evidence. Trial counsel not only had information about the abuse, but put information before the jury through Ms. Wright.

Allen's true complaint is that trial counsel did not paint a more fulsome or detailed picture of that abuse.

Yet Allen has not provided any specifics about what information trial counsel should have, but did not, put before jurors. Allen solely relies on Mr. Bierbaum's explanation that trial counsel should have subpoenaed uncooperative out-of-state witnesses. Allen does not provide any affidavit from uncalled witnesses. He does not give the names of any family members that trial counsel should have called or provide insight as to what their putative testimony would have been. Federal law requires specificity in complaints of uncalled witnesses. Recognizing that "the presentation of witnesses is generally a matter of trial strategy," the Fifth Circuit has often commented that "[c]laims that counsel failed to call witnesses are not favored on federal habeas review[.]" *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Because "allegations of what a witness would have stated are largely speculative," the Fifth Circuit requires an inmate to "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see also Turner v. Epps*, 412 F. App'x 696, 706 (5th Cir. 2011); *Hooks v. Thaler*, 394 F. App'x 79, 82-83 (5th Cir. 2010); *Woodfox*, 609 F.3d at 808. Allen provides nothing but speculation about testimony that unspecified family members could have provided.

Importantly, Allen's federal claim alleges that "had the jury heard about this abuse from someone *with firsthand knowledge* the jury would likely have found that this strong mitigation evidence called for a sentence of life in prison." (Docket Entry No. 15 at 76-77) (emphasis added). Ms. Wright's trial testimony indicated that firsthand accounts of abuse are exceptionally rare. Allen

makes no allegation that any family member witnessed the sexual abuse or that the perpetrators were willing to confess on the stand.

Allen argues that he "cannot properly present this claim to this Court without the ability to further investigate the factual basis of the claim and the opportunity to further present evidence to this Court." (Docket Entry No. 32 at 9). Allen asks the Court to authorize funds for an investigator to interview family members and others who could provide information about abuse in his background. Nevertheless, *Martinez* does not require the authorization for funds absent a concrete showing that an investigation would uncover admissible testimony that a reasonable attorney could and would have presented at trial. *See Crutsinger*, 540 F. App'x at 317 (observing that, even after *Martinez*, an inmate must "show a substantial need for funds when his claim is procedurally barred from review"). Allen has not provided the Court with any information that exceeds the evidence presented by trial counsel. In fact, Mr. Bierbaum's affidavit contains far less detail than Ms. Wright's testimony.

Allen did not give the state courts an opportunity to consider his *Strickland* claim. Because Allen has not supported his allegations with affidavits or other admissible evidence that a reasonably effective attorney would have put before the jury, he has not made a strong case of deficient representation by trial counsel, much less that habeas counsel should have raised the defaulted ineffective-assistance claim in his habeas application. Allen has not shown under *Martinez* that he can overcome the procedural bar.

### 4.     *Alternative Review of Merits*

For the same reasons that Allen has not shown cause and prejudice to overcome the procedural bar of his claims, he has not shown an entitlement to habeas relief. In particular, Allen's

pleadings fall short of proving *Strickland* prejudice. To show "actual prejudice," a petitioner "must establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008). Allen committed a brutal crime against an innocent, defenseless victim. Allen's assault of the victim was only the last event in an escalating pattern of neglecting, abusing, and sexually assaulting the little girl and her siblings. The heart-wrenching abuse Allen inflicted on his young victim would weigh heavily against any defense. The murder, however, was only the culminating event in a life full of sexual crime and violence. Allen had repeatedly committed sexual assaults against minors. He had eschewed opportunities to reform and had taken advantage of those who trusted him.

Despite the strong – almost overwhelming – evidence against his client, trial counsel presented a sympathetic case against a death sentence. Trial counsel called lay witnesses and expert witnesses to chronicle Allen's difficult background, including the abuse he suffered as a child. Allen only now speculates that additional witnesses would have provided "firsthand knowledge" about the abuse (Docket Entry No. 15 at 18), and thus prevented the prosecution from saying that Allen had lied about being abused. Allen complains that trial counsel did not corroborate the allegations of physical and sexual abuse; Allen has not done so either. As such, this Court can only speculate as to whether the jury could respond to any additional information about abuse differently than that they heard at trial. Even if the Court could reach the merits of the procedurally barred *Strickland* claim, Allen has not made a substantial showing that would entitle him to habeas relief.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless a district or circuit court

certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Allen has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte. See Alexander*, 211 F.3d at 898. The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Allen's claims. Because Allen has not shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Allen has not shown an entitlement to federal habeas relief. This Court **DENIES** Allen's petition and **DISMISSES** all Allen's claims **WITH PREJUDICE**. The Court will not issue a Certificate of Appealability.

The Clerk will provide copies of this Order to the parties.

Signed at Houston, Texas, on _____, 2014.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE